# 26-0341-cv

# United States Court of Appeals

*for the*

# Second Circuit

ENTESAR OSMAN KASHEF, TURJUMAN RAMADAN ADAM,
ABULGASIM SULEMAN ABDALLA,

*Plaintiffs-Appellees,*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## PAGE PROOF BRIEF FOR PLAINTIFFS-APPELLEES


MICHAEL D. HAUSFELD
MARY SAMEERA VAN HOUTEN HARPER
HAUSFELD LLP
1200 17th Street, NW, Suite 600
Washington, DC 20036
(202) 540-7200
-and-
ADAM J. LEVITT
DICELLO LEVITT LLP
10 North Dearborn Street, 6th Floor
Chicago, Illinois 60602
(312) 214-7900
-and-
SCOTT GILMORE
DICELLO LEVITT LLP
801 17th Street, NW, Suite 430
Washington, DC 20006
(202) 975-2288

KATHRYN LEE BOYD
DAVID L. HECHT
LORI G. FELDMAN
HECHT PARTNERS LLP
125 Park Avenue, 25th Floor
New York, New York 10017
(212) 851-6821
-and-
KRISTEN L. NELSON
HECHT PARTNERS LLP
6420 Wilshire Boulevard, 14th Floor
Los Angeles, California 90048
(212) 851-6821

*Attorneys for Plaintiffs-Appellees*



COUNSEL PRESS
A Proceed Service
The Appellate Experts®
(800) 4-APPEAL • (394537)

---

ALFADEL MOSABAL, ABUBAKAR ABAKAR, SIAMA ABDELNABI HAMAD, ABBO AHMED ABAKAR, HAWA MOHAMED OMAR, FATIMA ABDALLA ABDELRAHMAN, NYANRIAK TINGLOTH, REVEREND ANDERIA LUAL, NICOLAS HAKIM LUKUDU, JOHNMARK MAJUC, JOSEPH JOK, HALIMA SAMUEL KHALIFA, AMBROSE MARTIN ULAU, SANDI (SUNDAY) GEORGARI MARJAN, SHAFIKA G. HASSAN, JANE ROE, CLARA E. TABOR, SARA NOURELDIRZ ABDALLA, AMIR AHMED, ISAAC ALI, KUOL SHBUR, JUDY ROE, ESAMELDIN N. ABDELAZIZ, HAMDAN JUMA ABAKAR, ROSA BOL RING, ADIEL ABAKER ABDALLA, ARBAB KHAMIS KHATER, ISMAIL IDRIS ADAM, FATMA OMAR AHMED, HAWA ISMAIL, ADAM ABAKAR HISSEIN, ACHAN ACHOR DUMO, MONG PETER LAM, JACOB LOK GATKOUTH, MAHDI ALTIGANI ALNOUR, HAYDAR AHMED ABDALLA, MAHMOUD MOHAMED IBRAHIM, RABAB AHMED EL SAYED ADAM, HANADI ABAKER MOHAMED, AHMED JUMA AHMED, ATONG D DENG, ABDALLA MOHAMED IDRISS, MOHAMED OMER SALIH HASABO, OMAR BAHER SIBOURU, ADAM ABDELRAHMAN ISMAIL, ABDULMAJID A GAMAR, MUTAZ MOHAMED MAKI KOMI, GAFFAR HAMID ALI NOURELDEIN, NOHA GAFFER HAMID ALI, FATHIA YAGOUB ELNOUR BAKHAT, SADAM Y MOHAMED, KHALID SAYFELDIN KRAMELDIN, SALAH IBRAHIM AHMED, SOMIA ALI ALI, ABDELRAHMAN HASSAN AHMED, MOHAMED ADAM OSMAN MOHAMED, ELHADI HAROUN ADAM, YAHYA MUSA ABDALLA, ABDELRAHMAN OSMAN FADOUL, ABDELKARIM MOUSA OMAR, KUIER AGUER ATEMDENG, SAID ABOBAKAR AHMED ABDALA, ABDELRAZIQ MUSA HUSSEIN, MUSTAFA ALNOR, MOHAMED I ABOH, ALI OMER AMIR TAGAL, IBRAHIM FADL JUMAA, ABBAS KHAMIS HAROON, ZEINAB ABBU, YOUNES OMAR ADAM, IBRAHIM FADEL HUSSEIN, KALTHOUM ARBAB MUSA, MUSA S ADAM, ABDULATIF ISAAK, MARYAM BABO, BABIKER ABDALLA ISAAC, IBRAHIM ALNOR JUMA, ABOUD ISSA SALEH, OMER AMIR BAKHIT, NORELDIN ADAM OSMAN, EISA MOHAMED, IDRISS ADAM MOHAMED DAWOUD, ABDELAZIM ADAM AHMED ABDELMOULA, RAMADAN YAHAI HAROUN, ABDUSHAFAIE ABUBAKER AHMED, NAWAL ABAKR, MUSA MOHAMED AHMED, MUSTAFA ISAAC MOHAMMED, HAROUN MOHAMED IDRIS, ABDALLA OMER AMIR, HALEEMA HARSWON ABDALLA, ABDELGADIR MOHAMED ABBAKER, MUSA BABIKER ALI HUSSEIN, ABDELKARIM MOHAMED TOGOL B BAKHIT, MOHAMED ABDALLA MOHAMUD, HASSEN A MOHAMED ISMAEL ISMAEL, YAKOUB A YAKOUB, SALEH MOHAMED AHMED, YAGOUB OMER ELSHEIKH, SHADIA MOKHTAR HAMAD ABDELRHAMAN, ISMAIL ABBAS, MARIA ADAM SALIH, JAMES THON ALEER, MALUAL MANYOK DENG DUOT, AMIR SULEIMAN SHAWKAR, YOR CHOI YOR, MORWEL MATHIANG DENG, THON MAJAK DENG, ISHAG OTHMAN ADAM AHMED, SULEIMAN MOHAMED SALEH, JOSEPH AJEO MOILINGA, KRISTENA PETER RUFAEL, ELAF RUFAEL, NOURELDIN

MAHDI ABDALLA ELTOM, ARBAB ABDALLAH ADAM, MOUSTAPHA IBRAHIM MAHAMAT, SAMIA ARBAB ABDURHAMAN, HAMRA IBRAHIM FADOUL, DJOUMA ARBAB ADAM, MATAR MAKINE ABAKAR, YAKUB HAROUN ABDULMOLA, HALEIMA NASRALDEN ABDELMAWLA SHERF, YAHYA KHAMIS, ANWAR HAMED ELNOUR, HASSAN HADO IBRAHIM HASSAN, YOUNESS HASSAN, MOHAMED ADAM ABDALLAH, ABDU MOHAMED, AHMED ARGA BAKHIT, MOHAMMED DAUD ARBAB, ADAM BABKER IBRAHIM, MOHAMED ISHAG, ADAM ZAKARIA JUMA, MARIAM Y. YAKHOUB, SALIH MOHAMED EISSA, SAMIA ABDELRAHMAN, ABDELRAHMAN ADELKARIM, ADAM ABDALLAH BAKHAT, IDRIS ABDULRASUL ADEM, BUSH ZAKARIYA MOHAMMED, EHSSAN ALTAHIR SABIL, IBRAHIM MOHAMMED ADAM, MUBARAK OMAR WADI, JUMA SEIF SHAIBU, ABDELRAZIG ADAM DAHIYA, ABDULKARIM ALI IBRAHIM, AKUEIN AWAN KUETH, AMIRA EL DENG, HOUZAIFA AHMED, AISHA ADAM ABUBAKAR, NADIA YAKUB, DAVID MATTHEWS GERI-ORIMATEO, ZARA IBRAHIM MAHAMAT, ABDELRAHIM OSMAN BASHIR HASSAN, ADAM ABDELKARIM ADAM HAROUN, MUBARAK A. MOHAMED, MARY DENG, KALTUM JUMA ZACHARIA, MONA OSMAN ABDELRAHMAN HASSAN, SULEIMAN ABDALLA ISMAIL, LAILA IBRAHIM ABBAKER, MOHAMED IBRAHIM AHMED, RODA ABDALLA SULEIMAN, ZUHAL FADI, ABDELKARIM ADAM ADAM AHMED MUSA, ADAM AHMED ABUBAKAR, JOHN ALIER LEEK YEN, ABDULKARIM AZARAK AHMED, DAVID BUOTH, ABDELMONEIM MOHAMED KORSI, AKOL CITHEC MACAR AKOL, FATIMA M. ABDELLA, ABELWAHAB GUMAA, SHAMS ELDIN ADAM, ELNAKHEIL BASHA DARA, MICHAEL PETER ABA, MAYEN THON DENG AYUEL, IBRAHIMA ADAMOU, VIOLA PAUL, AHMED TOM ABDALLA SAIEED, YAIA ABAKAR ABRAHIM, VIOLA JOHN DIRI JOSEPH, RAMSEY RENBY SEBIT, AHMED SAIEED, ADAM MOHAMED IBRAHIM, ABBASS AWAD ADAM ALI, NUR AL HUDA ABUBAKAR, NYAKOACH PETER LAM, HEIDER ABULGASIM SULEIMAN, CLEMENT JOSEPH WANI MOJUS, ADIER M KUDUM AWEL KWAI, HATIM ABDALLA ADAM, ABDELGABAR MOHAMED MOHAMEDIAN, LUAL RIAK MARIER ADEIM, REBECCA NYAKOTA NYOACH, LAM THOT MUANG, SAMUEL MATHIONG REEC, TABESA AKON YUOL, GUOT KARLO KEN, ALI ABAKER HASSAN, BUOL MAYEN JOK, LEWIS ALFRED UTU BARUD, ADAM KHAMS ARBAB, MOHAMED ISSA SULIMAN ABDALLA, NYADUOP PETER LAM, NYABEL LAM THOT, MOHAMED ABBASHER MHDI, DENG DENG REYAK, ADAM HARI OMER ABU, GATLUAK PETER LAM, DENG YEL AKOL DENG, YUSSIF MOHAMMED SABIL, SALAH BAKHET BAKHET, NYBOL DENG REYAK, AHMED M ABKER, MUSA MOHAMED ARJA, MOUSSA BABIKIR ABAKAR, MAYSA OSMAN ARBAB, NOORELDIN OMER ALI, HAROON A BATI, ABDALLA SULIMAN ABAKAR, IZZELDIN SALEH AHMAD IBRAHIM, HAROUN HASSAN, DIYO JOK, IBRAHIM ADAM HASSAN, MAHASIN ELNOUR ADAM, ABDELMALIK HUSSEIN YAAKOUB, MOUSSA TEJEDDINE MOHAM AHMAD, RASHIDA HAMED AHMED BALLAH, ADAM JUMAA ARBAB, SOULEYMAN ABDELKERIM MAHAMAD, MICHAEL ADUUT PARENG, MARY JOHN DERY JOSEPH, NASRIN ANGLO MOHAMED,

ZAHRA MOUSSA, DIING RING DIING YOL, FLORA AVURU, RODA LOGA, SABIT BARAKENYI KUBARI, AMEER AJAK NYHAL, NASIR KABASHI NASIR, IBRAHIM BAKHAT, AHMED ADAM ARBAB, YOUSIF KHALIL SULIMAN, JOSEPH G GAMUNDE, ISMAIL ISAAK ADAM, MUNAZIR ABDULLAH BAKHIET, GABRIEL CHARLES RIAK, CHARITY LOWOH, AMNA MOHAMED HASSAN KHALIFA, SAMYA A. HARAN, JAMES KADIN, ABDALLAH OMAR IBRAHIM, ISHAG ADAM GUMA MOHAMED, ADAM YACOB HAMID, ZEINAB AHMED MUSA ABBAS, KAMAL ADAM ABDULRAHMAN, MOHAMMED DABIYO ADAM, BABIKER ISMAEL ABDAHMMLLAH ELNOUR, ESTER PETER BEYAL LUWAL, MAWADA IBRAHIM ALI BAKHAT, IBRAHIM A ALI, MALKA ADAM ARBAB, KALTOUM FADUL MUSTAFA, KHALID MOHAMED ALI, DUAL D LUAL, ADAM ABAKER ABDALLA, ABDLAZIZ ALI YAGOUB, TIMANE ISSA WAR, JAMES AYUEL REHAN, ISRAA IBRAHIM AHMED, SAMIA ABUBAKER ABDALLA MOHAMED, AHMAD ALI ASHEKH, ALSADK HASSAN ADAM, ABUBAKR ALDOUM ADAM MUSA, MANAHIL IBRAHIM ALI, SANTINO RIAK AKUEI AJAK, MOHAMED IBRAHIM KAMBAL, YOUNES SALEM OMAR, SUKRAH M ELDHAI, ISMAIL MOHAMED ABDELMULLA, ABUBAKAR ALI ZAKARIA, MAHAMAT IBRAHIM ARBAB, JAKLIEN FARAH, AHMED A ISAAK, ASMA M HUSSEIN, ELNOUR HAROUN BABIKER ALI ELRASHID, MONIKA MAKUER MAJOK DOMINIC, MAYOM RIAK MABOR, LORANS OUJIT LOUAL, ANESA SIMON AJEUTH, FANNE ABDELNABI, ABBAS KAMSOR IBRAHIM, YACUOB ADAM OUMAR, ABDALLAH MOHAMMED HASSABANABI, USMAN ARBAB SULAEMAN, NOEL JADA LAKO, JAFAR HARRY JUMMA HASAPALLH, KHALID KHATER MOHAMED ALI, ALSADIG J SABIL, NEHAL GIBREIL, MAWAHIB ABBO, MOHAMEDALMURTADA H ABDALLA, MUSA YAGOUB, YOUNIS MOHAMED MOHAMED, AMONAH ISMAEL, MAHMOUD HAMED ISSA, ABDULRAHMAN ABAKAR, TAGWA IBRAHIM YAHYA, MOHUSSIN ABAKAR, ABDULRASUL ADAM AHMED, AMAN MIHEMEED, YAHIA ADAM SHOGAR ATIA, MOHAMED ISMAIL YOUSIF, DAHIYA YACUB ADAM, MOHAMED AHMED MOHAMED, MALIK KHATAR MALIK, DOW HUSSIEN GASIM, ABDELAZIZ BAKHEIT, HABALDEEN ADAM HASSAN IDREES, YOSEF MOHAMED BAKHAT ABDALLA, ABDULRAHMAN ALNOUR GONGE, FATIMA TEGANI ALI, REMAZ ADAM, AHMED ALSADIG MOHAMED ABDELKARIM, MARIAM OMER KHAMIS, BUTHAINA A AHMED, MAGDI NOURALDIN YOUSF IBRAHIM, BUTRUS ALDO GWAKE LAZARUS, ANNA SERENO MODI, MARTHA AGUEK JOK, ADIL BASHAR ALI ADAM, SALAH MOHAMED KHATER AHMED, REBECCA ATHIENG DENG, YOUSIF MOHAMED, YAHYA ABDALLA JUMAA, ACHOL A AJAK, RHODA YAR ALIER, MOHAMMED KAMALELDIN HAMAH ALI, LUETH M YAK, ADAM ISMAIL MOHAMMED OMER, HAMADI YOUNIS AHMED ADAM, FADLALLA ADAM IBRAHEM MOHAMMED, YASIR RIZIG HASSAN, FATHIYA ABDELDAYIM, EMADALDEEN ALI SWAR BASHIR, MICHAEL M DUT, AMILIYA S DORI, ABDELRAZIG GUMA SULIMAN MOHAMED, NAMAT OSMAN YAGOUB, SALADIN AHMAT HAROUN, MUBARAK ABAKAR MOHMMED, ADAM YAHYA OMAR, SAFIYA AHMAT HAROUN, AWATIF IBRAHIM ISSA, MONIR AHMED ABDALLA, ADAM MOHAMED

ABDALLA AHMED, HASSAN ISSACK ABDALLA, DFAALLA BASHIR DFAALLA, MOAWIA ABDELRAHMAN I. ABOH, EBTESAM OSMAN, BASHIR D IDRISS, FAIZA SABIL MOHAMED, SAMUEL GUYA LOBURI, GAFAR IBRAHIM YAGOUB, NABEEL A KHAMIS, MUTASIM IBRAHIM ABDALLA MOHAMMED, MONICA H TIMON, MAGDI YAHIA YUNIS, IBRIS AMIN, KARIMA ABRAHIM, ALGEZAFEE MOHAMED HAMID HAMID, ZAINAB BABIKER ABDELMA HASSAN, ZAHARA MOHAMED HUSSEIN, AGOK K GARANG, MOHIELDIN DAWED OMER, ROSE NAJORE HALISTO, NOURALDEIN ABAKER HOSS BAKHT, MOHMOUD IBRAHIM ABDULRAZIG, ABDALLAH ADAM TAHIR ADAM, HAMDI IBRAHIM AMIR, SULIMAN ADAM, MUBARAK YAGOUB IBRAHIM RAHMA, MUSTAFA MOHAMMED ALI, OMER ADAM OMAR, AHMED IBRAHIM YUSUF, HUSSIEN BASHIR HAROUN ADAM, RASHID HUSSEIN YOUNIS IBRAHIM, NOURDINIE MAHAMAD YUNIS, GAMAL ADAM YAGOUB HASSAN, MADIBO ADAM HASSABLLAH MADIBO, SALAHELDIN IDRIS YOUNIS SENIEN, AMER MOHAMMED BAKHT MENAWY, ADAM A IBRAHIM, NYANTHIEC JAM AWEL, NORALDIEM AHMED ISMAIL, LADO YANGA JURKIN, MUNA YAQOUB MOHAMED, AHMED ABDULRASOUL MOH MATAR, BAHARELDIN MOHAMMAD OMER ABDALLA, ABDU NORAIN MOHAMED, MUOTASIM MUSA ALSAFI, MAHSIM ABAKAR ISMAIL, MOHAMMED H KHATER, AUAR IBRAHIM YAHYA, KHALED OSMAN, YONIES HASSAN, ABDALLAH ALI ELNOUR, JUR KUCHA, MOHAMMED IBRAHIM, HANAN MUSA TAGAL, ABDALKARIM ADAM MOHAMMED IZZALDIN, KAMAL AHMAD MAHMOUD, MARY ABIECH AKOON, ARBAB ISMAIL IBRAHIM, MOHAMED ADAM MOHAMED JUMA, MUSAB ARBAB, ZAHARA YEKISUK, MAHAMAD ISMAIL IBRAHIM, ADAM IBRAHIM ISMAIL, MONICA ALUEL AYUEN, MOHAMMED MAHMOUD WARA, EMAN ALI, ABOBAKER S IBRAHIM, ATIA KAFI KUJUR, ABUALGESEM A ABDALMOULA, IBRAHIM AHMED ALI, ABBAKAR EL SONOSI MOHAMED, JOHN MALWAL, MOHAMED O FADHL, YASSIEN DALEEL, MARY DAWOD L. LAKO, AMAN GAI GARANG DENG, AMNA KORASHY, EKALINO M AWOUR KUR, MAHMOUD ABDALLA ADAM ABDALLA, HAFIZ ABDULKARIM WADI, SAMUAL MUSA ABDALGADIR, MUBARAK SULIMAN RAHMA, YASMEEN MUSA ABELGADIR, ABDULRAZIK MAHDI, ABDELKARIM OSMAN HASSAN, BABIKER ABDALLA HAROUN ABDALLA, ABDALLAH ISHAG, ABDELBARI ELTIGANI M ADAM, ELSHAZLY RAHMA, ISMAIL AHMED ALNOUR, MANAL MUSA MUHAMED-AHMED, HASSAN AWAAD ABDALLAH, AMANI SHAREIF A. MOHAMED, MUTASIM A ALI AHMED, SAFA ALI ARBAB, AMIR ARBAB HASSAN MOHAMED, MOHAMED YAGOUB ADAM, ALI ADAM MOHAMMEDIN BHAR, HANAA AHMED ABAKER IBRAHIM, MAHGOUB ABDALLAH DAFALL KHDIR, EKRAM IBRAHIM HAMED, ABEER HAROUN MOHAMMED HASABALLAH, SAYEDA ABDALRHMAN FASHIR, A. B., SAFA ALI IBRAHIM ABDELKARIM, ANDERIA AROK LUAL, SAIDA SHARAFEFLDIN MORSAL KHAMIS, ALI AHMED ELTAYIB ELFAKI, SADIYA M MOHAMED, MUSA ABDALWAHAB BABKER KAMAL, AHMED KHAMIS MOHAMED HAROUN, C. D., NYANGOK DANIEL DONGWAY, HAROUN HASSAN HAROUN, MAHA SABIR ABDALLA, ABUBAKAR IYDAM

IBRAHIM MOHAMMED, SAMRA ABBAS IBRAHIM MOHAMMED, AZAHIR ALZAIN ADAM, KHALID HAROUN, ALSADIG SALIM TUKKA SABUN, ANDREW AKECH JOHN JOK, AWDIA AMIR ABDELBAGI, VICTORIA ADHAR AGUEK, ELTEGANI AHMED NHAR BERKA, YOSIF ABUALQASIM KHATIR OMER, SAMIA ALTOM TIBIN OMER, ZAINA HAMID GARELNAB ELTAHIR, SALIH INTISAR ABDELRAHMAN, GATAR GALIA HAMED ADAM, AHMED ISMAIL A. WADI, E. F., ATEM JOHN THUE AGUER, SAMIRA MOHAMMED ADAM IBRAHIM, FAISEL ABDURHMAN ADAM, OMDA A AHMED, ROSE BAGAZI LORI, MOHAMMED MOHAMMED AHMED, ZAKAREYA MOHAMED TARBOUSH, OMAR ABDELHAMEED, ALIET MALEK ALIER, TAHA HASSAN ISHAG, IBRAHIM A ISSA, AHMED ABDULKARIM WADI ISMAIL, AREK GARANG BAK LUAL, ZAKIA HAROUN SULYMAN ADAM, MAHMOUD MUKHTAR ELTAYB, OMAR HANDOGA KHATIR NAIR, ABDULLAH ABDULMAHMUOD ABDULMAHMUOD, ANWAR MOHAMMED DAFALLA, AHMED ADAM ELOMDA MOHAMED, AMINA OUSMAN IBRAHIM, AZIZA KHAMIS IBRAHIM, HAWA IBRAHIM JUMA HAROUN, SUMAIA IBRAHIM ALNOR JUMA, NOURACHAM OUMAR, ALTAYEB MUSTAFA ADAM WAR, BUTHAINA AMBADA, AMANI ABDALLA IBRAHIM, MOHAMMED ISMEIL JOMA MOHAMMED, ABUBAKAR ADAM OBAID BAKO, EMADALDEEN SULIMAN IBRAHIM, MAHMOUD ELRAYAH GUMAA, FAISAL ADAM IDRIS, MOUSAB TOGOL, KHALID ABAKER MUHAMED TAIRAB, ABDULAZIZ MOHAMMED ABDALLA, SIHAM ARBAB ABDALLAH, OSAM BAKHIT MUSA SAM, MUHIEDDIN ABELRAHMAN I. MAHMOUD, MOHYALDEEN ABDRHEEM ABAM ABAKAR, ACHOL GARANG AWUOL AKOIH, ABUK MATHIANG MADUT, HANADI ZAKARIYA IBRAHIM, GEHAD A ABDELRASOUL, MUNIRA HARON ALTOM MOUSA, AMEERA BASHEER HAROUN, HAITHAM ABUBAKAR ABDELMAILK, HAMED YAGOUB ADAM, NAJWA ADAM ISA JUBARA, OSMAN MAHAMED ISMAIL ABDELRAHMAN, MAHMOUD OMER ISSAK ADAM, SALMA ABDELKARIM ALI, ABDELRAHMAN YAGOUB ABDELMALIK,

*Plaintiffs-Consolidated Plaintiffs,*

– v. –

BNP PARIBAS, a French corporation,

*Defendant-Appellant,*

BNP PARIBAS NORTH AMERICA, INC., a Delaware corporation, DOES 1-10, BNP PARIBAS, SA NEW YORK BRANCH, a foreign branch, BNP PARIBAS US WHOLESALE HOLDINGS, CORP., FKA BNP Paribas North America, Inc., a Delaware corporation,

*Defendants.*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................1

JURISDICTION ........................................................................................5

QUESTIONS PRESENTED ........................................................................5

STATEMENT OF THE CASE ....................................................................5

A. BNPP's Key Role in the Sudanese Genocide. ..................................5

B. Procedural History. .........................................................................9

SUMMARY OF ARGUMENT .................................................................12

STANDARDS OF REVIEW .....................................................................13

ARGUMENT ...........................................................................................14

I. ARTICLE 50.1 PROVIDES AN INDEPENDENT BASIS FOR ACCOMPLICE LIABILITY. ..............................................................14

A. Article 50.1 Independently Makes BNPP Liable as an Accomplice. ..........................................................................................15

B. Plaintiffs Were Not Required to Sue BNPP or Sudan Under Article 41 ......................................................................................................29

C. The Swiss Government's Amicus Brief Merits No Absolute Deference by This Court. ..................................................................32

II. THE DISTRICT COURT PROPERLY INSTRUCTED THE JURY ON THE BURDEN OF PROOF. .........................................................37

A. Preponderant Likelihood Applies to All Three Elements of Article 50.1 Under the Swiss Rule for Circumstantial Cases. ......................37

B. The District Court Correctly Defined Preponderant Likelihood. ....39

III. THE DISTRICT COURT PROPERLY INSTRUCTED THE JURY ON THE ELEMENTS OF ARTICLE 50.1 ACCOMPLICE LIABILITY. ...............................................................................40

A. The Conscious Assistance Instruction Was Correct. .......................41

B. The Causation Instructions Were Correct. .......................................45

C. Any Error Was Harmless. ....51

IV. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ITS EVIDENTIARY RULINGS. ....52

A. The District Court Did Not Abuse Its Discretion in Concluding That BNPP's Guilty Plea Was More Probative Than Prejudicial. ....53

B. The District Court's Rulings on BNPP's Purported Compliance with Foreign Sanctions Were Not Abuses of Discretion. ....55

V. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DECLINING TO HOLD AN EVIDENTIARY HEARING REGARDING ALLEGED ATTORNEY MISCONDUCT ....57

A. The District Court Reasonably Declined a Pretrial Hearing and Preserved Adequate Alternatives for BNPP's Objections. ....58

B. BNPP Failed to Identify Taint in the Trial Proceedings. ....59

VI. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING REMITTITUR, AND REASONABLY ALIGNED SWISS JUDGE-DETERMINED DAMAGES WITH THE SEVENTH AMENDMENT. ....60

VII. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING BNPP'S *FORUM NON CONVENIENS* MOTION. ....63

CONCLUSION ....67

# TABLE OF AUTHORITIES

**Page(s)**

**U.S. Cases**

*Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*,
585 U.S. 33 (2018) .......... 3, 36

*Arlio v. Lively*,
474 F.3d 46 (2d Cir. 2007) .......... 54

*Barlow v. Liberty Maritime Corp.*,
746 F.3d 518 (2d Cir. 2014) .......... 42

*BNP Paribas SA v. Kashef*,
145 S. Ct. 1426 (2025) .......... 11

*Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.*,
145 F.3d 481 (2d Cir. 1998) .......... 64

*Bugliotti v. Republic of Argentina*,
952 F.3d 410 (2d Cir. 2020) .......... 36

*Buon v. Spindler*,
65 F.4th 64 (2d Cir. 2023) .......... 60, 61

*Carroll v. Trump*,
124 F.4th 140 (2d Cir. 2024) .......... 52

*Celestin v. Caribbean Air Mail, Inc.*,
30 F.4th 133 (2d Cir. 2022) .......... 64

*Direct Sales Co. v. United States*,
319 U.S. 703 (1943) .......... 45

*Gasperini v. Ctr. for Humanities, Inc.*,
518 U.S. 415 (1996) .......... 60

*Geders v. United States*,
425 U.S. 80 (1976) .......... 58

*Gill v. Arab Bank, PLC*,
893 F. Supp. 2d 523 (E.D.N.Y. 2012) .......................................................... 56

*Gordon v. N.Y. City Bd. of Educ.*,
232 F.3d 111 (2d Cir. 2000)........................................................................ 51

*Guidi v. Inter-Continental Hotels Corp.*,
224 F.3d 142 (2d Cir. 2000)........................................................................ 66

*Huebner v. Midland Credit Mgmt., Inc.*,
897 F.3d 42 (2d Cir. 2018)........................................................................... 59

*In re Brooklyn Navy Yard Asbestos Litig.*,
971 F.2d 831 (2d Cir. 1992)........................................................................ 63

*In re Terrorist Attacks on Sept. 11, 2001,*
714 F.3d 118 (2d Cir. 2013)........................................................................ 51

*Iragorri v. United Techs. Corp.*,
274 F.3d 65 (2d Cir. 2001)..................................................................... 63, 64

*Kashef v. BNP Paribas S.A.*,
925 F.3d 53 (2d Cir. 2019)......................................................................*passim*

*Kinneary v. City of New York*,
601 F.3d 151 (2d Cir. 2010)................................................................... 51, 52

*LaForest v. Autoridad de Las Fuentes Fluviales de Puerto Rico*,
536 F.2d 443 (1st Cir. 1976) ....................................................................... 63

*Lainez v. Bondi*,
141 F.4th 393 (2d Cir. 2025)....................................................................... 27

*Lore v. City of Syracuse*,
670 F.3d 127 (2d Cir. 2012)........................................................................ 51

*Manu Int'l, S.A. v. Avon Prods., Inc.*,
641 F.2d 62 (2d Cir. 1981)..................................................................... 64, 65

*Mastercard Int'l Inc. v. FIFA*,
464 F. Supp. 2d 246 (S.D.N.Y. 2006)........................................................ 10, 27

*Matthews v. CTI Container Transp. Int'l, Inc.*,
871 F.2d 270 (2d Cir. 1989)........................................................................ 60

*Motorola Credit Corp. v. Uzan*,
388 F.3d 39 (2d Cir. 2004)..................................................................... 66, 67

*New Hampshire v. Maine*,
532 U.S. 742 (2001) ..................................................................................... 15

*Norex Petroleum Ltd. v. Access Indus., Inc.*,
416 F.3d 146 (2d Cir. 2005)................................................................... 64, 65

*Ortiz v. Stambach*,
137 F.4th 48 (2d Cir. 2025)......................................................................... 60

*Petersen Energia Inversora S.A.U. v. Argentina Republic & YPF S.A.*,
172 F.4th 120 (2d Cir. 2026)....................................................................... 63

*Petersen Energia Inversora S.A.U. v. Argentine Republic & YPF S.A.*,
895 F.3d 194 (2d Cir. 2018)........................................................................ 36

*Petroleos de Venezuela S.A. v. MUFG Union Bank*,
106 F.4th 263 (2d Cir. 2024)....................................................................... 27

*Piper Aircraft Co. v. Reyno*,
454 U.S. 235 (1981) ..................................................................................... 64

*Renz v. Grey Advert., Inc.*,
135 F.3d 217 (2d Cir. 1998)........................................................................ 51

*Rossbach v. Montefiore Med. Ctr.*,
81 F.4th 124 (2d Cir. 2023)......................................................................... 58

*Rothstein v. UBS AG*,
708 F.3d 82 (2d Cir. 2013)..................................................................... 50, 51

*Safe-Strap Co. v. Koala, Inc.*,
270 F. Supp. 2d 407 (S.D.N.Y. 2003)............................................................. 59

*Saint-Jean v. Emigrant Mortg. Co*.,
129 F.4th 124 (2d Cir. 2025)........................................................................ 40

*Sanders v. N.Y.C. Human Res. Admin*.,
361 F.3d 749 (2d Cir. 2004)......................................................................... 51

*Smith v. Lightning Bolt Prods., Inc*.,
861 F.2d 363 (2d Cir. 1988)......................................................................... 59

*SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props., LLC*,
467 F.3d 107 (2d Cir. 2006)......................................................................... 13

*Suero-Algarín v. CMT Hosp. Hima San Pablo Caguas*,
957 F.3d 30 (1st Cir. 2020) .......................................................................... 63

*Terra Firma Invs. (GP) 2 Ltd. v. Citigroup Inc*.,
716 F.3d 296 (2d Cir. 2013)......................................................................... 40

*Tesser v. Bd. of Educ*.,
370 F.3d 314 (2d Cir. 2004)......................................................................... 58

*Twitter, Inc. v. Taamneh*,
598 U.S. 471 (2023) ............................................................................... 44, 45

*United States v. Bastian*,
770 F.3d 212 (2d Cir. 2014)......................................................................... 15

*United States v. Bermudez*,
529 F.3d 158 (2d Cir. 2008)......................................................................... 52

*United States v. Brady*,
26 F.3d 282 (2d Cir. 1994)........................................................................... 54

*United States v. Downing*,
297 F.3d 52 (2d Cir. 2002)...................................................................... 53, 54

*United States v. McCallum*,
584 F.3d 471 (2d Cir. 2009) ... 54

*United States v. Morgan*,
786 F.3d 227 (2d Cir. 2015) ... 54

*Watson v. Tarpley*,
59 U.S. 517 (1855) ... 32

*Wiwa v. Royal Dutch Petroleum Co.*,
226 F.3d 88 (2d Cir. 2000) ... 64, 65

**Swiss Cases**

*Boat*,
4A_444/2010 ... 47

*Bow and Arrow*,
104 II 184 (1978) ... 25, 44

*Cat*,
4C.27-2003 ... 26

*Coffeemaker*,
133 III 81 (2006) ... 37, 38, 39

*Cracks*,
4A_0431_2015 (2016) ... 37, 38, 39

*Employment Insurance*,
4A_0424/2020 ... 40

*Firecrackers*,
42 II 473 (1916) ... 22, 29

*Gallerist*,
104 II 225 (1978) ... 20, 44

*Gravel Pit*,
107 II 269 (1981) ... 40

*Gunshot*,
132 II 117 (2006) ........................................................................................ 61

*Hay-Wagon*,
55 II 310 (1929) ........................................................................... 16, 42, 44

*Headache*,
133 III 462 (2007) ....................................................................................... 38

*Hockey*,
79 II 66 (1953) .................................................................................... 23, 29

*Insurance Contract*,
130 III 321 (2004) ....................................................................................... 38

*Locksmith*,
4A_185/2007 ........................................................................................ *passim*

*Marriage Protection*,
119 II 167 (2003) ........................................................................................ 65

*Ministère public de la Confédération v. Nezzar*,
TPF BB.2011.140 (2012)) ............................................................................ 31

*Poster Campaign*,
128 IV 53 (2002) .................................................................................. 61, 62

*Prostitution*,
6B_628/2012 ................................................................................................ 61

*Rediffusion*,
107 II 82 (1981) .................................................................... 16, 23, 29, 56

*Scooter*,
6B_253/2012 ................................................................................................ 49

*Shooting Contest*,
71 II 107 (1945) .................................................................................... *passim*

*Ski Lift*,
126 III 113 (2000) .......... 31

*Stamp Dealers*,
82 II 544 (1956) .......... 23, 24

*Strike*,
57 II 417 (1931) .......... 16, 43, 46

*Stroke*,
4A_401/2023 (2024) .......... 38, 40

*Strip Search*,
2C_19/2022 .......... 31

*Swisscom*,
145 III 72 (2019) .......... *passim*

*Unfair Competition*,
4A_311/2021 .......... 47, 48

*Unsafe Roof*,
17B_62/2023 .......... 39

*Vacation*,
128 III 271 (2004) .......... 38

*Vehicular Homicide*,
131 IV 145 (2005) .......... 49, 50

*Whiplash*,
147 V 161 (2021) .......... 47, 48

*Work Contract*,
130 III 362 (2004) .......... 21, 35

**Rules**

Fed. R. Civ. P. 11 .......... 59

Fed. R. Civ. P. 44.1 .......... 41

Fed. R. Civ. P. 50 .......... 13, 51

Fed. R. Civ. P. 54(b) .......... 11

Fed. R. Evid. 403 .......... 52, 54

Fed. R. Evid. 801(d)(2)(A) .......... 53

Fed. R. Evid. 803(22) .......... 52

**Swiss Statutes**

Swiss Code of Obligations, Article 50.1 .......... *passim*

Swiss Code of Obligations, Article 51 .......... *passim*

Swiss Code of Obligations, Article 41 .......... *passim*

**Other Authorities**

Agence France Presse, *BNP 'Knew' It Was Breaking Sudan Sanctions In 2000s: French Probe*, Barron's (Mar. 11, 2024), https://www.barrons.com/news/bnp-knew-it-was-breaking-sudan-sanctions-in-2000s-french-probe-8decea99?refsec=topics_afp-news .......... 3

Alexandre Kirschmann & Jean-Randolphe Fiechter, New Law On The Statute Of Limitations From 1st January 2020, Mondaq (Mar. 20, 2020), https://www.mondaq.com/construction-planning/905890/new-law-on-the-statute-of-limitationsfrom-1st-january-2020 .......... 28

Announcement, Swiss Fed. Dep't of Just. & Police (Jan. 21, 2009), https://clinics.law.harvard.edu/human-rights-entrepreneurs/files/2026/08/2009-Swiss-tortreform-press-release-Transl-1.pdf .......... 28

Brehm, *Bernese Commentary* (2013) .......... 29, 43, 46

Brunner, *The Application of Tort Law Rules to Contractual Liability* (1991) .......... 27

Code of Obligations, Swiss Confederation, Fedlex, Unofficial English version, https://www.fedlex.admin.ch/eli/cc/27/317_321_377/en .................................... 16

Fellman & Kottmann, *Swiss Liability Law* (2012) .......................................... 19, 44

Final Report, Independent Commission of Experts Switzerland—Second World War (2002), https://www.uek.ch/en/schlussbericht/synthesis/ueke.pdf.............. 36

Krauskopf, *Zürcher Commentary* (2016) ................................................. 18, 27, 30

Michael Posner, Lafarge Verdict Puts Multinationals In Conflict Zones On Notice, Forbes (Apr. 21, 2026), https://www.forbes.com/sites/michaelposner/2026/04/21/lafarge-the-costof-complicity/........................................................................................... 66

Müller, *Perfect Joint and Several Liability* (2009)........................................*passim*

Oftinger & Stark, Swiss Liability Law (1995) ......................................... 22, 23, 43

Perritaz, *Art. 50 para. 1 CO: a standard that provides a basis for liability?* (2018) ........................................................................................................... 18

Perritaz, *Concurrent Actions and Joint and Several Liability* (*Concurrent Actions*) (2017) ....................................................................................... 19, 43

President Simonetta Sommaruga [Switzerland], "Auschwitz – never again" (Jan. 27, 2015), https://www.admin.ch/en/nsb?id=91015 ............................................ 36

Revision and Unification of Liability Law: Preliminary Draft, https://clinics.law.harvard.edu/human-rights-entrepreneurs/files/2026/08/Draft-Revision-and-Reunification-of-Liability-Law-Transl.pdf.................................. 28

Swiss Code of Obligations - French – Extract at Art. 50, https://clinics.law.harvard.edu/human-rights-entrepreneurs/files/2026/08/Swiss-Code-of-Obligation-French-Translated.pdf. ...................................................... 17

Swiss Code of Obligations - Ger – Extract at Art. 50, https://clinics.law.harvard.edu/human-rights-entrepreneurs/files/2026/08/Swiss-Code-of-Obligation-German-Translated.pdf ...................................................... 17

Swiss Crim. Code – FR – extract, https://clinics.law.harvard.edu/human-rights-entrepreneurs/files/2026/08/Swiss-Criminal-Code-French-Translated.pdf ............................................................... 30

Swiss Parliament, Parliamentary Inquiry 26.3161 (May 13, 2026), https://clinics.law.harvard.edu/human-rights-entrepreneurs/files/2026/08/Swiss-Parliamentary-Inquiry-26.3161-Transl.pdf ......................................................... 3

Weber, *Causality and Joint and Several Liability* (2010) ............................... 19, 29

Widmer & Wessner, Revision and Unification of Liability Law: Explanatory Report, https://clinics.law.harvard.edu/human-rights-entrepreneurs/files/2026/08/Widmer-Wessner-Explanatory-Report-for-Draft-Revision-of-Liability-Law-Transl.pdf ................................................................ 28

## INTRODUCTION

BNP Paribas, S.A. ("BNPP") asks this Court to do what Switzerland's own Parliament would not: repeal Swiss accomplice liability law and overrule the Swiss Supreme Court—all to protect a convicted French bank from civil liability to its Sudanese-American victims.

BNPP pled guilty in New York to conspiring with the Islamist military regime of Sudan to violate U.S. sanctions "aimed at halting the genocide" in Sudan. *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 55 (2d Cir. 2019). Its conduct did not involve routine banking practices. Rather, BNPP admitted to an elaborate scheme to subvert the U.S. financial system and fund genocide in Sudan through its global subsidiaries, including Geneva. Each of these Plaintiffs' claims "arise out of the same occurrence as the criminal prosecution." *Id.* at 62-63. BNPP "conceded that it had knowledge of the atrocities being committed in Sudan and of the consequences of providing Sudan access to U.S. financial markets." *Id.* at 56. BNPP not only staved off collapse of Sudan's oil- and U.S.-dollar-dependent regime, JA-[ECFNo.1105at489:16-491:6], but also provided U.S. dollars required for arms purchases and fueled the military campaign of atrocities against Plaintiffs that the U.S. sanctions were designed to thwart. *E.g.*, JA-[ECFNo.1099at102:18-21], JA-[ECFNo.1099at107:10-18]; JA-[ECFNo.1105at489:16-491:6]; JA-[ECFNo.1105at578:2-6]; JA-[ECFNo.1112at822:12-823:9]; JA-[PX404at1-2]; JA-[PX397at3].

BNPP itself sought the application of Swiss law (JA-[ECFNo.69at14-17], JA-[ECFNo.117at2]) and told the District Court "Swiss courts recognize the types of tort claims that Plaintiffs allege." JA-[ECFNo.262at15]. BNPP called them "normal" torts. *See* JA-[ECFNo.641at2-3]. Two judges—then-District Judge Allison J. Nathan and later District Judge Alvin K. Hellerstein—thoroughly analyzed Swiss accomplice liability law and applied it consistently with the text and structure of the Swiss Code of Obligations and Swiss Supreme Court holdings. Since 1916, unbroken Swiss precedent—reaffirmed as recently as 2019—holds that Article 50.1, the sole provision in the entire civil Code that refers to an "accomplice," imposes accomplice liability even when neither the main perpetrator nor the accomplice is found liable under Article 41, the provision invoked by BNPP. BNPP Br. (Dkt. 53) 26, 27, 31, 34.[1] No Swiss case has held otherwise. The central premise of BNPP's appeal is baseless.

Now, BNPP asserts that "[t]he district court . . . used its manufactured construct to impose liability for claims that would not be viable under the laws of *any* nation" (Br. at 1). But "atrocities such as genocide, mass rape, and ethnic cleansing . . . violate jus cogens norms," which "enjoy the highest status within international law." *Kashef*, 925 F.3d at 61.

[1] "Dkt." refers to this Court's docket. "ECF No." refers to the District Court's docket (No. 1:16-cv-3228).

After a decade of unsuccessful scorched-earth litigation, BNPP's 11th-hour tactic is to seek to overturn Swiss precedent and excise accomplice liability from Article 50.1. But in 2009 the Swiss Parliament declined to end accomplice liability.

Seeking to avoid the plain meaning of Article 50.1, BNPP faults the District Court for not blindly following a disavowed Swiss Ambassador's letter submitted a week before trial. BNPP Br. 24. In May 2026, the Swiss Executive disclaimed the letter as unauthorized and "not binding on the court."[2]

The Swiss Government's amicus brief (Dkt. 64) fares no better. It cites only a handful of inapposite cases and effectively asks this Court to override the Swiss Supreme Court. A court need not accept a foreign government's view of its own law, particularly when offered "in the context of litigation." *Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, 585 U.S. 33, 43 (2018).

BNPP pretends this case is an internal Swiss matter involving only Swiss sovereignty. Wrong. There are no Swiss nationals here. BNPP is French. Far from supporting BNPP, the French government is prosecuting the Bank for its role in the Sudan genocide.[3]

---

[2] *See* Swiss Parliament, Parliamentary Inquiry 26.3161 (May 13, 2026), https://clinics.law.harvard.edu/human-rights-entrepreneurs/files/2026/08/Swiss-Parliamentary-Inquiry-26.3161-Transl.pdf (English translation).

[3] Agence France Presse, *BNP 'Knew' It Was Breaking Sudan Sanctions In 2000s: French Probe*, Barron's (Mar. 11, 2024),

BNPP maintains the transactions were "authorized under Swiss banking law." BNPP Br. 1, 3, 66. Wrong. Swiss law did not authorize criminal U.S.-dollar transactions in New York. No evidence shows Switzerland blessed BNPP's forgery, money laundering, or sanctions-busting for a genocidal regime, all crimes under Swiss law.

BNPP asserts it complied with the Swiss arms embargo. BNPP Br. 10. Wrong and irrelevant. BNPP presented that defense at trial, but the jury saw evidence that BNPP financed Sudan's airbases and import of military vehicles. Regardless, supposed compliance with Swiss sanctions would not exonerate BNPP. Those sanctions did not *require* BNPP to falsify commercial instruments, launder Sudan's oil proceeds, or fund its airbases.

BNPP seeks to force dismissal to Switzerland, whereby BNPP's own admission, "courts would decline jurisdiction." BNPP Br. 36. This is reverse forum-shopping, exactly the kind of foreign interference with a completed federal judicial proceeding that comity guards against.

Nor does this case threaten international banking. It involves willfully disguised criminal transactions and deliberate violations of international banking directives, not routine banking practices.

---

https://www.barrons.com/news/bnp-knew-it-was-breaking-sudan-sanctions-in-2000s-french-probe-8decea99?refsec=topics_afp-news.

The District Court carefully considered and explained its rejection of BNPP's remaining objections. This Court should affirm.

## JURISDICTION

Plaintiff-Appellees adopt Appellant's Jurisdictional Statement.

## QUESTIONS PRESENTED

1. Whether the District Court erred in concluding that BNPP may be held liable under Article 50.1.

2. Whether the court erred in its jury charge on the burden of proof and elements of Article 50.1.

3. Whether the court abused its discretion in its evidentiary rulings.

4. Whether the court abused its discretion in declining to hold an evidentiary hearing on alleged attorney misconduct.

5. Whether the court abused its discretion in denying remittitur.

6. Whether the court abused its discretion in denying *forum non conveniens* dismissal.

## STATEMENT OF THE CASE

### A. BNPP's Key Role in the Sudanese Genocide.

In 1989, a military-Islamist coup installed Omar al-Bashir as dictator of Sudan. For more than two decades, his regime waged an intensifying campaign of atrocities targeting Sudan's Black African population that the United States and

international community condemned as genocide. In 1997 and 2006, the United States imposed sanctions "aimed at halting the genocide." *Kashef II*, 925 F.3d at 55.

BNPP knew of the sanctions and Sudan's human-rights abuses. JA-[PX939at6]; JA-[PX139at2]; JA-[PX991at38:13-15]; JA-[ECFNo.1099at99:20-100:10]; JA-[ECFNo.1120at1181:7-10]. Its employees "recognized" Sudan's "human rights abuses" as a "humanitarian catastrophe." JA-[PX939at6].

Yet BNPP deliberately assisted Sudan. Shortly after the 1997 sanctions' introduction, BNPP "conspired with banks and other entities . . . to knowingly, intentionally and willfully move billions of dollars through the U.S. financial system on behalf of Sanctioned Entities in violation of U.S. sanctions laws." JA-[PX939at3], JA-[PX939at5]. BNPP facilitated more than $80 billion in U.S.-dollar transactions with Sudan, including at least $10 billion that admittedly violated U.S. sanctions. JA-[ECFNo.1112at799:23-25], JA-[ECFNo.1112at800:18-22]. It "evaded the U.S. embargo" by "deliberately modifying and omitting references to Sudan in the payment messages," JA-[PX939at5]; used money-laundering structures "with no legitimate business purpose" to escape scrutiny, JA-[PX939at4], JA-[PX939at8-9]; and routed transactions through front-company "satellite banks" so "U.S. authorities would be unable to link the payments to the involved Sanctioned Entit[ies]." JA-[PX939at7-9].

BNPP directly supported Sudan's military apparatus. At the height of the genocide, it extended unrestricted lines of credit financing military vehicle imports for GIAD, Sudan's state-owned maker of armored vehicles. JA-[PX84at2]; JA-[PX207at19], JA-[PX207at36]; JA-[ECFNo.1103at424:16-22]. It funded Sudan's aviation authority, which ran hybrid military-civilian airbases used to carry out the genocide—including aerial attacks on Plaintiff Kashef's and Plaintiff Abdalla's villages and the transport of Plaintiff Turjuman to a detention center. JA-[PX174]; JA-[ECFNo.1103at409:16-18], JA-[ECFNo.1103at410:8-11], JA-[ECFNo.1103at416:17-18]; JA-[ECFNo.1122at923:25-924:3](Abdalla); JA-[ECFNo.1114at967:9-10] (Kashef); JA-[ECFNo.1108at692:4-13] (Turjuman). Sudan's Ministry of Defense was a direct client. JA-[PX60at10]. BNPP's unbounded financing let the regime expand its security state—through weapons, salaries, and militias—and develop a domestic military industrial complex. *E.g.*, JA-[ECFNo.1103at428:15-432:3]; JA-[ECFNo.1105at520:9-521:9]; JA-[ECFNo.1099at118:11-119:1]. BNPP knew "in Sudan, the distinction between civil and military is very blurred" and lacked any assurance its financing was not used for military purposes. JA-[PX980at5]; JA-[PX991at244:6-25], JA-[PX991at248:3-18]; JA-[ECFNo.1103at449:11-451:6]. The regime's military spending consumed nearly ***half*** its budget. JA-[ECFNo.1105at574:1-17].

BNPP's assistance was critical to Sudan's genocide. Before BNPP's help, Sudan was a pariah, cut off by the World Bank and International Monetary Fund, sanctioned by the U.S., and abandoned by former Middle East supporters. JA-[ECFNo.1105at473:12-474:6]. Sudan's trade balance went "negative," causing a "particularly severe" lack of foreign exchange. JA-[ECFNo.1105at477:13-21]; JA-[PX891]. Sudan operated "on a shoestring," with "very limited" military budgets. JA-[ECFNo.1103at451:24-452:5]; JA-[ECFNo.1105at461:12-25]. Dr. Verhoeven, expert on Sudan's political economy, testified that the regime faced collapse and feared "the end of the road." JA-[ECFNo.1105at470:13-471:6].

BNPP became Sudan's "black knight," JA-[ECFNo.1067at1363:18-16], rescuing the regime from collapse, JA-[ECFNo.1105at578:2-6], and transforming a cash-strapped government into a well-armed, genocidal machine. JA-[PX404at1-2]; JA-[PX397at3]. The United States recognized a "causal link" between Sudan's access to revenue and "human rights abuses." JA-[ECFNo.1101at278:9-21]; *see also* JA-[PX405] (linking "an increase in government revenue" to "at least proportionally increased military expenditures"). BNPP admitted its intentional sanctions violations gave Sudan access to billions in U.S.-dollars it "otherwise would not have had." JA-[PX939at12]. BNPP admitted playing a "central role in providing Sudanese financial institutions access to the U.S. financial system." JA-[PX939at6]. BNPP admitted oil proceeds funneled to the regime would sustain its "repressive

measures" for "a long time." JA-[PX939at6]. Its "most important service" was protecting Sudan's foreign currency reserves from U.S. anti-genocide efforts. JA-[ECFNo.1105at487:5-18]. Those BNPP-protected reserves were "absorb[ed]" by Sudan's military expenditures. JA-[PX47at1]. A senior compliance officer warned in 2006 that its scheme, if exposed, would be "seen to help the rulers in power and contribute to furthering the suffering endured by the civilian population." JA-[PX139at2].

These harms were entirely foreseeable. The very point of U.S. sanctions was to deprive Sudan "of the financial and material benefits of U.S. trade and investment," JA-[PX923at1], because Sudan "repeatedly stated that it intend[ed] to use the expected proceeds" "to increase the tempo and lethality of the war." JA-[PX404at1-2].

**B. Procedural History.**

In May 2016, Plaintiffs sued BNPP in the Southern District of New York on behalf of a putative class of Sudanese genocide victims. As it did throughout this litigation, BNPP characterizes Plaintiffs and the class as foreign (Br. at 1 ("three refugees from Sudan")), "seemingly to suggest that [the court] should treat them differently based on their national origin." JA-[ECFNo.338at5]. Plaintiffs are Americans—lawfully admitted, and now citizens. Plaintiffs alleged tort claims

stemming from unimaginable atrocities including mass bombings on civilians, rape, murder, and torture.

In 2019, this Court reversed the district court's 2018 dismissal of Plaintiffs' claims under the act-of-state doctrine and, alternatively, as untimely. *Kashef II*, 925 F.3d at 61-63.

On remand, BNPP argued Swiss law applied to Plaintiffs' claims, and Judge Nathan agreed. JA-[ECFNo.151at10-19]. Since then, BNPP advanced shifting interpretations of Swiss law, relying on ***five*** different Swiss law experts in the District Court. *E.g.*, ECF No. 443 at 37-43 (BNPP's summary judgment motion citing experts Roberto, Keller, Thevenoz, Romy, and Müller).

After foreign law expert discovery, Judge Nathan rejected BNPP's interpretation in February 2021, dismissed primary-liability claims under Article 41 (which Plaintiffs did not pursue), and allowed secondary liability claims under Article 50.1. She found that BNPP relied on a set of supposed "requirements" that its own expert admitted are not actual "elements articulated by the Swiss courts." JA-[ECFNo.193at9]. By contrast, Professor Franz Werro's opinion was "coherent, credible, and supported by Swiss case law." *Id.* Other courts have adopted Professor Werro's opinions and conclusions on Swiss law "in their entirety" as "the most persuasive and informative." *Mastercard Int'l Inc. v. FIFA*, 464 F. Supp. 2d 246, 303 (S.D.N.Y. 2006).

In 2022, six years after the case began, BNPP moved to dismiss for *forum non conveniens*, conceding that "Swiss courts recognize the types of tort claims that Plaintiffs allege." ECF No. 262 at 15. The District Court (Hellerstein, J.)[4] denied BNPP's motion. JA-[ECFNo.338at9], JA-[ECFNo.338at12].

In April 2024, the District Court denied BNPP's Motion for Summary Judgment almost entirely, JA-[ECFNo.499at8], and in May 2024, the court certified a class of U.S.-residing refugees. JA-[ECFNo.505at1-3]. BNPP sought interlocutory review of the class certification order, which this Court denied, JA-[ECFNo.561at1], and filed an unsuccessful petition for certiorari in the Supreme Court. *BNP Paribas SA v. Kashef*, 145 S. Ct. 1426 (Mem.) (2025).

In October 2025, a unanimous jury found for the three class representative Plaintiffs, awarding $6.7 million to Abulgasim Abdalla, $7.3 million to Entesar Kashef, and $6.75 million to Turjuman Turjuman. JA-[ECFNo.1004at1-2]. *See also* JA-[ECFNo.944at1]; JA-[ECFNo.1081at448:1-12]; JA-[ECFNo.1097at30:5-10]. The court entered a final judgment under Rule 54(b), JA-[ECFNo.1006at1], and in January 2026 denied BNPP's post-trial motions for judgment as a matter of law, a new trial, and remittitur, as well as Plaintiffs' motion for prejudgment interest. JA-[ECFNo.1085at1-3]; JA-[ECFNo.1087at16:16-21:35], JA-[ECFNo.1087at28:15-

[4] This case was reassigned to Judge Hellerstein in April 2022 upon Judge Nathan's appointment to this Court.

37:15], JA-[ECFNo.1087at39:10-40:15], JA-[ECFNo.1087at41:7-42:2], JA-[ECFNo.1087at50:14-53:25], JA-[ECFNo.1087at55:18-58:2], JA-[ECFNo.1087at66:24-70:2].

## SUMMARY OF ARGUMENT

I. Article 50.1 creates a cause of action against accomplices. It is not conditioned on Article 41 primary liability or duplicate Article 51 loss-allocation. BNPP's argument that accomplice liability depends on whether BNPP or Sudan could have been sued in Switzerland is refuted by (i) the text and structure of Article 50.1, (ii) Swiss Federal Supreme Court precedent holding accomplices liable under Article 50.1 even where no participant was identifiable or otherwise liable under Article 41, and (iii) the studied views of Swiss law experts, including those BNPP cites. Neither the Swiss government's amicus brief nor the Ambassador's eve-of-trial letter engage with Swiss caselaw. They are meritless.

II. The District Court properly instructed the jury on the burden of proof. The preponderant likelihood standard applies to every Article 50.1 element, as the evidence for each element was necessarily circumstantial.

III. The District Court properly instructed the jury on Article 50.1 accomplice liability, including the standards for collective fault and natural and adequate causation. If anything, the charge asked more of Plaintiffs than Swiss law demands.

IV. The District Court did not abuse its discretion in holding that BNPP's guilty plea was more probative than prejudicial, or in denying BNPP's motion to introduce its supposed compliance with Swiss, EU, and UN sanctions. BNPP introduced evidence of its asserted compliance anyway, so it suffered no prejudice.

V. The District Court did not abuse its discretion in declining to hold an evidentiary hearing regarding Plaintiffs' counsel's alleged misconduct. The Court preserved adequate alternatives for BNPP to raise its spurious objections and false references to "witness tampering" which have no basis in evidence or judicial finding, and BNPP cannot identify any taint or impact on the trial.

VI. The District Court did not abuse its discretion in denying remittitur. Swiss law affords the factfinder wide discretion over moral damages, with no preset formula. The verdicts reflected the gravity of the atrocities. BNPP's position offends the Seventh Amendment.

VII. The District Court did not abuse its discretion in denying BNPP's *forum non conveniens* motion. Post-trial, BNPP cannot show the substantial prejudice required for reversal.

This Court should affirm.

## STANDARDS OF REVIEW

Plaintiffs-Appellees adopt BNPP's statement of the applicable standards of review, with one clarification: in reviewing the denial of a Rule 50 motion, this Court

construes all facts in favor of the nonmoving party and "must disregard all evidence favorable to the moving party that the jury is not required to believe." *SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 118 (2d Cir. 2006) (citation omitted).

## ARGUMENT

### I. ARTICLE 50.1 PROVIDES AN INDEPENDENT BASIS FOR ACCOMPLICE LIABILITY.

In 2019, Switzerland's highest court reaffirmed that an "accomplice" who "contributes" to an unlawful act "but does not himself fulfill any statutory infringement requirements is jointly and severally liable for the tort pursuant to Art. 50 para. 1." *Swisscom*, 145 III 72, 74 § 2.2.1 (2019) (JA-[ECFNo.708-13at4]). That is what the text and structure of Article 50.1 provide and what the Swiss Supreme Court has held for a century. Accordingly, Plaintiffs were not required to sue under Article 41, either here or in Swiss court.

Indeed, BNPP "agree[d] that the operative provision of Swiss Law in this case is Article 50.1" and "agree[d]" that Plaintiffs must prove three elements under Article 50.1: (i) an illicit act by a main perpetrator, (ii) BNPP's conscious assistance, and (iii) causation. JA-[ECFNo.193at4-5] (citing declaration of BNPP expert Müller). BNPP represented that the "core questions" "at the center of this trial" were "whether BNPP consciously assisted and caused these injuries"—both elements of

Article 50.1, which BNPP described as a "normal tort." JA-[ECFNo.641at2-3] (quoting the Court).

Only now BNPP attempts to recast Article 41 as the governing provision and saddle Plaintiffs with a fourth element: that BNPP and Sudan were directly liable to Plaintiffs under Article 41. Despite BNPP's belated attempt at a do-over, ECF No. 896 at 4-5 n.1, it is judicially estopped from abandoning the framework it endorsed below for almost a decade. BNPP's newfound position was "absent from every expert report submitted by the Bank on Article 50 between 2016 and 2024." ECF No. 1078 at 32-34. BNPP cannot "evade the consequences of [its] unsuccessful tactical decision" in agreeing to the governing framework. *United States v. Bastian*, 770 F.3d 212, 218 (2d Cir. 2014) (citation omitted). A party is precluded from abandoning a former position, adopted by a court, to take advantage of a new contradictory position. *New Hampshire v. Maine*, 532 U.S. 742, 755 (2001).

Regardless, BNPP's newfound position is meritless.

### A. Article 50.1 Independently Makes BNPP Liable as an Accomplice.

#### *1. Article 50's text and structure.*

Enacted in 1911, the Swiss Code of Obligations (the "Code" or "CO") sets out the rules on torts and damages (Articles 41-61) and joint-and-several obligations (Articles 143-150). The Code is enacted in Switzerland's three official languages: French, German, and Italian. JA-[ECFNo.174at7] ¶ 15.

The Code distinguishes between primary and secondary liability. Article 41.1 imposes primary liability on principals who commit unlawful acts that directly cause damage: "Any person who unlawfully causes damage to another, whether willfully or negligently, is obliged to provide compensation."[5]

Article 50.1 imposes secondary liability on accomplices who contribute to unlawful acts, making all participants jointly and severally liable to the victim: "Where two or more persons have together caused damage, whether as instigator, perpetrator or accomplice, they are jointly and severally liable to the person suffering damage."[6] Article 50.1 is a general liability clause applying to all tort claims, ranging from personal injury to intellectual property. *See, e.g.*, *Strike*, 57 II 417 § 2 (1931) (JA-[ECFNo.708-8at4]) (battery); *Rediffusion*, 107 II 82, 92-93 § 9 (1981) (JA-[ECFNo.533-10at6-7]) (copyright).

Long-settled precedent establishes the three elements of an Article 50.1 claim: (1) a principal unlawful act, (2) collective fault, and (3) collective causation of damage. *See Hay-Wagon*, 55 II 310, 314 § 2 (1929) (JA-[ECFNo.169-7at5-6]); *Locksmith*, 4A_185/2007 § 6 (JA-[ECFNo.708-15at11-12]). The District Court correctly adopted this three-element test—quoting it from BNPP's own expert: (1)

---

[5] Code of Obligations, Swiss Confederation, Fedlex, Unofficial English version, https://www.fedlex.admin.ch/eli/cc/27/317_321_377/en.
[6] *Id.*

"a main perpetrator committed an illicit act," (2) "the accomplice consciously assisted the perpetrator and knew or should have known that he was contributing to an illicit act" [collective fault], and (3) "their culpable cooperation was the natural and adequate cause of the plaintiff's harm or loss" [collective causation]. JA-[ECFNo.193at4-5] (quoting JA-[ECFNo.170at3] ¶ 6).

Statutory text confirms that Article 50.1 generates liability. Articles 41.1 and 50.1 both use the same conditional syntax: a factual predicate triggers a legal result. In Article 41.1, the predicate is injurious conduct ("Any person who unlawfully causes damage to another"). The result is liability ("is obliged to provide compensation.").

In Article 50.1, the predicate is also injurious conduct ("Where two or more persons have together caused damage"). The result is also liability ("they are jointly and severally liable").[7] The verb establishing liability is in the present-tense, confirming that main perpetrator liability is not a condition precedent.

---

[7] The structure is the same in the English, French, and German versions. *Compare* Code of Obligations, *supra* note 7 (English), *with* Swiss Code of Obligations - French – Extract at Art. 50, (English translation from French CO) ("When several persons have jointly caused damage . . ."), https://clinics.law.harvard.edu/human-rights-entrepreneurs/files/2026/08/Swiss-Code-of-Obligation-French-Translated.pdf, *and* Swiss Code of Obligations - Ger – Extract at Art. 50, (English translation from German CO) ("If several persons have caused damage through collective fault . . ."), https://clinics.law.harvard.edu/human-rights-entrepreneurs/files/2026/08/Swiss-Code-of-Obligation-German-Translated.pdf.

As BNPP's cited scholar, Vincent Perritaz, concludes:

> [A]rticles 41 and 50 para. 1 CO are two general standards of liability. The first punishes the conduct of the main perpetrator and the second punishes the conduct of the other participants. *However, the conditions for each of these two norms are not the same.* This is [because] the main perpetrator directly caused the damage, whereas the other participants are only the mediate cause of the damage.

Perritaz, *Art. 50 para. 1 CO: a standard that provides a basis for liability?* 800 (2018) (emphasis added) (JA-[ECFNo.174-5at122]).

Nothing in Article 50.1 provides that accomplices are liable only if each participant satisfies Article 41. That reading erases "accomplice" from Article 50.1. If accomplices must satisfy Article 41, they are principals, which would render Article 50.1 superfluous.

BNPP argues Article 50.1 only "apportions liability that has already been imposed." BNPP Br. 26. But no other provision in the Code imposes liability on accomplices. Accomplices are not liable under Article 41, since they do not commit the unlawful act that directly causes damage. Perritaz, *a standard that provides a basis for liability?* 800 (JA-[ECFNo.174-5at122]); Krauskopf, *Zürcher Commentary* ¶¶ 44-45 (2016) (JA-[ECFNo.174-5at155]) (Article 50's express reference to "the accomplice" "establishes a liability for persons who otherwise might not have been liable.").

Moreover, BNPP would render Article 50.1 redundant. Article 51 already allocates losses among tortfeasors if each is liable under Article 41 for the same

damage: "Where two or more persons are liable for the same damage on different legal grounds, whether under tort law, contract law or by statute, the provision governing recourse among persons who have jointly caused damage is applicable mutatis mutandis."[8] When Parliament wished to limit a provision to already-liable persons, it said so. The precondition in Article 51 is "liability." Article 51 thus allocates preexisting liability, while Article 50.1 establishes accomplice liability.[9]

BNPP's own authorities mark Article 50.1's "function of establishing liability" as the "core of the difference between art. 50 and 51 CO." Fellman & Kottmann, *Swiss Liability Law* ¶ 2760 (2012) (JA-[ECFNo.170-2at4]); *see* Perritaz, *Concurrent Actions and Joint and Several Liability* (*Concurrent Actions*) ¶ 252 (2017) (JA-[ECFNo.171-33at7]) (Article 51 "does not constitute the foundation of an obligation of compensation of the liable parties (cf. Art. 50)."); Weber, *Causality and Joint and Several Liability* 123 (2010) (JA-[ECFNo.171-54at12-13]) ("CO 51 . . . presupposes joint liability," whereas in "CO 50 . . . joint and several liability is ordered for a multiplicity of those liable to pay compensation." "In contrast to CO

---

[8] Code of Obligations, *supra* note 7 at Art. 51.

[9] *Id*. Article 50.2 is another loss-allocation rule, providing that defendants found jointly-and-severally liable under Article 50.1 may sue co-tortfeasors for contribution. Code of Obligations, *supra* note 7. If Article 50.1 merely duplicated Article 41's primary-liability test for each participant, Article 50.2 would be redundant.

50, the 'joint' liability in CO 51 does not have to be justified because it is assumed to already exist.").

BNPP contends "there is no basis to treat Article 51 differently from Article 50." BNPP Br. 28. But the Swiss Supreme Court disagrees: "joint and several liability in cases of damage caused by collective fault according to Art. 50 CO must be distinguished" from Article 51 cases where a plaintiff is "affected by different, mutually independent unlawful acts" and multiple tortfeasors "are otherwise liable for the same damage for different legal reasons." *Gallerist*, 104 II 225, 231 § 4(b) (1978) (JA-[ECFNo.174-1at114]).[10]

Nor can Articles 50 and 51 be conflated because they appear under a heading "Multiple liable parties." BNPP Br. 26. The official French and German versions do not use that phrase. The French heading says, "Plural Liability"; the German "Liability of several persons."[11] Instead of parsing the official versions in their original language, BNPP analyzes the unofficial English translation, published with the disclaimer that it "has no legal force."[12]

---

[10] *Gallerist* does not hold that Article 50.1 requires that each party be liable under Article 41. *Contra* BNPP Br. 29. Rather, it opines that Article 50.1 merely requires "an intentional or negligent interaction of the persons who caused the damage," *Gallerist*, 230 § 4a (JA-[ECFNo.174-1at113]), which Plaintiffs demonstrated here.

[11] English translation from French CO & English translation from German CO, *supra* note 9.

[12] Code of Obligations, *supra* note 7.

BNPP cites *Work Contract*—an Article 51 case—as its sole support for its loss-allocation theory. BNPP Br. 28. The issue there was whether one tortfeasor's Article 51 contribution claim against another was time-barred. *Work Contract*, 130 III 362, 369-370 §§ 5.2-5.3 (2004) (JA-[ECFNo.530-18at6-7])). The case did not discuss accomplice liability under Article 50.1. Nevertheless, BNPP points to the line that "[j]oint and several liability" *under Article 51* "implies a preceding liability: a person who is not liable for damage cannot be jointly and severally liable." *Id.* at 370 § 5.2; BNPP Br. 28. But the Court was not addressing Article 50.1, nor did it say "prior liability *under Article 41*." If there is collective fault—conscious assistance in a principal unlawful act—that liability arises under Article 50.1. That is why, for over 100 years, Swiss courts have held accomplices liable for collective fault under Article 50.1 without any prior finding of Article 41 liability.

#### 2. *Swiss caselaw confirms that Article 50.1 establishes liability independent of Article 41.*

BNPP cannot cite any decision denying accomplice liability because the accomplice or main perpetrator was not sued under Article 41. In *Swisscom*, Switzerland's highest court confirmed Article 50.1 accomplice liability even though the main perpetrators (direct copyright infringers) had never been sued. *Swisscom*, 74 § 2.2.1 (JA-[ECFNo.708-13at4]). The Court asked only "whether the defendant is liable under art. 50 para. 1 CO . . . as an access provider," not whether it was liable under Article 41. *Id*. at 77 § 2.3.1 (JA-[ECFNo.708-13at7]). It rejected the theory

that Article 50.1 merely allocates losses without imposing liability, holding that joint-and-several liability under Article 50 is itself "interpreted as a statutory recognition of the civil liability of the participants"—otherwise "contribut[ing] to the unlawful act" would be superfluous as a basis for liability. *Id*. at 74, 79 §§ 2.2.1, 2.3.2 (JA-[ECFNo.708-13at4], JA-[ECFNo.708-13at9]).

BNPP leans on *Swisscom's* statement that liability "presumes . . . the illegality of the participants' behavior," *id*. at 74 § 2.2.1, but ignores the court's clarification that an accomplice need not "fulfill any statutory infringement requirement"—i.e., need not itself violate Article 41. *Id*. Tellingly, the Court never analyzed whether Swisscom itself infringed any copyright; it asked only whether Swisscom made a legally relevant contribution to others' unlawful acts.

This law is not new. In *Firecrackers*, several men set off firecrackers around town and one injured a bystander, but investigators could not determine which of the three "was specifically the one who threw" it. 42 II 473, 473-75 §§ A, 3 (1916) (JA-[ECFNo.708-18at2-3]). The lower court dismissed the claim for lack of an identifiable Article 41 perpetrator; the Supreme Court reversed, holding all three jointly and severally liable under Article 50.1: "by. . . their entire behavior, those two Defendants who did not themselves commit the directly harmful action also jointly caused this harm." *Id.* at 477 § 3 (JA-[ECFNo.708-18at4]); *see also* Oftinger & Stark, Swiss Liability Law ¶¶ 320-21, n.481 (1995) (JA-[ECFNo.170-1at5-6]).

*Rediffusion* (1981) reached the same result. The Swiss Supreme Court held state-owned antenna operator PTT liable as an accomplice to a satellite company's copyright infringement—even after the plaintiff dropped its direct-infringement claim against PTT, foreclosing any Article 41 finding. *Rediffusion*, 92-94 (JA-[ECFNo.533-10at6-8]). It was "not necessary to rule whether the PTT companies violate copyrights"; they were liable under Article 50.1 for merely "participat[ing] in the violation of rights by Rediffusion, even if only as an accomplice." *Id*. at 92-93.

*Hockey* (1953) also confirmed the independence of Art. 50.1. A spectator struck by a hockey stick during a player brawl sued the player who struck her, his teammates, the visiting club, and the host municipality. 79 II 66, 66-67 (JA-[ECFNo.460-17at2]). Even though the player who struck her had done nothing unlawful, the Court held him and the club jointly and severally liable under Article 50.1 for creating a "dangerous state of affairs." *Id*. at 69-73 §§ 2, 4, 8 (JA-[ECFNo.460-17at3-5]). The Court rejected Article 41 liability against the municipality and Article 50.1 liability independently applied to all defendants. *Id*. at 72 § 5 (JA-[ECFNo.460-17at5]).

*Stamp Dealers* (1956) makes the rule explicit: Article 50.1 requires only conscious assistance to a principal, not independent liability under Article 41. A stamp dealer and a collectors' "League" president published defamatory circulars

attacking a rival. 82 II 544, 544-46 (JA-[ECFNo.460-9at2-3]). Sued as an accomplice, the League argued—as BNPP does here—that it could not be liable without meeting the requirements of primary liability. *Id* at 546 § 1 (JA-[ECFNo.460-9at3]). The Court disagreed, holding it irrelevant "whether and under what conditions the [League] could also be prosecuted for unfair competition" on its own. *Id*. at 547 § 1 (JA-[ECFNo.460-9at3]).

Finally, in *Locksmith* (2007), a financial-services company was held liable as an accomplice for a client locksmith's trademark infringement even though its own "administrative and financial assistance" to the client was entirely lawful. *Locksmith*, § 6.2.1 (JA-[ECFNo.708-15at12]). Liability attached because "it was reasonably foreseeable that [the company], by associating with [its client], would infringe [the competitor's] intangible rights." *Id*. at § 6.2.3 (JA-[ECFNo.708-15at13]); *see* JA-[ECFNo.536-3at12-13] ¶¶ 35-36.

By contrast, BNPP distorts. It selectively edits *Cat's* statement that "perfect joint and several liability presupposes a common tortious fault on the part of the co-responsible parties within the meaning of Article 41 *et seq*. CO" 4C.27-2003 § 3.3 (JA-[ECFNo.169-4at7]) (emphasis added). But BNPP cuts out "*et seq*.," BNPP Br. 29, which includes not just Article 41, but all of "Section Two: Obligations in Tort"

of Division One, Title One of the CO, including.[13] *Cat* provides no support for BNPP's position that Article 50.1 requires showing that each participant is liable under Article 41.

Nor did *Bow and Arrow* adopt such a requirement. Rather, the Court held that children playing a bow-and-arrow game were subject to Article 50.1 "[b]y participating together in an activity whose dangerous character they could and should have recognized," 104 II 184, 187 §§ 2-3 (1978) (JA-[ECFNo.528-115at5]), and therefore committed "a collective fault." Müller, *Perfect Joint and Several Liability* 38 (2009) (JA-[ECFNo.174-3at10]) (quoting 104 II 184, 187). The Court separately noted that all three children acted wrongfully toward one another under Article 41. *Bow and Arrow*, 187 § 2 (JA-[ECFNo.528-115at4-5]). But this was simply an instance in which participants could be held liable under both Article 41 and Article 50.1. BNPP distorts when it implies that each child's direct liability was a prerequisite to their joint and several liability. BNPP Br. 29-30. But, the case involved both direct and collective fault based on the circumstances.

Finally, in *Shooting Contest*, the plaintiff sued two contributors to an unlawful shooting contest. An officer was sued for "approv[ing]" the initial game and also for acting as "the instigator" of its second phase by "changing the target" to nearby

---

[13] Code of Obligations, *supra* note 7.

bottles and "encourag[ing] the other shooters to imitate him." *Shooting Contest*, 71 II 107, 110-12 § 2 (1945) (JA-[ECFNo.528-111at4-5]). The plaintiff also sued the innkeeper under Article 50: his "tacit authorization" of the contest made him "'complicit' with the shooters," entitling the plaintiff to "the joint and several liability established under article 50." *Id*. at 113-15 §§ 3-4 (JA-[ECFNo.528-111at5-6]). The innkeeper was never sued under Article 41 or found to have acted unlawfully. *See id.;* JA-[ECFNo.536-3at15-16] ¶ 42. BNPP, as in *Cat*, misquotes *Shooting Contest* as holding the innkeeper "jointly-and-severally liable in tort '*based on Article 41*' in conjunction with 'article 50.'" BNPP Br. 30 (emphasis added). In fact, the plaintiff sued him under "arguments based on article 41 *et seq.*," *Shooting Contest*, 115 § 4 (JA-[ECFNo.528-111at6]) (emphasis added)—a phrase that refers to all tort-law provisions, including Article 50.1.[14]

A century of Swiss case law confirms that Article 50.1 creates an independent basis of accomplice liability.

#### *3. The District Court properly credited Plaintiffs' Swiss-law expert.*

After analyzing the Code and caselaw discussed above, the District Court properly credited Professor Werro's opinion as to the application of Article 50.1 by the Swiss Supreme Court. JA-[ECFNo.193at5], JA-[ECFNo.193at9]. Courts in this

[14] Code of Obligations, *supra* note 7.

Circuit have recognized Professor Werro's authority. *See Mastercard,* 464 F. Supp. 2d at 303. Swiss scholars agree with Professor Werro that Article 50.1 establishes liability, *e.g.*, Krauskopf ¶¶ 44-45 (JA-[ECFNo.174-5at155]); Brunner, *The Application of Tort Law Rules to Contractual Liability* ¶ 312 (1991), JA-[ECFNo.174-5at135]; JA-[ECFNo.536-3at18-19] ¶ 50 & n.43; JA-[ECFNo.280at5] ¶ 11, including independent scholars who have analyzed the court's application of Article 50.1, *see* JA-[ECFNo.536-3at7-8] ¶ 24 (noting work of Nussbaumer-Laghzaoui and Lüchinger). In contrast, the District Court found BNPP's position was "unsupported by, and at times inconsistent with, [Swiss] cases." JA-[ECFNo.193at9].

The District Court credited Plaintiffs' expert testimony and correctly applied Article 50.1. This Court should do the same. *See Lainez v. Bondi*, 141 F.4th 393, 404 n.5 (2d Cir. 2025) (resolving "conflicting expert evidence" on foreign law is "an essentially factual issue best suited for resolution in the district court"); *Petroleos de Venezuela S.A. v. MUFG Union Bank*, 106 F.4th 263, 269 (2d Cir. 2024) (per curiam) ("[D]eterminations of another sovereign's law frequently call for fact-like procedures that a district court is better situated to implement.") (citation modified).

#### *4. The Swiss Parliament declined to repeal independent accomplice liability.*

BNPP asks this Court to rewrite Swiss law in a way Parliament itself rejected. In 2000, Switzerland's Federal Council proposed overhauling the Code of

Obligations, commissioning an 800-page report and draft legislation that would have struck "accomplice" from the Code entirely—repealing Article 50.1 and replacing it with the rule BNPP now calls settled law: joint and several liability only after each tortfeasor is independently liable.[15] "If several persons are liable for damage caused to a third party, they are jointly and severally liable for compensation." Draft Art. 53b(1).[16] Parliament declined to enact it. The Federal Council shelved the project in 2009, calling the reform a "wish emanating from academic circles" that practitioners saw no need for, since "liability principles are often fixed by case law rather than statute."[17]

In 2018—while this case was pending—Parliament amended the Code's joint-and-several-liability regime, but only to adjust limitations periods.[18] Article 50.1's accomplice liability survived untouched.

---

[15] *See generally* Widmer & Wessner, Revision and Unification of Liability Law: Explanatory Report at 169-170 (translated extract) (proposing Art. 50 be "replaced" and no longer impose "liability for the acts of others."), https://clinics.law.harvard.edu/human-rights-entrepreneurs/files/2026/08/Widmer-Wessner-Explanatory-Report-for-Draft-Revision-of-Liability-Law-Transl.pdf.

[16] Revision and Unification of Liability Law: Preliminary Draft, (excising "accomplice" from Code of Obligations), https://clinics.law.harvard.edu/human-rights-entrepreneurs/files/2026/08/Draft-Revision-and-Reunification-of-Liability-Law-Transl.pdf (translation).

[17] Announcement, Swiss Fed. Dep't of Just. & Police (Jan. 21, 2009), https://clinics.law.harvard.edu/human-rights-entrepreneurs/files/2026/08/2009-Swiss-tort-reform-press-release-Transl-1.pdf (translation).

[18] *See* Alexandre Kirschmann & Jean-Randolphe Fiechter, *New Law On The Statute Of Limitations From 1st January 2020*, Mondaq (Mar. 20, 2020),

**B. Plaintiffs Were Not Required to Sue BNPP or Sudan Under Article 41.**

Because Article 50.1 independently supplies accomplice liability, Plaintiffs had no burden to sue BNPP or Sudan under Article 41. JA-[ECFNo.985-1at9] ¶ 19; JA-[ECFNo.985-1at36] ¶ 108 n.37. In *Swisscom*, the direct copyright infringers were not sued at all. In *Rediffusion*, the direct liability claim was dismissed. In *Hockey* and *Locksmith*, no defendant could be liable under Article 41. And in *Firecrackers*, no main perpetrator could even be identified, let alone sued. Article 50.1 applied in each case, and it applies here.

Indeed, scholars cited by BNPP have recognized that Article 50.1 applies even where the elements of Article 41 *cannot* be met. As Dr. Weber explains, Article 50.1 applies where the main perpetrator "cannot be ascertained." Weber, *Causality and Joint and Several Liability* 119 (JA-[ECFNo.171-54at57]). And Dr. Brehm adds, where rioters injure a victim but cannot be individually identified, "all involved participants" share joint and several liability, even though the main "perpetrators . . . remain unknown." Brehm, *Bernese Commentary* ¶ 35a (2013) (JA-[ECFNo.174-41at9]). The reason is to protect the injured party: a claimant "*does not need to prove the liability of the other involved parties*," only "that the defendant contributed to

---

https://www.mondaq.com/construction-planning/905890/new-law-on-the-statute-of-limitations-from-1st-january-2020.

the damage." *Id.* ¶ 36 (emphasis added). BNPP's expert Professor Müller wrote that, "[w]hen several co-accused parties have 'together caused damage' within the meaning of Article 50 I CO, it is this latter provision that establishes passive joint and several liability." JA-[ECFNo.534-47at7] ¶ 23.

Plaintiffs did not need to prove BNPP violated Swiss sanctions or non-tort law. Article 50.1 "even applies to the party whose secondary actions (for example, 'keeping watch') does not in itself represent an illegal action or cause of damage." Krauskopf ¶ 55 (JA-[ECFNo.174-5at158]); *see Locksmith*, § 6.2.1 (JA-[ECFNo.708-15at11-12]) (imposing Article 50 liability for lawful "administrative and financial assistance"). Regardless, BNPP committed its own unlawful acts under "jus cogens norms," *Kashef*, 925 F.3d at 61, and under the Swiss Criminal Code, which forbids complicity in genocide, crimes against humanity, and war crimes.[19] BNPP also broke Swiss sanctions banning assistance linked to the provision of military equipment. *E.g.*, JA-[ECFNo.1067at1384:19-25], JA-[ECFNo.1067at1390:1-12]; JA-[PX60at10], JA-[PX60at30].

BNPP's argument that Sudan could not be liable under Article 41 (BNPP Br. 31-37) is also irrelevant to BNPP's Article 50.1 liability. As Professor Werro

---

[19] Swiss Crim. Code – FR – extract, Arts. 12.2, 25, 264 *et seq.*, https://clinics.law.harvard.edu/human-rights-entrepreneurs/files/2026/08/Swiss-Criminal-Code-French-Translated.pdf (translated from official French).

explains: "a tortfeasor might be dead, defunct, incapacitated, immune, or beyond the personal jurisdiction of a court." JA-[ECFNo.985-1at48] ¶ 142. "None of that would alter whether his or her conduct was unlawful" and "that is the only predicate for Article 50 CO." *Id.* In any event, although BNPP attempts to legitimize Sudan's genocide as valid "acts of public power," BNPP Br. 35, this Court has already held Sudan's atrocities against Plaintiffs do not "constitute official acts entitled to deference." *Kashef*, 925 F.3d at 61. Swiss law agrees. *See* JA-[ECFNo.528-105at15] ¶ 31 ("[T]he Federal Supreme Court has stated that 'the prohibition of genocide is part of mandatory customary international law"). Hence, no issue of sovereign immunity arises under Swiss law. *See, e.g.*, *Ministère public de la Confédération v. Nezzar*, TPF BB.2011.140 §§ 5.4.2-5.4.3 (2012)[20] (denying Swiss functional immunity for war crimes committed by former Algerian Minister of Defense).

Nor would Swiss public law displace Plaintiffs' tort claims. Swiss public and private law both recognize claims for violations of "absolute rights" such as life, health, and bodily integrity. *See Strip Search*, 2C_19/2022 §§ 4.2-4.3 (JA-[ECFNo.708-2at4-5]) (public law); *Ski Lift*, 126 III 113, 115 § 2(a)-(aa) (2000) (private tort) (JA-[ECFNo.708-9at2-3]); *see also* JA-[ECFNo.174at13] ¶ 31; JA-[ECFNo.534-47at10-11] ¶¶ 32-35; JA-[ECFNo.985-1at54-55] ¶¶ 163-70.

---

[20] Available at https://casebook.icrc.org/case-study/switzerland-immunity-general-nezzar (unofficial English translation).

Likewise, whether Swiss courts "would decline jurisdiction" because of jurisdictional immunity or extraterritoriality is immaterial to U.S. federal courts, which do not import foreign procedural rules. BNPP Br. 36. Title 28 governs this Court's jurisdiction, not Swiss law. *See Watson v. Tarpley*, 59 U.S. 517, 520 (1855). BNPP's reliance on *Naït-Liman*, 4C.379/2006 §§ 3-4 (JA-[ECFNo.1079-1at5-7]), is beside the point. BNPP Br. 35. *Naït-Liman* shows a Swiss court may decline subject matter jurisdiction where a plaintiff's injury and the perpetrator's harmful conduct lack sufficient connection to Switzerland. But we are not in Swiss court.

### C. The Swiss Government's Amicus Brief Merits No Absolute Deference by This Court.

BNPP has advanced a bewildering array of Swiss law arguments in this case. The Swiss Government's amicus brief is only the latest failed attempt in a revolving door of experts, amici, and eleventh-hour theories.

#### *1. BNPP's shifting positions on Swiss law.*

Lacking any viable support in the Code or Swiss caselaw, BNPP cycled through five Swiss legal academics in the District Court, at times reading as many as fourteen distinct requirements into the three elements of Article 50.1. ECF No. 173 at 10, 22 nn.3, 17. After the court found that BNPP's Article 50.1 requirements were inventions, "not elements articulated by the Swiss courts," JA-[ECFNo.193at9], BNPP swapped such experts—each inconsistent with the last.

BNPP's Professor Roberto conceded that Article 50.1 supplies the cause of action here but insisted negligent complicity must also somehow be "willful and substantial." JA-[ECFNo.170at9] ¶ 24. Under oath he admitted he was opining what Swiss law ought to provide, not what it actually says. JA-[ECFNo.193at9]; JA-[ECFNo.170at16]. Exit Roberto. Without leave, BNPP substituted Professor Müller, who claimed that only perpetrators can be liable as accomplices—never squaring that paradox. JA-[ECFNo.528-104at13-16] ¶¶ 27-34, JA-[ECFNo.528-104at26] ¶ 56. Exit Müller.

On BNPP's *forum non conveniens* motion, Professor Romy emerged to assert that Swiss courts would recognize Plaintiffs' tort claims. JA-[ECFNo.264at6] ¶¶ 30-31. But right before trial, she told the court the opposite, JA-[ECFNo.897at6-8] ¶¶ 21-32, while also reprising BNPP's failed argument that Article 50.1 provides no accomplice liability at all. JA-[ECFNo.897at2-4] ¶¶ 6-15. BNPP never explained her reversal or disclosed her conflict: she sat on UBS's board when that bank helped state-sponsors-of-terrorism evade sanctions and settled charges of over 220 U.S. sanctions violations. ECF No. 482 at 89 n.321; JA-[ECFNo.986at2n.4]. Her report in this case stated her own defense.

Then, a week before trial, the Swiss Ambassador emailed the District Court's chambers echoing BNPP's talking points (with scant citations to legal authority) and requesting dismissal of the case. JA-[ECFNo.937at2-4]. When the court asked who

wrote the letter, BNPP would not say. JA-[ECFNo.1007at92:15]. But the letter left a clue: it invoked the "willful and substantial standard" that Professor Roberto admittedly invented. *See* JA-[ECFNo.193at9].

BNPP contends the District Court slighted the letter. But the court ordered briefing, held a hearing, and said it "respects the Ambassador and his views." JA-[ECFNo.943at1]. Nothing more was owed. *See Animal Sci. Prods.*, 585 U.S. at 36 (foreign state's views on foreign law receive "respectful consideration," not "conclusive" effect). The letter was conclusory and cited none of the relevant Article 50.1 cases, only a single, inapposite decision on a causation issue. It ignored the extensive opinions on Swiss law already issued by the District Court.

Questions surrounding the letter led the Swiss Parliament to open an inquiry. On May 13, 2026, the Federal Council—Switzerland's collective head of state—confirmed it "was not involved in this decision" to submit the letter, and letter's views were "not binding on the court."[21]

The U.S.'s amicus brief suggests the letter deserved more consideration—apparently unaware the Federal Council had disclaimed it—but conceded its last-minute arrival "may have made it difficult for the district court" to respond. U.S. Br. 15 (Dkt. 63). Indeed, the letter arrived a week before trial in a case pending for over

[21] Parliamentary Inquiry 26.3161, *supra* note 2.

nine years—and a decade after the DOJ criminally convicted BNPP for violating sanctions specifically aimed at preventing genocide of which Plaintiffs and the class were victims. *See* JA-[ECFNo.637-1atTr.9:9-10:22]; Notice of Lien, *United States v. BNP Paribas, S.A.,* No. 1:14-cr-00460 (LGS) (S.D.N.Y.), ECF No. 29-2 at 19. In any event, this Court's review of Swiss law on appeal cures any shortcoming.

#### 2. *The Swiss Government's amicus brief is unauthoritative and unpersuasive*

A week after the Federal Council disclaimed the Ambassador's letter, the Swiss Government moved for leave to file its amicus brief in this Court, without disclosing the Federal Council's action. *See* Swiss Br. (Dkt. 64.1). The brief even revives the debunked "willful and substantial" standard, now reattributed to the Ambassador. Swiss Br. 21. It invites this Court to depart from settled Swiss law and adopt BNPP's litigation positions. The Court should decline the invitation.

A foreign government's submission lacking "clarity, thoroughness, and support" merits no deference. *Animal Sci. Prods.*, 585 U.S. at 43. And when a foreign government "offers an account in the context of litigation, there may be cause for caution." *Id.* at 43. Caution is warranted here.

The brief repeatedly cites the non-binding and *ipse dixit* letter as legal authority—a exercise in bootstrapping. Swiss Br. 11, 17, 19, 21, 24, 25. None of the handful of cited cases—*Work Contract* and *Swisscom*, plus an inapposite contracts case (Swiss Br. 6, 16-20)—supports its argument regarding Article 50.1.

A U.S. court applying quoted holdings from the Swiss Supreme Court does not "offend Swiss sovereignty." Swiss Br. 11. To the contrary, *Animal Science Products* instructs that U.S. courts applying foreign law should follow that country's highest court, just as they follow a state's highest court. 585 U.S. 33, 43-44 (noting treatment of foreign high courts is "analogous" to state high courts). This court should defer to the Swiss Supreme Court, not to a Swiss ambassador.

This Court has treated similar submissions skeptically. *See Petersen Energia Inversora S.A.U. v. Argentine Republic & YPF S.A.*, 895 F.3d 194, 208-209 (2d Cir. 2018) (rejecting Argentina's views of its own law). In *Bugliotti v. Republic of Argentina*, this Court noted that "a decision by an Argentine court as to the meaning of the relevant Argentine laws may be preferable to any of the materials proffered thus far in this litigation," and instructed the district court it was not required to defer to views of the Argentine Attorney General offered in litigation. 952 F.3d 410, 414 & n.3 (2d Cir. 2020). So too here.

Moreover, *Animal Science Products* discounts foreign-government submissions that contradict "past positions." 585 U.S. at 34. Switzerland has long vowed "never again" will its banks aid and abet genocide.[22] Yet the Swiss brief now

[22] *E.g.*, President Simonetta Sommaruga [Switzerland], "Auschwitz – never again" (Jan. 27, 2015), https://www.admin.ch/en/nsb?id=91015; Final Report, Independent Commission of Experts Switzerland—Second World War (2002), 24, 265-66, https://www.uek.ch/en/schlussbericht/synthesis/ueke.pdf.

condones financial complicity in genocide—contradicting its own criminal code. It incentivizes global financial institutions to knowingly violate another sovereign's sanctions, finance sanctioned entities and governments and fuel the very harms those sanctions target.

## II. THE DISTRICT COURT PROPERLY INSTRUCTED THE JURY ON THE BURDEN OF PROOF.

The court properly defined the "preponderant likelihood" standard of proof and correctly instructed the jury that it applied to all three elements of Article 50.1 accomplice liability. JA-[ECFNo.1071at1624:23-1625:6].

### A. Preponderant Likelihood Applies to All Three Elements of Article 50.1 Under the Swiss Rule for Circumstantial Cases.

The Swiss Supreme Court instructs that courts may apply the preponderant-likelihood standard where "strict proof"—a smoking gun or literal specimen—is objectively impossible or unreasonable. *Cracks*, 4A_0431_2015 § 5.1.2 (2016) (JA-[ECFNo.813-6at12]). The standard can apply to any element of a civil claim "if the facts alleged by the party bearing the burden of proof can only be established indirectly *and by circumstantial evidence*." *Coffeemaker*, 133 III 81, 88 § 4.2.2 (2006) (JA-[ECFNo.708-20at5]) (emphasis added); *see also Violin*, 4A_594/2017 § 5.1 (JA-[ECFNo.174-2at180-81]) (same). This "state of necessity in terms of evidence" is considered an "evidentiary hardship" or *Beweisnot*. *Coffeemaker*, 88 § 4.2.2 (JA-[ECFNo.708-20at5]). Applying preponderant likelihood thus rests on

the principle that "legal enforcement should not fail due to typical evidentiary difficulties associated with certain facts." *Insurance Contract*, 130 III 321 § 3.2 (2004) (JA-[ECFNo.813-3at6]).

BNPP wrongly contends that "full conviction" applies to every element except natural causation. BNPP cites no authority so limiting the rule. The Swiss Supreme Court applies preponderant likelihood to other elements, including whether an event occurred, *id.* at §§ 2-3.3 (JA-[ECFNo.813-3at4-7]), and the existence of damages, *Vacation*, 128 III 271, 276-77 (JA-[ECFNo.813-4at5-6]); *Cracks*, § 5.1.2 (JA-[ECFNo.813-6at12]). *Coffeemaker* applied preponderant likelihood to natural causation but did not confine its application to that element. *See* 88-89 §§ 4.2.2-.3 (JA-[ECFNo.708-20at5-6]). So too *Headache*: natural causation was the only issue before the Court. 133 III 462, 465, 467 §§ B, 3.2 (JA-[ECFNo.813-12at8]); *see also Stroke*, 4A_401/2023 §§ 5-6.4 (2024), (JA-[ECFNo.801-1at6-8]) (same).

The District Court was correct: this case poses a *Beweisnot* on every element. JA-[ECFNo.951at4]; JA-[ECFNo.800at8-13] ¶¶ 23-39. Proving Sudan's atrocities required circumstantial proof: "In a country ruled by a military dictatorship and embroiled in a civil war, it would be unreasonable to expect that the Plaintiffs could obtain direct evidence from Sudan." JA-[ECFNo.800at8] ¶ 23. So did conscious assistance: "proving that the bank should have known it was contributing to human rights abuses necessarily requires inferences drawn from circumstantial evidence"—

a corporation's state of mind is never proved directly. JA-[ECFNo.800at9] ¶ 26; *cf. Unsafe Roof*, 7B_62/2023 § 2.2.2 (JA-[ECFNo.708-10at5]) ("If the perpetrator does not confess, the question [of direct intent or recklessness] must be decided based on external circumstances..."). BNPP compounded that problem by falsifying records. *See* JA-[PX939at47]. BNPP concedes preponderant likelihood applies to natural causation, BNPP Br. 38-39, but adequate causation turns on the same inferences. JA-[ECFNo.800at12-13] ¶¶ 38-39. And damages under Article 42(2) require no strict proof. JA-[ECFNo.800at13] ¶ 42; *e.g.*, *Cracks*, § 5.1.2 (JA-[ECFNo.813-6at12]). BNPP's argument proves Plaintiffs' point: every fact it says Plaintiffs could directly prove was itself circumstantial. BNPP Br. 39-40.

### B. The District Court Correctly Defined Preponderant Likelihood.

BNPP characterizes the jury instruction as a 51% test. *Id.* 40; Swiss Br. 27-28. But the court properly told the jury not to think of this standard "in terms of percentages": the standard "require[s] more than a bare probability" and demands proof "more likely than not that the event occurred" and that "other explanations do not reasonably explain the event." JA-[ECFNo.1071at1624:23-1625:6]. The court drew that language from the Swiss case, *Coffeemaker*, and said so, overruling BNPP's objection because the "language is taken from the Coffeemaker case and Professor Werro's description of that case." JA-[ECFNo.1069at1469:18-21], JA-[ECFNo.1069at1470:12-15]; *see* JA-[ECFNo.1087at57:6-16]; *Coffeemaker*, 88-89

§ 4.2.2 (JA-[ECFNo.708-20at5]). This instruction tracks Swiss law. *See Stroke*, § 6.1.1 (JA-[ECFNo.801-1at6]) ("Preponderant likelihood means that, from an objective point of view, there are substantial grounds to believe that an allegation is true, without other possibilities having major importance or reasonably entering into account."); *accord Shoulder*, 8C_331/2020 § 5.3 (JA-[ECFNo.801-2at6]); *Gravel Pit*, 107 II 269, 273 § 1 (1981) (JA-[ECFNo.801-3at4]).

BNPP's 75% threshold for preponderant likelihood is not Swiss law. The Swiss Supreme Court expressly "renounces using percentages of probability." *Shoulder*, § 5.3 (JA-[ECFNo.801-2at6]) (rejecting law-professor proposals to set high-percentage thresholds); *Employment Insurance*, 4A_0424/2020 § 4.1 (JA-[ECFNo.813-9at10]) ("The case law does not use percentages."). Read "in its entirety," the charge was correct. *Saint-Jean v. Emigrant Mortg. Co.*, 129 F.4th 124, 147 (2d Cir. 2025).[23]

## III. THE DISTRICT COURT PROPERLY INSTRUCTED THE JURY ON THE ELEMENTS OF ARTICLE 50.1 ACCOMPLICE LIABILITY.

The District Court correctly charged that Plaintiffs were required to prove (i) Sudan committed illicit acts in the form of human rights violations, (ii) BNPP

[23] BNPP's reliance on *Terra Firma Invs. (GP) 2 Ltd. v. Citigroup Inc.* is misplaced. BNPP Br. 40-41. That case vacated a foreign-law verdict because the instruction "incorrectly shifted the burden of proof" to the wrong party. 716 F.3d 296, 301 (2d Cir. 2013) (emphasis added). Here, the burden rested on Plaintiffs throughout.

consciously assisted Sudan, and (iii) BNPP's conduct was a natural and adequate cause of Plaintiffs' injuries.

The first element is not at issue here. Sudan's atrocities were so widely reported and Plaintiffs' rights were so clearly violated that BNPP did not contest this element. BNPP acknowledges "Sudan's illicit acts." BNPP Br. 41; *see also* JA-[ECFNo.1069at1466:24-25], JA-[ECFNo.1069at1472:1-2]; JA-[ECFNo.1071at1625:8-17].

**A. The Conscious Assistance Instruction Was Correct.**

The District Court correctly charged that Plaintiffs were required to prove that BNPP "knew or should have known" its "banking and financial services" to Sudan were "contributing to [Sudan's] human rights violations," and that BNPP "knew, or reasonably should have known, that [Sudan] was engaged in human rights violations and [BNPP's] activities would contribute to [Sudan's] ability to commit" them. JA-[ECFNo.1071at1624:15-18], JA-[ECFNo.1071at1625:18-22]. The pretrial standard BNPP invokes (BNPP Br. 41) refutes its own position. Resolving Swiss law under Rule 44.1, Judge Nathan found that that Professor Werro's position "is the accurate description of how the Swiss Supreme Court has interpreted Article 50.1," that the interpretations of Professor Roberto—BNPP's expert—"are flawed," and that "BNPP knew or should have known" "that the Sudanese regime was engaged in a campaign of human rights abuses, that it was massively enriching the Regime by

providing it access to U.S. dollars," and that its conduct "contribut[ed] to tortious conduct." JA-[ECFNo.193at7-8], JA-[ECFNo.193at11-12].

The charge neither "omit[ed]" conscious assistance nor "water[ed] [it] down." BNPP Br. 41. The premise is belied by the charge itself, which told the jury that to know" of Sudan's violations "is to be consciously aware that that was happening," and that liability attaches where BNPP "consciously disregarded information about such conduct." JA-[ECFNo.1071at1625:23-1626:9]; JA-[ECFNo.193 at 6-9]. BNPP stipulated it provided "banking and financial services" to Sudan, which the charge incorporated. JA-[ECFNo.1071at1624:16-20], JA-[ECFNo.1071at1626:7-8]. The charge then asked the jury to determine whether BNPP "reasonably should have known" Sudan committed illicit acts to which those services would contribute. JA-[ECFNo.1071at1626:3-9]. That was legally correct and within the court's "broad discretion" to formulate in terms of stipulated facts. *Barlow v. Liberty Maritime Corp.*, 746 F.3d 518, 529 (2d Cir. 2014).

BNPP relies on snippets—"intentionality of interaction" (*Hay-Wagon*, § 2 (JA-[ECFNo.169-7at6])) and "in concert" (*Locksmith*, § 6.2.1 (JA-[ECFNo.708-15at12]))—to argue that Swiss law requires a specific agreement or mutual intent to cause a particular harm. BNPP Br. 42. That is wrong, as even BNPP's own expert agrees: "conscious collaboration does not presuppose that the participants are working together." Müller, *Perfect Joint & Several Liability* 38 (JA-[ECFNo.174-

3at10]). Under Article 50.1, it is enough that the accomplice and perpetrator "[knew] or could have known by exercising due care, of the contribution of the others to the harmful act." *Locksmith*, § 6.2.1 (JA-[ECFNo.708-15at11-12]). When *Locksmith* stated "in concert," it was describing the facts, not the law. *Id*. *Shooting Contest* confirmed that "[f]or there to be conscious collaboration, it is not necessary for the participants to consult with each other." *Shooting Contest*, 114 § 3 (JA-[ECFNo.528-111at5]). *Strike* upheld liability whether or not an accomplice "intended such a brutal abuse" inflicted by the main perpetrator. *Strike*, § 2 (JA-[ECFNo.708-8at4]); Perritaz, *Concurrent Actions* ¶¶ 242-44 (JA-[ECFNo.171-33at4-5]); *see* JA-[ECFNo.174at15] ¶ 33.

BNPP is wrong is arguing that the court imposed "duty-less negligence." BNPP Br. 42. The court simply recognized that the requisite knowledge for conscious assistance could be shown by what BNPP should have known. BNPP's own expert and treatises agree. JA-[ECFNo.68at7] ¶ 14 (Roberto: liability where accomplice "should have known that the collective conduct might lead to loss or damage"); Perritaz, *Concurrent Actions* ¶ 243 n.308 (JA-[ECFNo.171-33at4-5]) ("each of them knew—or could have known—the contribution of the others and the collective cause") (citing Brehm, Oftinger & Stark, Tercier, and others); Brehm, *Bernese Commentary* ¶ 12 (JA-[ECFNo.171-41at5-6]) ("the participants could have eliminated the danger and could have prevented the damage caused, if they had paid

proper attention"); Fellman & Kottmann, *Swiss Liability Law* ¶ 2779 (JA-[ECFNo.170-2at984]) (*Shooting Contest* "held that liability arises 'for all the parties to a tort . . . as soon as they became aware or ought to have been aware of the danger they created together'"); *see also Gallerist*, 230 § 4a (JA-[ECFNo.174-1at113]) ("each participant is aware of the other's contribution or could have been aware if he had exercised due care"); *Bow and Arrow*, 187 § 2 (JA-[ECFNo.528-115at4]) ("they could and should have recognized" risk); *Locksmith*, § 6.2.2 (JA-[ECFNo.708-15at12]) (parties either "wanted the harm to occur (intent), or at least were aware it could happen (recklessness), or they could have avoided it if they had paid the necessary attention to the circumstances (negligence)").

BNPP cites inapposite authority. The tailgating driver and speeding motorcyclist in *Hay-Wagon* had no collective fault because they acted "without knowledge of the action of the other," causing "damage by different actions that [were] independent." *Hay-Wagon*, 315 § 3 (JA-[ECFNo.169-7at6]). The son in *Father-Son Robbery* escaped joint liability for certain thefts because he did not "participate[] in the transport and custody of" cash drawers, leaving his father "solely liable" for those thefts. 4A_573/2010 § 5 (JA-[ECFNo.530-19at10]). This case is the opposite, involving not unwitting parallel conduct, but years of conscious, full-service collaboration. JA-[PX939at3-14]. BNPP called its own Sudanese clients "BAD GUY." JA-[PX-75at3]. *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), is

inapposite. That case construed the federal aiding-and-abetting standard under the Justice Against Sponsors of Terrorism Act, not Article 50. And *Twitter* endorsed secondary liability where a co-conspirator provides lawful services to an "illicit operation." *Id*. at 502 (discussing *Direct Sales Co. v. United States*, 319 U.S. 703 (1943)).

**B. The Causation Instructions Were Correct.**

***1. Natural Causation***

The District Court properly instructed the jury that natural causation meant that "the human rights violations of the plaintiffs would not have occurred in the same way or in the same magnitude without the banking and financing services provided by BNP Paribas." JA-[ECFNo.1071at1626:24-1627:9]. "If plaintiffs prove by a preponderant likelihood that their injuries more likely occurred because [BNPP] financed [Sudan], or that their injuries occurred in a different manner or magnitude because of [BNPP's] actions, you may find that natural causation exists." *Id.*

BNPP contends that this instruction did not require the jury to find that its conduct was a "but-for" cause of Plaintiffs' injuries. BNPP Br. 44. But the court instructed the jury it must find that Plaintiffs' injuries would not have occurred in the same way "without" BNPP's conduct and that their injuries occurred "because" of BNPP's actions. JA-[ECFNo.1071at1626:24-1627:9]. The instruction comes from BNPP's own *Boat* case: "the result could not have occurred without the

relevant behavior, or it could not have occurred in the same way or at the same time." 4A_444/2010 § 2.1 (JA-[ECFNo.533-61at5-6]). Both district court judges rejected, as contrary to Swiss law, the literal but-for theory BNPP now presses, for which it offered no support. Judge Nathan held that BNPP "point[ed] to no authority from either the Swiss or United States courts" for the rule that "an accomplice is not a 'but for' cause if the primary tortfeasor may still have been able to commit some torts . . . without the help of the accomplice." JA-[ECFNo.193at12]. Judge Hellerstein overruled the same objection at the charging conference. JA-[ECFNo.1069at1486:1-2], JA-[ECFNo.1069at1487:19-20]. Swiss accomplice causation does not require tracing the harm to a single actor.

Moreover, Article 50.1 causation focuses on the participants' collective fault, not each actor's separate conduct. "[I]t is not only the behavior of the direct perpetrator, but rather all persons who participated . . . that is causally linked to the resulting effects." *Strike*, § 2 (JA-[ECFNo.708-8at3]). BNPP's own authority agrees: "it is not required that every tortfeasor be directly involved in the causation of the damage. It is sufficient that his actions . . . contributed." Brehm, *Bernese Commentary* ¶ 16 (JA-[ECFNo.171-41at6]). By tying causation directly to "the banking and financing services provided by BNP Paribas," the District Court demanded more than Swiss law requires. BNPP cannot complain of a standard tilted against Plaintiffs.

BNPP maintains that the instructions wrongly foreclosed argument that Sudan would have committed human rights violations regardless of BNPP's actions. BNPP Br. 45. But the instructions precluded no such argument, and BNPP argued just that defense to the jury. JA-[ECFNo.1071at1559:17-1560:2], JA-[ECFNo.1071at1573:19-1592:19], JA-[ECFNo.1071at1608:20-25], JA-[ECFNo.1071at1609:21-24]. And although BNPP baldly asserts Sudan "had resources" to wage genocide against Plaintiffs' communities "regardless of any oil-transaction revenues," BNPP Br. 16, that proves nothing because BNPP laundered those resources as well. Its scheme handled Sudan's "principal foreign exchange earnings" from gold, agriculture, and other sources. JA-[PX174at7]. In any event, the mere existence of "alternative explanations for the injury" (BNPP Br. 45) does not preclude natural causation, and BNPP was not entitled to an instruction so providing. "[I]t is not relevant that the [injuries] are also caused or even predominantly caused by [other] events," "since it is not required that [defendant's conduct] be the sole cause" of the injuries. *Boat*, § 4.4 (JA-[ECFNo.533-61at9]). Natural causation does not require that BNPP's actions be the "sole or direct cause" of Plaintiffs' injuries. *Whiplash*, 147 V 161, 163 § 3.2 (2021) (JA-[ECFNo.708-14at3]). BNPP's citation to *Unfair Competition* proves Plaintiffs' point. There, the court determined that the plaintiff failed to show confusion with a competing store—including because the plaintiff failed to substantiate its allegations of employee

poaching and trade-secret theft—and therefore plaintiff's own failures were *solely* to blame for the plaintiffs' injury. 4A_311/2021 §§ 2, 3.2-3.2.2 (JA-[ECFNo.528-121at4-6]).

### *2. Adequate Causation*

BNPP complains that the adequate causation instruction let the jury assume a causal link between its misconduct and Plaintiffs' injuries. BNPP Br. 47. But the instruction forbade that leap: "[I]f the link between [BNPP's] financial and banking services to [Sudan] and the injuries suffered by the plaintiffs is too attenuated or remote, then causation is not adequate." JA-[ECFNo.1071at1627:19-22]); *see also* JA-[ECFNo.1071at1624:19-21] ("[BNPP's] banking and financial services to [Sudan]" must be "a natural and adequate cause of *each plaintiff's injuries and losses*" (emphasis added)). The jury could consider damages only if Plaintiffs "each" proved that BNPP's conduct adequately caused "that plaintiff's loss and injuries." JA-[ECFNo.1071at1628:4-7].

Swiss law does not require anything more. Plaintiffs need not tie specific laundered dollars to particular atrocities or show that Turjuman's torture and detention, Abdalla's attacks, or Kashef's assaults were specifically foreseeable to BNPP. *Contra* BNPP Br. 46. Rather, adequate causation requires merely that the injury be "within the reasonable range of objectively foreseeable possibilities" of a defendant's conduct. JA-[ECFNo.536-3at55] ¶ 132 (quoting 119 Ib 334, 345 § 5).

Foreseeability of the precise victim or method of violence is not required. *Scooter*, 6B_253/2012 § 3.3.2 (JA-[ECFNo.174-2at312]) ("kind of result"). An accomplice need only make a "legally relevant contribution" "generally capable of facilitating" an act that harms the plaintiff. *Swisscom*, 77 § 2.3.1 (JA-[ECFNo.708-13at7]). BNPP's expert agrees that each Article 50 participant is liable "for everything" under the "principle of adequate causality, according to which a cause, even partial, can be adequately causal for all of the injury." Müller, *Extracontractual Civil Liability* 261 (2023) (JA-[ECFNo.533-7at3]).

The charge reflected the objective analysis required: whether a collective-harm participant's "conduct was capable, in the ordinary course of events and common experience, of leading to the kind of result that occurred." *Scooter*, § 3.3.2 (JA-[ECFNo.174-2at312]); *see Vehicular Homicide*, 131 IV 145, 147 § 5.1 (2005) (JA-[ECFNo.708-17at3]) (articulating "objective foreseeability" standard); *see also, e.g.*, JA-[ECFNo.1071at1625:4-6] (instructing jury to apply "common sense and life experience"). Additionally, BNPP's conduct need not be "the direct or sole cause": adequate causation exists even where other causes contribute, such as "the condition of the victim, the victim's conduct, or the conduct of third parties." *Vehicular Homicide*, 148 § 5.2 (JA-[ECFNo.708-17at3]); *cf. Shooting Contest*, 114 § 3 (JA-[ECFNo.528-111at6]) (noting the "sequence of acts by commission and omission which all contributed to adequately cause" the plaintiffs' damage). An unpredictable

"concurrent act" alone does not break the chain. *Vehicular Homicide*, 148 § 5.2 (JA-[ECFNo.708-17at3]).

Here, the fungibility of money and the collective nature of genocide obviate BNPP's proposed dollar-tracing requirement; sanctions work by constricting overall liquidity, not by tracking particular dollars to particular bullets. The Swiss Supreme Court did not require that type of close causal nexus when holding the financial service provider liable as an accomplice to trademark infringement, even though it did not design or choose the infringing mark. *Locksmith*, § 6.2.1 (JA-[ECFNo.708-15at12]). Nor was the passive "system liability" rejected in *Swisscom*, 79 § 2.3.2 (JA-[ECFNo.708-13at7-8]); JA-[ECFNo.174at24] ¶ 52. *Contra* BNPP Br. 48. Here, BNPP and Sudan had a direct, purposeful, and illegal relationship, and BNPP knew the atrocities were ongoing as it financed them. BNPP is nothing like a telecom provider offering automated service to the public.

The underlying point of U.S. sanctions implicitly acknowledges the causal link between Sudan's access to the very resources (U.S. dollars) needed to carry out its avowed and foreseeable genocidal plans. And the system of internationally established compliance safeguards touted in the Banks' Brief, 28-29 (Dkt. 17), confirms foreseeability; preventing foreseeable harm is why those safeguards exist. BNPP's U.S. proximate-cause authorities are inapposite as well: they construe the federal Anti-Terrorism Act, not Swiss adequate causation. *Rothstein v. UBS AG*, 708

F.3d 82, 84-85 (2d Cir. 2013); *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 119 (2d Cir. 2013).

**C. Any Error Was Harmless.**

This Court should affirm if "convinced that the error did not influence the jury's verdict"; the appellant bears the burden of showing prejudice. *Gordon v. N.Y. City Bd. of Educ*., 232 F.3d 111, 116 (2d Cir. 2000); *Renz v. Grey Advert., Inc*., 135 F.3d 217, 223-24 (2d Cir. 1998). Also, the Court affirms despite instructional error on one-sided records, including a human-rights verdict resting on a common factual core. *Sanders v. N.Y.C. Human Res. Admin*., 361 F.3d 749, 758-59 (2d Cir. 2004); *Lore v. City of Syracuse*, 670 F.3d 127, 150 (2d Cir. 2012).

As to BNPP's role, this record is not a close call. BNPP pleaded guilty and stipulated to a statement of facts read to the jury, JA-[PX939at1-14]; JA-[ECFNo.1101at104:4-18], JA-[ECFNo.1101at123:1-8]; it processed roughly eighty-one billion dollars in transactions for "Sudanese authorities and entities" between 2002 and 2009, JA-[ECFNo.1122at891:18-24]; JA-[PX991at34] while knowingly helping the Sudanese government skirt U.S. sanctions. JA-[ECFNo.1087at29:8-19], JA-[ECFNo.1087at37:8-13] (in denying BNPP's rule 50 motion, the Court referred to "the amount and quantity of evidence showing the conscious knowledge of Bank Paribas," and cited *Kinneary v. City of New York*, 601 F.3d 151, 155 (2d Cir. 2010).

The conscious assistance element was not seriously in contention. BNPP's own executive admitted from the stand, in answer to the bench, that "you knew when you were doing the financing that the government of Sudan was guilty of human rights violations"—"Yes, your Honor." JA-[ECFNo.1120at1181:7-10]. Any error perceived by BNPP in the instructions would not have changed the outcome.

## IV. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ITS EVIDENTIARY RULINGS.

BNPP challenges two evidentiary rulings: admitting evidence that BNPP pled guilty to criminal violations of U.S. sanctions, and excluding evidence of BNPP's purported compliance with Swiss, EU, and UN sanctions. Neither ruling was an abuse of discretion. "District courts have broad discretion to balance probative value against possible prejudice" under Rule 403, and this Court "will not disturb that balancing unless there is a clear showing of abuse of discretion or that the decision was arbitrary or irrational." *United States v. Bermudez*, 529 F.3d 158, 161-62 (2d Cir. 2008) (internal quotations and citation omitted). Any error would have been harmless. *Carroll v. Trump*, 124 F.4th 140, 157-58 (2d Cir. 2024). BNPP has failed to show harm and that the "factfinder's judgment was [materially] swayed by the error," *id.* (citation modified).

### A. The District Court Did Not Abuse Its Discretion in Concluding That BNPP's Guilty Plea Was More Probative Than Prejudicial.

BNPP's guilty plea is admissible as an opposing party's statement under Federal Rule of Evidence 801(d)(2)(A). Guilty pleas are also admissible in subsequent civil proceedings. *See* Fed. R. Evid. 803(22).

The Court tentatively ruled the plea had estoppel effect and foreclosed BNPP's defense altogether, JA-[ECFNo.675at2], but relented to give BNPP a chance to explain away its confession, *see* JA-[ECFNo.684at28:7-38:18]. The court narrowly tailored the Stipulated Statement of Facts paragraph by paragraph over Plaintiffs' objections, *see generally* JA-[ECFNo.738at1-53]; JA-[ECFNo.792-1at1-33], and framed it neutrally for the jury. The SSOF opens with a plain factual statement giving the jury relevant context: "In connection with a plea of guilty by Defendants in *United States v. BNP Paribas, S.A.*, Docket Number 14 Cr. 406, Defendants made the following statements, which they agree are true and correct, and which are now being put into evidence in this case." JA-[ECFNo.796at1]; JA-[PX939at1]. The rest recites BNPP's statements. JA-[PX939at3]. This was no abuse of discretion.

The plea was highly probative of the central issue—that BNPP willfully financed Sudan while knowing it would cause the harms Plaintiffs suffered—as this Court previously recognized. *Kashef*, 925 F.3d at 62-63. BNPP does not contest the probative value of its guilty plea, BNPP Br. at 49-51, which must be "maximize[d]"

on review. *United States v. Downing*, 297 F.3d 52, 59 (2d Cir. 2002) (citation modified).

BNPP's authorities do not help it. *Arlio v. Lively* excluded a prior arbitration under a different legal standard, "probative of a non-material issue." 474 F.3d 46, 53 (2d Cir. 2007). *United States v. McCallum* concerned a prior, unrelated conviction offered to show propensity. 584 F.3d 471, 476 (2d Cir. 2009). Here the plea is based on a higher standard of proof (beyond a reasonable doubt), is offered against the same party, for the same conduct, to prove the same mental state.

Nor was the Rule 403 analysis deficient: a judge "is not required to mechanically recite his analysis," *United States v. Brady*, 26 F.3d 282, 287 (2d Cir. 1994), and this Court presumes "due consideration" of the Rule 403 factors, *United States v. Morgan*, 786 F.3d 227, 232 (2d Cir. 2015). The court expressly found the plea "probative" of "knowledge." JA-[ECFNo.796at2]. BNPP also had ample means to blunt any prejudice: it argued in closing that the plea reflected cooperation with the Department of Justice and marked the limit of its responsibility, JA-[ECFNo.1116at1064:2-25]; JA-[ECFNo.1071at1610:5-23], and warned the jury against sending a supposedly "very different message" about BNPP's culpability. JA-[ECFNo.1071at1611:3-19].

BNPP's plea for a limiting instruction is unavailing. Limiting instructions address the risk that a jury might misuse evidence, but here the evidence was used for its proper purpose: establishing BNPP's knowledge and intent.

BNPP argues it wanted the jury to understand that the U.S. government, not Plaintiffs, was the "victim" of BNPP's criminal-sanctions violations. BNPP Br. 11. In addition to being a mischaracterization of criminal convictions, BNPP offers no better way to clarify that nuance than to tell the jury it pled guilty.

### B. The District Court's Rulings on BNPP's Purported Compliance with Foreign Sanctions Were Not Abuses of Discretion.

BNPP suffered no prejudice from the limits placed on its foreign-sanctions compliance evidence, because it put that case to the jury anyway. JA-[PX990at159:13-23]; JA-[ECFNo.1120at1170:12-24]; JA-[ECFNo.1067at1384:20-21].

Over Plaintiffs' objection, and contrary to its plea admissions BNPP introduced testimony that it "may have misinterpreted U.S. rules" and that "it was not that clear at the time that the U.S. sanctions were actually covering European banks." JA-[PX987at55:11-57:8], JA-[PX987at59:18-23]. The District Court told the jury "[t]he American sanctions were broader than the European sanctions," JA-[ECFNo.1067at1390:13-14], admitted testimony that the European embargo forbade financing arms, JA-[ECFNo.1067at1384:19-25], JA-[ECFNo.1067at1390:1-12,], and let BNPP argue compliance in summation, JA-[ECFNo.1071at1564:1-10], JA-

[ECFNo.1071at1595:9-20]. The District Court did not forbid BNPP's defense; it merely kept the foreign-sanctions issue from dominating the trial.

Rightly so. As, the Swiss Supreme Court held: "The fact that the defendants may have considered their actions to be licit does not exempt them." *Rediffusion*, 93 § 9 (JA-[ECFNo.533-10at7]).

On the merits, purported compliance with a narrower arms embargo says nothing about whether BNPP knew it funded and "generally facilitated" a genocide—the question Article 50.1 actually asks. *Swisscom*, 77 § 2.3.1 (JA-[ECFNo.708-13at7]). As the court explained, the issue was not "what other countries have done," but "whether the defendant . . . consciously assisted, aided, and abetted the government of Sudan." JA-[ECFNo.1101at277:12-17]. BNPP's reliance on *Gill v. Arab Bank, PLC* cuts against it: that court admitted foreign-law evidence because the bank's knowledge was contested yet held that "[c]ompliance with United States anti-money laundering and terrorist financing policies and practices is not dispositive." 893 F. Supp. 2d 523, 537-39 (E.D.N.Y. 2012). Here, BNPP's knowledge is admitted. *Kashef*, 925 F.3d at 56. The proffered evidence could not negate any element—it could only confuse the jury.

## V. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DECLINING TO HOLD AN EVIDENTIARY HEARING REGARDING ALLEGED ATTORNEY MISCONDUCT.

On the eve of trial, BNPP manufactured an ethical issue from uncorroborated hearsay allegations, later withdrawn. *See* JA-[ECFNo.1081at6:24-7:2] (withdrawing statements at JA-[ECFNo.1028at1-9]); JA-[ECFNo.1065at45:5-6]. BNPP seized on "disagreements" among Plaintiffs' counsel, *e.g.*, JA-[ECFNo.784-3at5-8] ¶¶ 11-14, and class-settlement activity—not trial evidence—to delay and distract from trial preparation. JA-[ECFNo.675at2]. The District Court recognized BNPP's role in fomenting the issue. JA-[ECFNo.1065at19:15-16].

BNPP's characterization of these events as "witness tampering" (BNPP Br. 4, 21, 57) is unsupported, inflammatory, and contradicted by every judicial finding below. All along, BNPP's *only* evidence of potential wrongdoing was based on uncorroborated hearsay allegations. *See* JA-[ECFNo.1065at30:20-23] (referring to JA-[ECFNo.784,784-1,784-2]); JA-[ECFNo.1023-1at1-2] (exclusively citing counsel's motion to disqualify); *see* JA-[ECFNo.1065at45:5-6] (noting withdrawal); JA-[ECFNo.939at2] (stipulated withdrawal). Finding no tainted evidence or prejudice, it rejected BNPP's "frivolous" "fishing expedition." JA-[ECFNo.1065at19:18], JA-[ECFNo.1065at22:16].

District courts have broad, deferentially-reviewed discretion to manage trials, regulate evidence, and decide whether live testimony is necessary—including

whether to hold an evidentiary hearing. *See Tesser v. Bd. of Educ.*, 370 F.3d 314, 318 (2d Cir. 2004). "[A] motion for sanctions does not automatically require an evidentiary hearing at all." *Rossbach v. Montefiore Med. Ctr.*, 81 F.4th 124, 138 (2d Cir. 2023). BNPP has shown no prejudice; and, its allegations of witness coaching find no support in the record. *See* JA-[ECFNo.1025at5-10]; JA-[ECFNo.1028-1at2] ¶ 3; JA-[ECFNo.1028-2at2] ¶ 3.

### A. The District Court Reasonably Declined a Pretrial Hearing and Preserved Adequate Alternatives for BNPP's Objections.

BNPP's own submissions alleged no misconduct—only tactical disagreements among Plaintiffs' counsel over class members and retained experts, none bearing on trial. *See generally* JA-[ECFNo.784at1-18]; JA-[ECFNo.784-3at5-8] ¶¶ 11-23. Finding "no support to any allegation of improper behavior with respect to the individual plaintiffs or their counsel," JA-[ECFNo.789at1], the court denied a hearing as to the individual plaintiffs and denied it without prejudice as to the class, with leave to renew post-trial. *Id*.

BNPP renewed weeks later; the court again denied the motion, explaining that cross-examination could probe any "coaching." JA-[ECFNo.818at2-3]; *see Geders v. United States*, 425 U.S. 80, 89 (1976). On the eve of jury selection, the court repeated that cross-examination remained available—which BNPP confirmed—and declined to open collateral mini-trials. JA-[ECFNo.1007at11:18-21], JA-[ECFNo.1007at30:18-20].

The court was well within its "inherent power and responsibility to manage its docket so as to achieve the orderly and expeditious disposition of cases." *Huebner v. Midland Credit Mgmt., Inc.*, 897 F.3d 42, 53 (2d Cir. 2018) (citation modified). It properly refused to "derail[]" the case with "collateral proceedings" threatening "the integrity of the attorney-client relationship and the work product doctrine." JA-[ECFNo.818at1-2]; *see Safe-Strap Co. v. Koala, Inc.*, 270 F. Supp. 2d 407, 417 (S.D.N.Y. 2003) (courts ordinarily defer Rule 11 determinations until litigation ends).

**B. BNPP Failed to Identify Taint in the Trial Proceedings.**

Post-verdict, the court tested BNPP's taint claim by demanding specific record support. JA-[ECFNo.1065at4:12-13], JA-[ECFNo.1065at4:23-24], JA-[ECFNo.1065at5:18]. BNPP could not identify a single episode. It pointed instead to an expert who did not testify, JA-[ECFNo.1065at9:4-5]; a lay witness whose testimony was struck, JA-[ECFNo.1065at13:9-12]; and a witness BNPP never cross-examined, JA-[ECFNo.1065at18:6-13], JA-[ECFNo.1065at27:4-12]—including victim-witnesses it chose not to cross-examine at all. JA-[ECFNo.1065at29:24-30:5]. Thus, the court found "not a shred" of proof. JA-[ECFNo.1065at5:10-11], JA-[ECFNo.1065at31:8-9]. That first-hand assessment is entitled to deference. *See Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 370 (2d Cir. 1988).

A new trial requires proof that "counsel's conduct created undue prejudice or passion which played upon the sympathy of the jury." *Matthews v. CTI Container Transp. Int'l, Inc.*, 871 F.2d 270, 278 (2d Cir. 1989). BNPP shows none—on appeal, it merely repeats that without a hearing it cannot know what testimony, if any, was "infected by the alleged misconduct." BNPP Br. 57-58. BNPP brushes past the fact that it had cross-examination available to attack credibility and expose coaching, as its own ethics expert acknowledged. JA-[ECFNo.1007at11:18-21], JA-[ECFNo.1007at30:18-20]; JA-[ECFNo.816at8-9] ¶ 23; JA-[ECFNo.818at2-3]. BNPP had a full opportunity to make its case and failed. The Court should affirm.

## VI. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING REMITTITUR, AND REASONABLY ALIGNED SWISS JUDGE-DETERMINED DAMAGES WITH THE SEVENTH AMENDMENT.

Calculating damages "is the province of the jury." *Ortiz v. Stambach*, 137 F.4th 48, 72-73 (2d Cir. 2025) (citation omitted). This Court "will not vacate or reduce a jury award merely because [it] would have granted a lesser amount of damages." *Id*. Denying remittitur lay "within the range of permissible decisions" and was no abuse of discretion. *Buon v. Spindler*, 65 F.4th 64, 74 (2d Cir. 2023) (citation omitted). Even under a "damage-control standard [foreign] law supplies," this Court "must give the benefit of every doubt to the judgment of the trial judge." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 438-39 (1996) (citation omitted).

BNPP does not challenge the economic-damages awards. BNPP Br. 58-60. It contends instead that the court had to slash Plaintiffs' moral damages to match "comparable cases.'" *Id*. at 59 (quoting JA-[ECFNo.1042-9at16-17] ¶ 40); *id*. at 58. But BNPP waived that argument because it never made a proffer of proof at trial concerning "comparable" Swiss cases.

Regardless, Swiss law gives the factfinder "a wide margin of discretion." *Prostitution*, 6B_628/2012 § 2.3 (JA-[ECFNo.708-22at5]). It sets no minimum or maximum, JA-[ECFNo.536-3at65-6] ¶¶ 157, 161, JA-[ECFNo.985-1at27] ¶ 77, and forbids setting moral damages "according to fixed tariffs," *Gunshot*, 132 II 117, 120 § 2.2.3 (JA-[ECFNo.708-21at3]). Comparisons are permitted, not required. An award stands unless the court "deviated from the *principles*" recognized in law, "[took] into account *facts* that should not have played a role in the decision," or "ignored *circumstances* that should have been taken into account." *Prostitution*, § 2.3 (JA-[ECFNo.708-22at5]).

BNPP misconstrues the Swiss "objective" damages analysis. BNPP Br. 59. The jury was entitled to first set an "objective baseline" award "approximat[ing] the harm that the 'average person' would suffer 'in a similar case, under the same circumstances,'" JA-[ECFNo.985-1at29] ¶ 83 (quoting *Poster Campaign*, 128 IV 53, 71 § 7 (JA-[ECFNo.708-24at11])), using "common-sense calculation[s]" and "general life experience." JA-[ECFNo.985-1at29] ¶ 84. The jury was then entitled

to weigh each Plaintiff's "subjective pain and suffering," hence the differing awards. *See* JA-[ECFNo.985-1at32] ¶ 92.

BNPP does not argue the jury or the court ignored relevant factors or relied on improper ones, but only that the court did not bring the awards closer to those in Swiss personal injury cases. BNPP Br. 59-60. But this case involves "atrocities," JA-[ECFNo.1071at1558:11-19], condemned "as genocide," not garden-variety torts. *Kashef*, 925 F.3d at 55; JA-[ECFNo.1099at113:6-9]. The jury heard uncontroverted evidence of slaughter, torture, gang-rape, and forced displacement. JA-[ECFNo.1114at967:4-10], JA-[ECFNo.1114at993:2-17], JA-[ECFNo.1114at992:1-3] (Ms. Kashef); JA-[ECFNo.1108at664:10-12], JA-[ECFNo.1108at669:2-8], JA-[ECFNo.1108at695:2-7] (Mr. Turjuman); JA-[ECFNo.1122at921:18-25], JA-[ECFNo.1122at930:18-931:19], JA-[ECFNo.1122at943:15-21] (Mr. Abdalla). The awards match that suffering, which BNPP conceded was "staggering." JA-[ECFNo.1099at33:12-19].

BNPP wrongly argues that the court treated Swiss and U.S. law "the same." BNPP Br. 59. The court applied principles grounded in Swiss caselaw: "broad discretion," "severity . . . presumed given the nature of" the atrocities, and an award informed by "[g]eneral life experience." JA-[ECFNo.1087at66:24-67:19]; *see also* JA-[ECFNo.536-3at60-66], JA-[ECFNo.985-1at23-32]. It agreed it must check whether the award was "manifestly too low or too high" or "disproportionate." JA-

[ECFNo.1087at67:21-68:12]. It used "the same" only to note that pain and suffering in both systems is "inherently subjective." *In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831, 853 (2d Cir. 1992).

The court carefully applied the Swiss civil-law system of damages to a federal jury trial without invading Plaintiffs' Seventh Amendment rights. BNPP's novel, rigid comparative cap would require damages calculated by Swiss judges and deny Plaintiffs a jury trial. *Suero-Algarín v. CMT Hosp. Hima San Pablo Caguas*, 957 F.3d 30, 45 n.16 (1st Cir. 2020); *LaForest v. Autoridad de Las Fuentes Fluviales de Puerto Rico*, 536 F.2d 443, 446-47 (1st Cir. 1976). It would have been error to force jurors to *disregard* evidence and rely instead on Swiss cases to measure damages. There was no abuse of discretion.

## VII. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING BNPP'S *FORUM NON CONVENIENS* MOTION.

A *forum non conveniens* ruling "may be overturned only" when "discretion has been *clearly* abused." *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 72 (2d Cir. 2001) (en banc). As a threshold matter, BNPP fails its burden to show "substantial prejudice" warranting reversal of the denial of *forum non conveniens* relief after a trial on the merits. *Petersen Energia Inversora S.A.U. v. Argentina Republic & YPF S.A.*, 172 F.4th 120, 133 (2d Cir. 2026). BNPP has not identified a single witness it could not call, document it could not obtain, or disadvantage it suffered from litigating in New York. No Swiss witnesses were forced to come to New York. The

trial record was built almost entirely from evidence already present in the U.S.: BNPP's guilty plea, the Stipulated Statement of Facts, U.S. government documents, and testimony from U.S.-based witnesses. BNPP did not suffer substantial prejudice. This alone defeats the appeal.

Regardless, the District Court properly applied the *forum non conveniens* test: deferring to Plaintiffs' choice of forum, finding no adequate alternative forum, and weighing the private and public interests. Denial lay well "within the range of permissible decisions," *Celestin v. Caribbean Air Mail, Inc.*, 30 F.4th 133, 137, 148 (2d Cir. 2022), and BNPP's parroting of its district-court arguments cannot support reversal. *See Iragorri*, 274 F.3d at 72 (rejecting *de novo* review).

***1. Deference.*** Plaintiffs, as U.S. citizens and residents, are entitled to significant deference in their choice of forum. *See Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 102 (2d Cir. 2000). And the need to apply Swiss law is no basis to dismiss; dismissal on that ground can itself be an abuse of discretion. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 260 n.29 (1981); *Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.*, 145 F.3d 481, 492 (2d Cir. 1998). Determining foreign law is "a chore federal courts must often perform." *Manu Int'l, S.A. v. Avon Prods., Inc.*, 641 F.2d 62, 67-68 (2d Cir. 1981) (citation omitted).

***2. No Adequate Alternative Forum.*** BNPP concedes "Swiss courts would decline jurisdiction." BNPP Br. 36. This concession is "fatal." *Norex Petroleum Ltd.*

*v. Access Indus., Inc.*, 416 F.3d 146, 157 (2d Cir. 2005). BNPP's fallback claim—that it could manufacture Swiss jurisdiction through consent (BNPP Br. 62)—fails too: Swiss courts "may decline jurisdiction if neither party has its domicile or habitual residence" in Switzerland and "if Swiss law is not applicable." *Marriage Protection*, 119 II 167 § 3 (2003) (JA-[ECFNo.279-7at5]); *see* JA-[ECFNo.279at12-20] ¶¶ 24-47. There is no Swiss party here, and a Swiss court would apply Sudanese law. *See* JA-[ECFNo.279at17-19] ¶¶ 38-47, n.32. Denial was proper.

***3. No Inconvenience.*** The court fairly weighed private interests. Any added cost to BNPP "is fully counterbalanced by the cost and inconvenience to the plaintiffs of requiring them to reinstitute the litigation in [Switzerland]—especially given the plaintiffs' minimal resources in comparison to the vast resources of [BNPP]." *Wiwa*, 226 F.3d at 107. Plaintiffs cannot speak French, German, or Italian, cannot afford Swiss litigation, and would lose their U.S. counsel. JA-[ECFNo.279at28-32] ¶¶ 72-82; JA-[ECFNo.282at2-3] ¶¶ 5-7. They could not "realistically" sue in Switzerland. *Manu*, 641 F.2d at 67. Just two of 94 potential witnesses were thought to be in Switzerland, versus 60 in the U.S., JA-[ECFNo.281at8-9] ¶ 21, and Swiss-originating documents were likewise available in the U.S. JA-[ECFNo.281at7] ¶ 15. Finally, BNPP's six-year delay—filing only after losing on Swiss law and after facing damaging discovery—cuts against it. ECF Nos. 229, 261; *see also* ECF No. 278 at 6, 16-17; JA-[ECFNo.338at5], JA-

[ECFNo.338at9-10] (noting BNPP "appear[ed] to be seeking to avoid the [court's] jurisdiction, perhaps in favor of another more favorable forum"). BNPP cannot show "the balance of conveniences tipped strongly in its favor." *Guidi v. Inter-Continental Hotels Corp.*, 224 F.3d 142, 147 (2d Cir. 2000); *see* JA-[ECFNo.388at7-12].

***4. Public justice.*** The public interests favor accountability over impunity. By laundering billions of U.S. dollars through New York, BNPP undermined a U.S. national-security policy: preventing genocide. It did so to support Sudan's bloody regime, causing unspeakable harm to Plaintiffs. A New York jury held it accountable to the foreseeable victims. BNPP wants to escape, but no forum offers shelter—France prosecutes for complicity in crimes against humanity,[24] and Switzerland lacks jurisdiction. *See* BNPP Br. 36.

This case belongs in New York federal court where BNPP was prosecuted and convicted. No party is Swiss, and Swiss courts lack mechanisms to handle mass tort litigation. *See* JA-[ECFNo.279at6] ¶ 7; *see generally* JA-[ECFNo.279at25-32] ¶¶ 63-83 (noting insuperable barriers Plaintiffs would face in Switzerland). U.S. courts are well equipped to apply Swiss law. *E.g.*, *Motorola Credit Corp. v. Uzan*,

[24] *See* Michael Posner, *Lafarge Verdict Puts Multinationals In Conflict Zones On Notice*, Forbes (Apr. 21, 2026), https://www.forbes.com/sites/michaelposner/2026/04/21/lafarge-the-cost-of-complicity/.

388 F.3d 39, 51-53 (2d Cir. 2004). And without jurisdiction, Switzerland has no compelling sovereign interest.

## CONCLUSION

This Court should affirm.

Date: August 21, 2026

Respectfully Submitted,

/s/ *Michael D. Hausfeld*
Michael D. Hausfeld
Mary Sameera Van Houten Harper
HAUSFELD LLP
1200 17th Street, NW, Suite 600
Washington, DC 20036
(202) 540-7200
mhausfeld@hausfeld.com
mvanhouten@hausfeld.com

Kathryn Lee Boyd
David L. Hecht
Lori G. Feldman
HECHT PARTNERS LLP
125 Park Avenue, 25th Floor
New York, NY 10017
(212) 851-6821
lboyd@hechtpartners.com
dhecht@hechtpartners.com
lfeldman@hechtpartners.com

Kristen L. Nelson
HECHT PARTNERS LLP
6420 Wilshire Boulevard, 14th Floor
Los Angeles, CA 90048
(212) 851-6821
knelson@hechtpartners.com

Adam J. Levitt
DICELLO LEVITT LLP
10 North Dearborn Street, 6th Floor
Chicago, IL 60602
(312) 214-7900
alevitt@dicellolevitt.com

Scott Gilmore
DICELLO LEVITT LLP
801 17th Street, NW, Suite 430
Washington, DC 20006
(202) 975-2288
sgilmore@dicellolevitt.com

# CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(5) of the Federal Rules of Appellate Procedure, the foregoing brief is in 14-Point Times New Roman proportional font and contains 13,951 words and thus is in compliance with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

Date: August 21, 2026

Respectfully Submitted,
/s/ *Michael D. Hausfeld*

Michael D. Hausfeld
Mary Sameera Van Houten Harper
HAUSFELD LLP
1200 17th Street, NW, Suite 600
Washington, DC 20036
(202) 540-7200
mhausfeld@hausfeld.com
mvanhouten@hausfeld.com

Kathryn Lee Boyd
David L. Hecht
Lori G. Feldman
HECHT PARTNERS LLP
125 Park Avenue, 25th Floor
New York, NY 10017
(212) 851-6821
lboyd@hechtpartners.com
dhecht@hechtpartners.com
lfeldman@hechtpartners.com

Kristen L. Nelson
HECHT PARTNERS LLP
6420 Wilshire Boulevard, 14th Floor
Los Angeles, CA 90048
(212) 851-6821
knelson@hechtpartners.com

Adam J. Levitt
DICELLO LEVITT LLP
10 North Dearborn Street, 6th Floor
Chicago, IL 60602
(312) 214-7900
alevitt@dicellolevitt.com

Scott Gilmore
DICELLO LEVITT LLP
801 17th Street, NW, Suite 430
Washington, DC 20006
(202) 975-2288
sgilmore@dicellolevitt.com