# 26-341

## United States Court of Appeals for the Second Circuit

ENTESAR OSMAN KASHEF, TURJUMAN RAMADAN ADAM, AND ABULGASIM SULEMAN ABDALLA,

*Plaintiffs-Appellees*,

v.

BNP PARIBAS,

*Defendant-Appellant*,

[*Caption Continued on Inside Cover*]

On Appeal from the U.S. District Court for the Southern District of New York
No. 16-cv-3228, Judge Alvin K. Hellerstein

**PAGE PROOF REPLY BRIEF FOR DEFENDANT-APPELLANT BNP PARIBAS S.A.**

Barry H. Berke
Dani R. James
Michael Martinez
Matt Benjamin
David Salant
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000

Carmine D. Boccuzzi, Jr.
Abena Mainoo
Katherine R. Lynch
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006
(212) 225-2000

Thomas H. Dupree Jr.
Russell B. Balikian
Aaron Smith
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036
(202) 955-8500
TDupree@gibsondunn.com

ALFADEL MOSABAL, ABUBAKAR ABAKAR, SIAMA ABDELNABI HAMAD, ABBO AHMED ABAKAR, HAWA MOHAMED OMAR, FATIMA ABDALLA ABDELRAHMAN, NYANRIAK TINGLOTH, REVEREND ANDERIA LUAL, NICOLAS HAKIM LUKUDU, JOHNMARK MAJUC, JOSEPH JOK, HALIMA SAMUEL KHALIFA, AMBROSE MARTIN ULAU, SANDI (SUNDAY) GEORGARI MARJAN, SHAFIKA G. HASSAN, JANE ROE, CLARA E. TABOR, SARA NOURELDIRZ ABDALLA, AMIR AHMED, ISAAC ALI, KUOL SHBUR, JUDY ROE, ESAMELDIN N. ABDELAZIZ, HAMDAN JUMA ABAKAR, ROSA BOL RING, ADIEL ABAKER ABDALLA, ARBAB KHAMIS KHATER, ISMAIL IDRIS ADAM, FATMA OMAR AHMED, HAWA ISMAIL, ADAM ABAKAR HISSEIN, ACHAN ACHOR DUMO, MONG PETER LAM, JACOB LOK GATKOUTH, MAHDI ALTIGANI ALNOUR, HAYDAR AHMED ABDALLA, MAHMOUD MOHAMED IBRAHIM, RABAB AHMED EL SAYED ADAM, HANADI ABAKER MOHAMED, AHMED JUMA AHMED, ATONG D DENG, ABDALLA MOHAMED IDRISS, MOHAMED OMER SALIH HASABO, OMAR BAHER SIBOURU, ADAM ABDELRAHMAN ISMAIL, ABDULMAJID A GAMAR, MUTAZ MOHAMED MAKI KOMI, GAFFAR HAMID ALI NOURELDEIN, NOHA GAFFER HAMID ALI, FATHIA YAGOUB ELNOUR BAKHAT, SADAM Y MOHAMED, KHALID SAYFELDIN KRAMELDIN, SALAH IBRAHIM AHMED, SOMIA ALI ALI, ABDELRAHMAN HASSAN AHMED, MOHAMED ADAM OSMAN MOHAMED, ELHADI HAROUN ADAM, YAHYA MUSA ABDALLA, ABDALRAHMAN OSMAN FADOUL, ABDELKARIM MOUSA OMAR, KUIER AGUER ATEMDENG, SAID ABOBAKAR AHMED ABDALA, ABDELRAZIQ MUSA HUSSEIN, MUSTAFA ALNOR, MOHAMED I ABOH, ALI OMER AMIR TAGAL, IBRAHIM FADL JUMAA, ABBAS KHAMIS HAROON, ZEINAB ABBU, YOUNES OMAR ADAM, IBRAHIM FADEL HUSSEIN, KALTHOUM ARBAB MUSA, MUSA S ADAM, ABDULATIF ISAAK, MARYAM BABO, BABIKER ABDALLA ISAAC, IBRAHIM ALNOR JUMA, ABOUD ISSA SALEH, OMER AMIR BAKHIT, NORELDIN ADAM OSMAN, EISA MOHAMED, IDRISS ADAM MOHAMED DAWOUD, ABDELAZIM ADAM AHMED ABDELMOULA, RAMADAN YAHAI HAROUN, ABDUSHAFAIE ABUBAKER AHMED, NAWAL ABAKR, MUSA MOHAMED AHMED, MUSTAFA ISAAC MOHAMMED, HAROUN MOHAMED IDRIS, ABDALLA OMER AMIR, HALEEMA HARSWON ABDALLA, ABDELGADIR MOHAMED ABBAKER, MUSA BABIKER ALI HUSSEIN, ABDELKARIM MOHAMED TOGOL B BAKHIT, MOHAMED ABDALLA MOHAMUD, HASSEN A MOHAMED ISMAEL ISMAEL, YAKOUB A YAKOUB, SALEH MOHAMED AHMED, YAGOUB OMER ELSHEIKH, SHADIA MOKHTAR HAMAD ABDELRHAMAN, ISMAIL ABBAS, MARIA ADAM SALIH, JAMES THON ALEER, MALUAL MANYOK DENG DUOT, AMIR SULEIMAN SHAWKAR, YOR CHOL YOR, MORWEL MATHIANG DENG, THON MAJAK DENG, ISHAG OTHMAN ADAM AHMED, SULEIMAN MOHAMED SALEH, JOSEPH AJEO MOILINGA, KRISTENA PETER RUFAEL, ELAF RUFAEL, NOURELDIN MAHDI ABDALLA ELTOM, ARBAB ABDALLAH ADAM, MOUSTAPHA IBRAHIM MAHAMAT, SAMIA ARBAB ABDURHAMAN, HAMRA IBRAHIM FADOUL, DJOUMA ARBAB ADAM, MATAR MAKINE ABAKAR, YAKUB HAROUN ABDULMOLA, HALEIMA NASRALDEN ABDELMAWLA SHERF, YAHYA KHAMIS, ANWAR HAMED ELNOUR, HASSAN HADO IBRAHIM HASSAN, YOUNESS HASSAN, MOHAMED ADAM ABDALLAH, ABDU MOHAMED, AHMED ARGA BAKHIT, MOHAMMED DAUD ARBAB, ADAM BABKER IBRAHIM, MOHAMED ISHAG, ADAM ZAKARIA JUMA, MARIAM Y. YAKHOUB, SALIH MOHAMED EISSA, SAMIA ABDELRAHMAN, ABDELRAHMAN ADELKARIM, ADAM ABDALLAH BAKHAT, IDRIS ABDULRASUL ADEM, BUSH ZAKARIYA MOHAMMED, EHSSAN ALTAHIR SABIL, IBRAHIM MOHAMMED ADAM, MUBARAK OMAR WADI, JUMA SEIF SHAIBU, ABDELRAZIG ADAM DAHIYA, ABDULKARIM ALI IBRAHIM, AKUEIN AWAN KUETH, AMIRA EL DENG, HOUZAIFA AHMED, AISHA ADAM

ABUBAKAR, NADIA YAKUB, DAVID MATTHEWS GERI–ORIMATEO, ZARA IBRAHIM MAHAMAT, ABDELRAHIM OSMAN BASHIR HASSAN, ADAM ABDELKARIM ADAM HAROUN, MUBARAK A. MOHAMED, MARY DENG, KALTUM JUMA ZACHARIA, MONA OSMAN ABDELRAHMAN HASSAN, SULEIMAN ABDALLA ISMAIL, LAILA IBRAHIM ABBAKER, MOHAMED IBRAHIM AHMED, RODA ABDALLA SULEIMAN, ZUHAL FADL, ABDELKARIM ADAM ADAM AHMED MUSA, ADAM AHMED ABUBAKAR, JOHN ALIER LEEK YEN, ABDULKARIM AZARAK AHMED, DAVID BUOTH, ABDELMONEIM MOHAMED KORSI, AKOL CITHEC MACAR AKOL, FATIMA M. ABDELLA, ABELWAHAB GUMAA, SHAMS ELDIN ADAM, ELNAKHEIL BASHA DARA, MICHAEL PETER ABA, MAYEN THON DENG AYUEL, IBRAHIMA ADAMOU, VIOLA PAUL, AHMED TOM ABDALLA SAIEED, YAIA ABAKAR ABRAHIM, VIOLA JOHN DIRI JOSEPH, RAMSEY RENBY SEBIT, AHMED SAIEED, ADAM MOHAMED IBRAHIM, ABBASS AWAD ADAM ALI, NUR AL HUDA ABUBAKAR, NYAKOACH PETER LAM, HEIDER ABULGASIM SULEIMAN, CLEMENT JOSEPH WANI MOJUS, ADIER M KUDUM AWEL KWAI, HATIM ABDALLA ADAM, ABDELGABAR MOHAMED MOHAMEDIAN, LUAL RIAK MARIER ADEIM, REBECCA NYAKOTA NYOACH, LAM THOT MUANG, SAMUEL MATHIONG REEC, TABESA AKON YUOL, GUOT KARLO KEN, ALI ABAKER HASSAN, BUOL MAYEN JOK, LEWIS ALFRED UTU BARUD, ADAM KHAMS ARBAB, MOHAMED ISSA SULIMAN ABDALLA, NYADUOP PETER LAM, NYABEL LAM THOT, MOHAMED ABBASHER MHDI, DENG DENG REYAK, ADAM HARI OMER ABU, GATLUAK PETER LAM, DENG YEL AKOL DENG, YUSSIF MOHAMMED SABIL, SALAH BAKHET BAKHET, NYBOL DENG REYAK, AHMED M ABKER, MUSA MOHAMED ARJA, MOUSSA BABIKIR ABAKAR, MAYSA OSMAN ARBAB, NOORELDIN OMER ALI, HAROON A BATI, ABDALLA SULIMAN ABAKAR, IZZELDIN SALEH AHMAD IBRAHIM, HAROUN HASSAN, DIYO JOK, IBRAHIM ADAM HASSAN, MAHASIN ELNOUR ADAM, ABDELMALIK HUSSEIN YAAKOUB, MOUSSA TEJEDDINE MOHAM AHMAD, RASHIDA HAMED AHMED BALLAH, ADAM JUMAA ARBAB, SOULEYMAN ABDELKERIM MAHAMAD, MICHAEL ADUUT PARENG, MARY JOHN DERY JOSEPH, NASRIN ANGLO MOHAMED, ZAHRA MOUSSA, DIING RING DIING YOL, FLORA AVURU, RODA LOGA, SABIT BARAKENYI KUBARI, AMEER AJAK NYHAL, NASIR KABASHI NASIR, IBRAHIM BAKHAT, AHMED ADAM ARBAB, YOUSIF KHALIL SULIMAN, JOSEPH G GAMUNDE, ISMAIL ISAAK ADAM, MUNAZIR ABDULLAH BAKHIET, GABRIEL CHARLES RIAK, CHARITY LOWOH, AMNA MOHAMED HASSAN KHALIFA, SAMYA A. HARAN, JAMES KADIN, ABDALLAH OMAR IBRAHIM, ISHAG ADAM GUMA MOHAMED, ADAM YACOB HAMID, ZEINAB AHMED MUSA ABBAS, KAMAL ADAM ABDULRAHMAN, MOHAMMED DABIYO ADAM, BABIKER ISMAEL ABDAHMMLLAH ELNOUR, ESTER PETER BEYAL LUWAL, MAWADA IBRAHIM ALI BAKHAT, IBRAHIM A ALI, MALKA ADAM ARBAB, KALTOUM FADUL MUSTAFA, KHALID MOHAMED ALI, DUAL D LUAL, ADAM ABAKER ABDALLA, ABDLAZIZ ALI YAGOUB, TIMANE ISSA WAR, JAMES AYUEL REHAN, ISRAA IBRAHIM AHMED, SAMIA ABUBAKER ABDALLA MOHAMED, AHMAD ALI ASHEKH, ALSADK HASSAN ADAM, ABUBAKR ALDOUM ADAM MUSA, MANAHIL IBRAHIM ALI, SANTINO RIAK AKUEI AJAK, MOHAMED IBRAHIM KAMBAL, YOUNES SALEM OMAR, SUKRAH M ELDHAI, ISMAIL MOHAMED ABDELMULLA, ABUBAKAR ALI ZAKARIA, MAHAMAT IBRAHIM ARBAB, JAKLIEN FARAH, AHMED A ISAAK, ASMA M HUSSEIN, ELNOUR HAROUN BABIKER ALI ELRASHID, MONIKA MAKUER MAJOK DOMINIC, MAYOM RIAK MABOR, LORANS OUJIT LOUAL, ANESA SIMON AJEUTH, FANNE ABDELNABI, ABBAS KAMSOR IBRAHIM, YACUOB ADAM OUMAR, ABDALLAH MOHAMMED HASSABANABI, USMAN ARBAB SULAEMAN, NOEL JADA LAKO, JAFAR HARRY JUMMA HASAPALLH, KHALID KHATER MOHAMED ALI,

ALSADIG J SABIL, NEHAL GIBREIL, MAWAHIB ABBO, MOHAMEDALMURTADA H ABDALLA, MUSA YAGOUB, YOUNIS MOHAMED MOHAMED, AMONAH ISMAEL, MAHMOUD HAMED ISSA, ABDULRAHMAN ABAKAR, TAGWA IBRAHIM YAHYA, MOHUSSIN ABAKAR, ABDULRASUL ADAM AHMED, AMAN MIHEMEED, YAHIA ADAM SHOGAR ATIA, MOHAMED ISMAIL YOUSIF, DAHIYA YACUB ADAM, MOHAMED AHMED MOHAMED, MALIK KHATAR MALIK, DOW HUSSIEN GASIM, ABDELAZIZ BAKHEIT, HABALDEEN ADAM HASSAN IDREES, YOSEF MOHAMED BAKHAT ABDALLA, ABDULRAHMAN ALNOUR GONGE, FATIMA TEGANI ALI, REMAZ ADAM, AHMED ALSADIG MOHAMED ABDELKARIM, MARIAM OMER KHAMIS, BUTHAINA A AHMED, MAGDI NOURALDIN YOUSF IBRAHIM, BUTRUS ALDO GWAKE LAZARUS, ANNA SERENO MODI, MARTHA AGUEK JOK, ADIL BASHAR ALI ADAM, SALAH MOHAMED KHATER AHMED, REBECCA ATHIENG DENG, YOUSIF MOHAMED, YAHYA ABDALLA JUMAA, ACHOL A AJAK, RHODA YAR ALIER, MOHAMMED KAMALELDIN HAMAH ALI, LUETH M YAK, ADAM ISMAIL MOHAMMED OMER, HAMADI YOUNIS AHMED ADAM, FADLALLA ADAM IBRAHEM MOHAMMED, YASIR RIZIG HASSAN, FATHIYA ABDELDAYIM, EMADALDEEN ALI SWAR BASHIR, MICHAEL M DUT, AMILIYA S DORI, ABDELRAZIG GUMA SULIMAN MOHAMED, NAMAT OSMAN YAGOUB, SALADIN AHMAT HAROUN, MUBARAK ABAKAR MOHMMED, ADAM YAHYA OMAR, SAFIYA AHMAT HAROUN, AWATIF IBRAHIM ISSA, MONIR AHMED ABDALLA, ADAM MOHAMED ABDALLA AHMED, HASSAN ISSACK ABDALLA, DFAALLA BASHIR DFAALLA, MOAWIA ABDELRAHMAN I. ABOH, EBTESAM OSMAN, BASHIR D IDRISS, FAIZA SABIL MOHAMED, SAMUEL GUYA LOBURI, GAFAR IBRAHIM YAGOUB, NABEEL A KHAMIS, MUTASIM IBRAHIM ABDALLA MOHAMMED, MONICA H TIMON, MAGDI YAHIA YUNIS, IBRIS AMIN, KARIMA ABRAHIM, ALGEZAFEE MOHAMED HAMID HAMID, ZAINAB BABIKER ABDELMA HASSAN, ZAHARA MOHAMED HUSSEIN, AGOK K GARANG, MOHIELDIN DAWED OMER, ROSE NAJORE HALISTO, NOURALDEIN ABAKER HOSS BAKHT, MOHMOUD IBRAHIM ABDULRAZIG, ABDALLAH ADAM TAHIR ADAM, HAMDI IBRAHIM AMIR, SULIMAN ADAM, MUBARAK YAGOUB IBRAHIM RAHMA, MUSTAFA MOHAMMED ALI, OMER ADAM OMAR, AHMED IBRAHIM YUSUF, HUSSIEN BASHIR HAROUN ADAM, RASHID HUSSEIN YOUNIS IBRAHIM, NOURDINIE MAHAMAD YUNIS, GAMAL ADAM YAGOUB HASSAN, MADIBO ADAM HASSABLLAH MADIBO, SALAHELDIN IDRIS YOUNIS SENIEN, AMER MOHAMMED BAKHT MENAWY, ADAM A IBRAHIM, NYANTHIEC JAM AWEL, NORALDIEM AHMED ISMAIL, LADO YANGA JURKIN, MUNA YAQOUB MOHAMED, AHMED ABDULRASOUL MOH MATAR, BAHARELDIN MOHAMMAD OMER ABDALLA, ABDU NORAIN MOHAMED, MUOTASIM MUSA ALSAFI, MAHSIM ABAKAR ISMAIL, MOHAMMED H KHATER, AUAR IBRAHIM YAHYA, KHALED OSMAN, YONIES HASSAN, ABDALLAH ALI ELNOUR, JUR KUCHA, MOHAMMED IBRAHIM, HANAN MUSA TAGAL, ABDALKARIM ADAM MOHAMMED IZZALDIN, KAMAL AHMAD MAHMOUD, MARY ABIECH AKOON, ARBAB ISMAIL IBRAHIM, MOHAMED ADAM MOHAMED JUMA, MUSAB ARBAB, ZAHARA YEKISUK, MAHAMAD ISMAIL IBRAHIM, ADAM IBRAHIM ISMAIL, MONICA ALUEL AYUEN, MOHAMMED MAHMOUD WARA, EMAN ALI, ABOBAKER S IBRAHIM, ATIA KAFI KUJUR, ABUALGESEM A ABDALMOULA, IBRAHIM AHMED ALI, ABBAKAR EL SONOSI MOHAMED, JOHN MALWAL, MOHAMED O FADHL, YASSIEN DALEEL, MARY DAWOD L. LAKO, AMAN GAI GARANG DENG, AMNA KORASHY, EKALINO M AWOUR KUR, MAHMOUD ABDALLA ADAM ABDALLA, HAFIZ ABDULKARIM WADI, SAMUAL MUSA ABDALGADIR, MUBARAK SULIMAN RAHMA, YASMEEN MUSA ABELGADIR, ABDULRAZIK MAHDI, ABDELKARIM OSMAN HASSAN, BABIKER ABDALLA HAROUN ABDALLA, ABDALLAH ISHAG, ABDELBARI

ELTIGANI M ADAM, ELSHAZLY RAHMA, ISMAIL AHMED ALNOUR, MANAL MUSA MUHAMED–AHMED, HASSAN AWAAD ABDALLAH, AMANI SHAREIF A. MOHAMED, MUTASIM A ALI AHMED, SAFA ALI ARBAB, AMIR ARBAB HASSAN MOHAMED, MOHAMED YAGOUB ADAM, ALI ADAM MOHAMMEDIN BHAR, HANAA AHMED ABAKER IBRAHIM, MAHGOUB ABDALLAH DAFALL KHDIR, EKRAM IBRAHIM HAMED, ABEER HAROUN MOHAMMED HASABALLAH, SAYEDA ABDALRHMAN FASHIR, A. B., SAFA ALI IBRAHIM ABDELKARIM, ANDERIA AROK LUAL, SAIDA SHARAFEFLDIN MORSAL KHAMIS, ALI AHMED ELTAYIB ELFAKI, SADIYA M MOHAMED, MUSA ABDALWAHAB BABKER KAMAL, AHMED KHAMIS MOHAMED HAROUN, C. D., NYANGOK DANIEL DONGWAY, HAROUN HASSAN HAROUN, MAHA SABIR ABDALLA, ABUBAKAR IYDAM IBRAHIM MOHAMMED, SAMRA ABBAS IBRAHIM MOHAMMED, AZAHIR ALZAIN ADAM, KHALID HAROUN, ALSADIG SALIM TUKKA SABUN, ANDREW AKECH JOHN JOK, AWDIA AMIR ABDELBAGI, VICTORIA ADHAR AGUEK, ELTEGANI AHMED NHAR BERKA, YOSIF ABUALQASIM KHATIR OMER, SAMIA ALTOM TIBIN OMER, ZAINA HAMID GARELNAB ELTAHIR, SALIH INTISAR ABDELRAHMAN, GATAR GALIA HAMED ADAM, AHMED ISMAIL A. WADI, E. F., ATEM JOHN THUE AGUER, SAMIRA MOHAMMED ADAM IBRAHIM, FAISEL ABDURHMAN ADAM, OMDA A AHMED, ROSE BAGAZI LORI, MOHAMMED MOHAMMED AHMED, ZAKAREYA MOHAMED TARBOUSH, OMAR ABDELHAMEED, ALIET MALEK ALIER, TAHA HASSAN ISHAG, IBRAHIM A ISSA, AHMED ABDULKARIM WADI ISMAIL, AREK GARANG BAK LUAL, ZAKIA HAROUN SULYMAN ADAM, MAHMOUD MUKHTAR ELTAYB, OMAR HANDOGA KHATIR NAIR, ABDULLAH ABDULMAHMUOD ABDULMAHMUOD, ANWAR MOHAMMED DAFALLA, AHMED ADAM ELOMDA MOHAMED, AMINA OUSMAN IBRAHIM, AZIZA KHAMIS IBRAHIM, HAWA IBRAHIM JUMA HAROUN, SUMAIA IBRAHIM ALNOR JUMA, NOURACHAM OUMAR, ALTAYEB MUSTAFA ADAM WAR, BUTHAINA AMBADA, AMANI ABDALLA IBRAHIM, MOHAMMED ISMEIL JOMA MOHAMMED, ABUBAKAR ADAM OBAID BAKO, EMADALDEEN SULIMAN IBRAHIM, MAHMOUD ELRAYAH GUMAA, FAISAL ADAM IDRIS, MOUSAB TOGOL, KHALID ABAKER MUHAMED TAIRAB, ABDULAZIZ MOHAMMED ABDALLA, SIHAM ARBAB ABDALLAH, OSAM BAKHIT MUSA SAM, MUHIEDDIN ABELRAHMAN I. MAHMOUD, MOHYALDEEN ABDRHEEM ABAM ABAKAR, ACHOL GARANG AWUOL AKOIH, ABUK MATHIANG MADUT, HANADI ZAKARIYA IBRAHIM, GEHAD A ABDELRASOUL, MUNIRA HARON ALTOM MOUSA, AMEERA BASHEER HAROUN, HAITHAM ABUBAKAR ABDELMAILK, HAMED YAGOUB ADAM, NAJWA ADAM ISA JUBARA, OSMAN MAHAMED ISMAIL ABDELRAHMAN, MAHMOUD OMER ISSAK ADAM, SALMA ABDELKARIM ALI, ABDELRAHMAN YAGOUB ABDELMALIK,

*Plaintiffs-Consolidated Plaintiffs*,

v.

BNP PARIBAS NORTH AMERICA, INC., a Delaware corporation, DOES 1–10, BNP PARIBAS, SA NEW YORK BRANCH, a foreign branch, BNP PARIBAS US WHOLESALE HOLDINGS, CORP., FKA BNP PARIBAS NORTH AMERICA, INC., a Delaware corporation,

*Defendants*.

# TABLE OF CONTENTS


Page

INTRODUCTION ....................................................................................1

ARGUMENT ..........................................................................................2

I. The District Court Misapplied Swiss Law, As The Swiss Government Confirms. ....................................................................2

A. The Swiss Government's Amicus Brief Confirms That The District Court Misapplied Swiss Law.................................3

B. Article 50 Does Not Provide An Independent Basis For Liability. ....................................................................................5

C. BNPP Cannot Be Liable Under Article 50 Where No Perpetrator Could Be Held Liable Under Swiss Tort Law. ......14

D. The Jury Instructions Misstated Swiss Law. ............................17

1. Burden Of Proof ..........................................................17

2. Conscious Assistance ..................................................19

3. Causation ....................................................................20

4. Prejudice .....................................................................22

II. The District Court's Inconsistent Rulings On Sanctions-Related Evidence Warrant A New Trial. ...............................................23

A. The District Court Erroneously Admitted Evidence Of BNPP's Guilty Plea.................................................................24

B. The District Court Excluded Relevant Evidence Of Compliance With Swiss, EU, And UN Sanctions. ...................25

III. The District Court Was Required To Hold An Evidentiary Hearing. ..........................................................................................27

IV. The Damages Awards Must Be Reduced Under Swiss Law.............29

V. The Case Should Be Dismissed For *Forum Non Conveniens*. ...........30

CONCLUSION .....................................................................................34

## TABLE OF AUTHORITIES

Page(s)

### U.S. Cases

*Animal Science Prods., Inc. v. Hebei Welcome Pharm. Co.*,
585 U.S. 33 (2018) .......... 2, 3, 4, 5

*Arlio v. Lively*,
474 F.3d 46 (2d Cir. 2007) .......... 25

*Blanco v. Banco Indus. de Venez., S.A.*,
997 F.2d 974 (2d Cir. 1993) .......... 33

*Bugliotti v. Republic of Argentina*,
952 F.3d 410 (2d Cir. 2020) .......... 4, 5

*Cameron v. City of New York*,
598 F.3d 50 (2d Cir. 2010) .......... 25

*Cisco Sys., Inc. v. Doe I*,
146 S. Ct. 1882 (2026) .......... 15

*Clark v. AII Acquisition, LLC*,
886 F.3d 261 (2d Cir. 2018) .......... 13

*Erickson v. Newmar Corp.*,
87 F.3d 298 (9th Cir. 1996) .......... 28

*Gasperini v. Ctr. for Humanities, Inc.*,
518 U.S. 415 (1996) .......... 29, 30

*Gill v. Arab Bank, PLC*,
893 F. Supp. 2d 523 (E.D.N.Y. 2012) .......... 26

*Gonzalez v. Naviera Neptuno A.A.*,
832 F.2d 876 (5th Cir. 1987) .......... 31

*Iragorri v. United Techs. Corp.*,
274 F.3d 65 (2d Cir. 2001) .......... 31, 32

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.*,
153 F.3d 82 (2d Cir. 1998) .......... 12

**TABLE OF AUTHORITIES** (*continued*)

Page(s)

*Kamen v. AT&T Co.*,
791 F.2d 1006 (2d Cir. 1986) ....................28

*Kashef v. BNP Paribas SA*,
925 F.3d 53 (2d Cir. 2019) ....................16

*Lainez v. Bondi*,
141 F.4th 393 (2d Cir. 2025) ....................12

*Linde v. Arab Bank, PLC*,
882 F.3d 314 (2d Cir. 2018) ....................23

*LNC Invs., Inc. v. First Fid. Bank, N.A. N.J.*,
173 F.3d 454 (2d Cir. 1999) ....................23

*Monticello Tobacco Co. v. Am. Tobacco Co.*,
197 F.2d 629 (2d Cir. 1952) ....................24

*Murray v. UBS Sec., LLC*,
128 F.4th 363 (2d Cir. 2025) ....................23

*Palin v. N.Y. Times Co.*,
113 F.4th 245 (2d Cir. 2024) ....................24, 26

*Petersen Energia Inversora S.A.U. v. Argentine Republic*,
895 F.3d 194 (2d Cir. 2018) ....................4

*Phoenix Assocs. III v. Stone*,
60 F.3d 95 (2d Cir. 1995) ....................27

*Rossbach v. Montefiore Med. Ctr.*,
81 F.4th 124 (2d Cir. 2023) ....................28

*Rozier v. Ford Motor Co.*,
573 F.2d 1332 (5th Cir. 1978) ....................25

*Sanders v. N.Y.C. Human Res. Admin.*,
361 F.3d 749 (2d Cir. 2004) ....................22

*Sharif v. Picone*,
740 F.3d 263 (3d Cir. 2014) ....................25

**TABLE OF AUTHORITIES** (*continued*)

Page(s)

*Stevenson v. Thornburgh*,
2026 WL 276584 (2d Cir. Feb. 3, 2026) .......................................................31

*United States v. Al-Moayad*,
545 F.3d 139 (2d Cir. 2008) ............................................................................26

*United States v. Brady*,
26 F.3d 282 (2d Cir. 1994) ..............................................................................24

*United States v. McCallum*,
584 F.3d 471 (2d Cir. 2009) ............................................................................24

*United States v. Scully*,
877 F.3d 464 (2d Cir. 2017) ............................................................................27

**Swiss & International Cases**

*Barbecue*,
4A_7/2007.........................................................................................................21

*Boat Collision*,
4A_444/2010.....................................................................................................21

*Bow and Arrow*,
104 II [1978] 184 ........................................................................................8, 13

*Cat*,
4C.27/2003...........................................................................................................9

*Coffeemaker*,
133 III [2006] 81 .......................................................................................18, 19

*Delayed MRI*,
4A_554/2025 (June 9, 2026) ............................................................................18

*Father-Son Robbery*,
4A_573/2010.....................................................................................................20

*Firecrackers*,
42 II [1916] 473 ...................................................................................8, 13, 15, 21

**TABLE OF AUTHORITIES** (*continued*)

Page(s)

*Gallerist*,
104 II [1978] 225 ....................7

*Gravel Pit*,
107 II [1981] 269 ....................18

*Hockey*,
79 II [1953] 66 ....................8, 13, 15, 16, 21

*Insurance Contract*,
130 III [2004] 321 ....................17, 18

*Locksmith*,
4A_185/2007 ....................15, 20, 22

*Naït-Liman*,
No. 51357/07 Eur.Ct.H.R. (Mar. 15, 2018) ....................16

*Rediffusion*,
107 II [1981] 82 ....................10, 15

*Shooting Contest*,
SCD 71 II [1945] 107 ....................10, 13

*Stamp Dealers*,
82 II [1956] 544 ....................8

*Strip Search*,
2C_19/2022 ....................16

*Swisscom*,
145 III [2019] 72 ....................9, 10, 14, 21, 22

*Whiplash*,
147 V [2021] 161 ....................21

**Statutes**

Federal Act on Private International Law, art. 5 ....................31

SCO art. 41 ....................6, 13, 15

**TABLE OF AUTHORITIES** (*continued*)

Page(s)

SCO art. 50 .......... 15

SCO art. 51 .......... 7

SCO § 2 .......... 7, 8

**Rules**

Fed. R. Civ. P. 44.1 .......... 5

Fed. R. Evid. 401 .......... 26

Fed. R. Evid. 403 .......... 24

**Other Authorities**

*Announcement*, Swiss Fed. Dep't of Just. & Police (Jan. 21, 2009) .......... 11

Brehm, *Bernese Commentary* .......... 15

*Interpellation* 26.3161 .......... 2, 5

Krauskopf, *Zurich Commentary* .......... 11

Overney & Perritaz, *Lien de Causalité* .......... 12

Werro & Perritaz, *The Plurality of Responsible Parties: New Concepts and Changes in Case Law* .......... 12

Widmer & Wessner, *Revision and Unification of Civil Liability Law* .......... 11

Wright & Miller, *Federal Practice & Procedure* § 3828 (4th ed. 2026) .......... 33

## INTRODUCTION

It is rare for a foreign government to appear in a private suit to explain that its tort law is being misinterpreted. The Government of Switzerland has done so twice in this litigation. In its amicus brief, the Swiss Government explains that the verdict rests on fundamental errors of Swiss law and will seriously undermine Switzerland's ability to regulate conduct occurring within its own borders. The Swiss Government raised these concerns to the district court too—but the court did not give respectful consideration to those views, as the United States explains in its own brief.

The district court manufactured its own version of Swiss law that would extend liability to any person who provides commercial services to a foreign sovereign engaged in wrongful conduct, without proof that the person directly and significantly supported that conduct, consciously assisted it, or actually caused the plaintiff's harm. Companies operating in conflict-affected nations would effectively become guarantors of those governments' independent conduct, potentially liable for human-rights abuses wholly unrelated to their lawfully provided services. BPI Br.4-8, 11-12. Plaintiffs point to no Swiss decision endorsing this result.

Lacking legal support, Plaintiffs mischaracterize the record and Swiss law. They misleadingly imply that BNPP funded military transactions, Resp.7, 30, yet they cite transactions involving non-military purchases, ignore testimony that BNPP did not engage in military transactions, and overlook that FINMA found no evidence

of Swiss sanctions violations. They falsely claim the French government "is prosecuting" BNPP. They dismiss as "uncorroborated hearsay" allegations of misconduct their own counsel made against each other under penalty of perjury. They misrepresent a statement that Swiss courts would decline jurisdiction *over Sudan* as a concession that they would decline jurisdiction *over this lawsuit*.

Most egregiously, they falsely claim that the Federal Council—Switzerland's highest executive body—"disavowed" the Swiss Ambassador's letter advising the district court that it was misapplying Swiss law. Resp.3, 34. In fact, the extra-record document Plaintiffs cite *confirms* the Ambassador filed the letter "after consultation with the competent services of [Switzerland's] federal administration" and that such letters are "common." *Interpellation* 26.3161 (transl. dated Aug. 4, 2026).[1]

If this case had been litigated in Switzerland, it would have been dismissed on the merits. Instead, it resulted in a verdict that distorted Swiss tort law and dwarfed the largest-ever Swiss moral-damages award. This Court should reverse.

## ARGUMENT

### I. The District Court Misapplied Swiss Law, As The Swiss Government Confirms.

Plaintiffs urge the Court to reject the Swiss Government's interpretation of its own law. But under *Animal Science Products, Inc. v. Hebei Welcome Pharmaceu-*

---

[1] https://clinics.law.harvard.edu/human-rights-entrepreneurs/files/2026/08/Swiss-Parliamentary-Inquiry-26.3161-Transl.pdf.

*tical Co.*, 585 U.S. 33 (2018), Switzerland's views are entitled to substantial weight, and require reversal.

### A. The Swiss Government's Amicus Brief Confirms That The District Court Misapplied Swiss Law.

The Swiss Government's amicus brief explains how the district court committed "serious errors" that "challenge the integrity of Swiss law." Swiss Br.14. Allowing the judgment to stand, Switzerland warns, would "adversely affec[t] Swiss sovereign interests" by "encourag[ing] other potential plaintiffs" to "take advantage of the district court's distortions of actual Swiss-law standards" in U.S. courts. Swiss Br.29. The brief reiterates and expands on the Swiss Ambassador's September 2025 letter. Swiss Br.11 (citing JA-__[Dkt.937]). There too, Switzerland called the district court's interpretations "not . . . Swiss law at all, but rather a new U.S. court-created law," JA-__[Dkt.937at3].

The Swiss Government's views as an objective non-party are entitled to "substantial" weight and "respectful consideration." *Animal Science*, 585 U.S. at 36, 46. The United States—*another* neutral sovereign—agrees that the district court "failed to meaningfully address important legal points raised by the Swiss government" and denied Switzerland's views "careful[] consider[ation]." U.S. Br.12-13.

While a foreign government's views do not command "absolute deference," Resp.32, all the *Animal Science* factors favor respecting Switzerland's interpretation.

Plaintiffs do not question the Swiss legal system's "transparency" or the Swiss Government's "role and authority" in explicating Swiss law. 585 U.S. at 43. The amicus brief marshals numerous Swiss-law authorities with "clarity [and] thoroughness." *Id.* The brief's "consistency" with and elaboration on the Ambassador's letter, *id.*, strengthen both submissions (*contra* Resp.35). Nor does Switzerland contradict its "past positions" by supposedly "condon[ing] financial complicity in genocide." Resp.36-37. It unequivocally condemns Sudan's human-rights abuses and confirms BNPP "did not breach Swiss sanctions" prohibiting military assistance, Swiss Br.1-2, before discussing the district court's misapplications of Swiss law. Finally, the brief's "context and purpose," *Animal Science*, 585 U.S. at 43—a non-party foreign sovereign addressing distortions of its own law—support its objectivity and distinguish it from briefs by sovereign *parties*, where skepticism might be warranted. Resp.36 (citing *Petersen Energia Inversora S.A.U. v. Argentine Republic*, 895 F.3d 194 (2d Cir. 2018); *Bugliotti v. Republic of Argentina*, 952 F.3d 410 (2d Cir. 2020)).

Plaintiffs detour far outside the trial record in falsely claiming that Switzerland's Federal Council "disavowed" the Ambassador's letter as "unauthorized." Resp.3. Responding to a single Parliament member's *interpellation* (request for information), the Federal Council *confirmed* the letter was filed "after consultation with the competent services of [Switzerland's] federal administration" to "challenge

misinterpretations of Swiss law" and "prevent negative consequences for Switzerland," given "its position as a business hub." *Interpellation* 26.3161, *supra*. The Federal Council *itself* is not "involved" with such "common" letters, which are "not a problem" under Switzerland's separation of powers. *Id.*

Plaintiffs' argument is a sideshow in any event because Switzerland's amicus brief in *this* Court is undisputedly authorized. That brief is a highly "relevant material or source" this Court should consider when determining Swiss law *de novo*. Fed. R. Civ. P. 44.1; *Animal Science*, 585 U.S. at 42; *Bugliotti*, 952 F.3d at 413-14.

### B. Article 50 Does Not Provide An Independent Basis For Liability.

The Swiss Government, former Swiss Supreme Court Judge Monique Jametti, and preeminent Swiss private-law scholar Pierre Tercier confirm what the Swiss Code makes clear: Article 41 "provides a conduct-regulating rule" governing whether a person is liable in tort, while Article 50(1) "furnishes a loss-allocating rule" imposing joint-and-several liability on "tortfeasors that acted together to cause damage to plaintiff(s)." Swiss Br.16; *accord* Jametti Br.5-6, 11-20; Tercier Br.2-15. "Under no circumstances does Article 50 . . . establish a type of tort liability distinct from or extending beyond that provided for in Article 41." Jametti Br.17. Article 41 "answers the question: 'Who is liable?'," while Article 50 "answers the question: 'How is liability apportioned among multiple liable defendants?'" Tercier Br.6. Text and precedent confirm this reading, and Plaintiffs' contrary arguments fail.

1. Article 41 establishes tort liability for both perpetrators and accomplices by providing that "*[a]ny person* who unlawfully causes damage to another, whether wilfully or negligently, is obliged to provide compensation." SCO art. 41(1) (emphasis added). Article 50(1) addresses who must pay if, under Article 41, "two or more persons have together caused damage"—whether they acted "as instigator, perpetrator, or accomplice, they are jointly and severally liable to the person suffering damage." Plaintiffs' contrary position—that Article 50 imposes liability on accomplices without an "unlawfulness" requirement, while Article 41 alone imposes liability on perpetrators—would work a seismic change in Swiss law, creating two disparate sources of liability in incongruous sections of the Code. Jametti Br.11-20.

Plaintiffs say that "[a]ccomplices are not liable under Article 41" because it does not use the word "accomplice" and because accomplices "do not commit the unlawful act that *directly* causes damage." Resp.18 (emphasis added). But Article 41 does not use the word "directly"; it extends liability to "[a]ny person"—perpetrator or accomplice—who "unlawfully *causes* damage." SCO art. 41(1) (emphasis added). Plaintiffs never explain why Article 41's broad reference to "[a]ny person" would exclude accomplices. BNPP Br.27. Their claim that "no other provision in the Code" beyond Article 50(1) "imposes liability on accomplices," Resp.18, is simply wrong—Article 41 does.

Once Plaintiffs' faulty premise about Article 41 is rejected, their position on Article 50 crumbles. Analyzing accomplice liability under Article 41 does not "eras[e] 'accomplice' from Article 50.1." Resp.18. Article 50(1) makes an Article 41 "accomplice" "jointly and severally liable" for *full* damages—like an Article 41 "perpetrator" or "instigator," but unlike abettors covered by Article 50(3), who are liable only for their share. By contrast, Plaintiffs never explain why Article 50(1) mentions "perpetrator[s]" if their liability is governed solely by Article 41. BNPP Br.27. Nor do Plaintiffs explain why two clauses purportedly governing liability (Articles 41 and 50) would be placed in starkly different parts of the Code, rather than side-by-side under the "Conditions of liability" heading. BNPP Br.26 (citing SCO § 2(A)(I)).

Article 51—which, like Article 50, apportions liability—confirms this reading. BNPP Br.28. Plaintiffs concede that Article 51 does not impose liability, Resp.19-21, and instead mischaracterize Article 51 as allocating losses "among tortfeasors." Resp.18. In fact, Article 51 apportions liability among defendants liable for the same damage "on different legal grounds," such as "tort law, contract law or by statute." SCO art. 51(1); *see Gallerist*, 104 II 225 (1978), JA-__[Dkt.174-1¶4(b)]. Article 50(1), by contrast, apportions liability among *co-tortfeasors*, *id.*, so it is not "redundant" of Article 51, *contra* Resp.18. The two provisions differ in the *source* of liability, not in whether they *impose* liability. That is why Articles 50 and

51 sit side-by-side under the heading governing joint-and-several liability for "Multiple liable parties" (or, as Plaintiffs prefer, "Plural Liability" or "Liability of several persons," Resp.20), SCO § 2(A)(VI), and outside the heading governing "Conditions of liability," where Article 41 sits, SCO § 2(A)(I); *see* Tercier Br.5-6.

2. Swiss case law is consistent with the Code's text and structure. Swiss courts impose Article 41 liability on direct participants in an injury-causing event who did not themselves commit the act that caused the injury. *Hockey* proves the point: *All* players sued were "liable in tort" under "Art. 41 ff." and "jointly and severally liable (Art. 50 ch. 1 CO)" to the injured spectator because *each* joined the dangerous game and thus "caused the damage through a joint fault." 79 II [1953] 66, JA-__[Dkt.460-17¶¶2, 8]. *Bow and Arrow* is the same: The two children who were shooting arrows but *did not* fire the injury-causing arrow were nonetheless liable "according to article 41." 104 II 184, JA-__[Dkt.528-115¶2]. Plaintiffs have no answer, so they claim *Bow and Arrow* just happens to be "an instance in which participants could be held liable under both Article 41 and Article 50.1." Resp.25. But Article 41 was the basis for liability, not happenstance. *Bow and Arrow*, JA-__[Dkt.528-115]; *accord Firecrackers*, 42 II 473, JA-__[Dkt.444-109¶¶3-4]; *Stamp Dealers*, 82 II [1956] 544, JA-__[Dkt.460-9¶1].

Because Article 41 provides for accomplice liability, Article 50 does something different: It apportions liability that Article 41 has already established. In

*Locksmith*, for example, the "proceedings for damages" were "based on article 41," with accomplices subject to "personal liability" for infringing a copyright. 4A_185/2007, JA-__[Dkt.460-13¶¶B.a, 4, 6.2-6.2.2]. Those accomplices and the primary infringer were held "jointly and severally liable" under "article 50," the "multi-party liability mechanism" for "damages caused by the illicit acts in question"—a means of sharing liability, not its source. JA-__[Dkt.460-13¶6.2]. If Article 50(1) itself created accomplice liability, the court would have simply said so when rejecting the accomplices' Article 41 argument. *Id.* Likewise, *Cat* explained that Article 50 "presupposes a common tortious fault . . . within the meaning of Article 41 *et seq.*" 4C.27/2003, JA-__[Dkt.169-4¶3.3]. Plaintiffs' only response is to accuse BNPP of dropping "et seq." from that quotation. Resp.24-25. But "et seq." could not embrace Article 50—the court's point was that Article 50 "presupposes" fault *before* it applies. JA-__[Dkt.169-4¶3.3]. Absent such underlying fault, "Art. 50 CO does not apply." *Id.*

*Swisscom* recognized the same principle. There, the Swiss Supreme Court held that a "claim for damages" against an accomplice under Swiss *tort* law—the only claim here—lies under "*art. 41 in conjunction with art. 50 CO*," because "joint and several liability of participants for damages *presumes* such liability" under Article 41 "and thus the illegality of participant behavior." JA-__[Dkt.708-13¶¶2.2.1-.3] (emphasis added). The court thus rejected Swisscom's liability as an accomplice,

even though it "contribute[d]" to the infringement. JA-__[Dkt.708-13¶¶2.2.1-.3]. Plaintiffs draw the wrong lesson from an inapposite part of the opinion. They claim *Swisscom* imposes liability directly under Article 50(1) because the court stated that an accomplice need not "fulfill any statutory infringement requirement"—which Plaintiffs read to mean an accomplice "need not itself violate Article 41." Resp.22-23. But that statement concerned *injunctive relief* in a copyright-infringement case, which could be based on "an unlawful principal act" and an "imminent" violation of intellectual-property rights. *Swisscom*, JA-__[Dkt.708-13¶2.2.1]. *Rediffusion* likewise enjoined the accomplice antenna operator (PTT) from servicing the confirmed infringer (Rediffusion), but not other companies. 107 II [1981] 82, JA-__[Dkt.533-10¶9(b)]. Here, Plaintiffs brought tort claims for damages, not copyright claims for injunctions.

Finally, Plaintiffs assert that the *Shooting Contest* innkeeper was "never . . . found to have acted unlawfully" before Article 50 applied. Resp.26. Not so: The court found him "at fault" for breaching his "obligation not to contribute to creating or maintaining" a dangerous condition, called "*ex delicto* liability." SCD 71 II [1945] 107, JA-__[Dkt.528-111¶¶3-4].

3. Plaintiffs' resort to legislative history, experts, and procedural doctrines is unavailing. They contend that in 2000, the Swiss Parliament proposed "overhauling the Code" with a package of amendments, including one purportedly adopting

BNPP's position on Article 50, but ultimately rejected them. Resp.27-28. But the proposed amendments support BNPP. The amendments proposed consolidating Articles 50 and 51, and the accompanying report *confirmed* that Article 50 is analogous to Article 51: "Arts. 50 and 51 CO generally govern plural liability," and their differences are of "little practical significance." Widmer & Wessner, *Revision and Unification of Civil Liability Law* 166-67 (translated excerpt).[2] Contrary to Plaintiffs' characterization, the report never said the proposed provision would "no longer impose 'liability for the acts of others,'" Resp.28 n.15; "no longer impose" is Plaintiffs' addition, and the quoted phrase is lifted out-of-context from an unrelated discussion on jointly-and-severally-liable defendants' rights to reduce damages. Widmer, *Revision and Unification*, at 170. Ultimately, Parliament rejected the *entire package* of Code amendments as unnecessary. *Announcement*, Swiss Fed. Dep't of Just. & Police (Jan. 21, 2009) (translation).[3]

Plaintiffs' scholars do not change the analysis. Krauskopf recognizes that "[j]oint-and-several liability assumes the liability of each joint and several debtor." Krauskopf, *Zurich Commentary* (2016), JA-__[Dkt.174-5¶38]. And even Perritaz,

---

[2] https://clinics.law.harvard.edu/human-rights-entrepreneurs/files/2026/08/Widmer-Wessner-Explanatory-Report-for-Draft-Revision-of-Liability-Law-Transl.pdf.

[3] https://clinics.law.harvard.edu/human-rights-entrepreneurs/files/2026/08/2009-Swiss-tort-reform-press-release-Transl-1.pdf.

a student of Professor Werro, has admitted his approach (and Plaintiffs') to multi-party liability is "new." Overney & Perritaz, *Lien de Causalité*, JA-__[Dkt.444-122¶75]. Indeed, the title of his article with Werro touts "New Concepts." Werro & Perritaz, *The Plurality of Responsible Parties: New Concepts and Changes in Case Law*, JA-__[Dkt.171-55].

Nor is Werro's report entitled to deference because the district court adopted it. Plaintiffs cite a dissenting opinion, Resp.27 (citing *Lainez v. Bondi*, 141 F.4th 393, 404 n.5 (2d Cir. 2025)), which does not alter the *de novo* standard for issues of foreign law, BNPP Br.22, 24; *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 92-94 (2d Cir. 1998); *supra*, at 5.

Finally, BNPP is not "judicially estopped" (Resp.15) from properly interpreting Articles 41 and 50. BNPP has consistently argued it cannot be held liable under Article 50. Plaintiffs mischaracterize pleading-stage submissions from BNPP expert Professor Roberto, who confirmed that "art. 50 section 1 CO does not establish an independent basis [of] liability" seven years before Plaintiffs say the argument first appeared. JA-__, __ [Dkt.87¶¶18,47]; *see also* JA-__, __[Dkt.68¶¶10,44; Dkt.172at6n.3]. BNPP repeated the argument in its *forum non conveniens* motion, at summary judgment, throughout trial, and post-trial. JA-__[Dkt.262at18; Dkt.443at27; Dkt.998at11; Dkt.1041at9-10]. Moreover, judicial estoppel applies to

"'factual position[s],'" not legal arguments such as the meaning of Article 50. *Clark v. AII Acquisition, LLC*, 886 F.3d 261, 264 (2d Cir. 2018); *supra*, at 5-12.

4. The difference in the parties' positions is significant. Plaintiffs insisted on proceeding under Article 50 to excuse themselves from having to prove that BNPP "unlawfully" caused harm under Article 41. SCO art. 41(1); BNPP Br.31. The Swiss Supreme Court has recognized that accomplices may "unlawfully" cause harm in only two circumstances. JA-___[Dkt.528-98¶117] (Müller). First, an accomplice may provide such direct and significant assistance that the injury-causing conduct is attributed to the accomplice. *Bow and Arrow*, JA-__[Dkt.528-115¶2]; *Firecrackers*, JA-__[Dkt.444-109¶3]. But unlike people shooting arrows or throwing firecrackers together, BNPP did not participate in the action that caused the harm or provide assistance of the sort that Swiss courts have recognized as sufficient to establish liability. Second, the accomplice may violate an independent Swiss-law protective norm. *E.g.*, *Shooting Contest*, JA-__[Dkt.528-111¶3]; *Hockey*, JA-__[Dkt.460-17¶¶3-4]. But Plaintiffs have not pointed to any Swiss-law protective norm that BNPP violated. Swiss Br.5-9, 17-18. This Court should reverse and enter judgment for BNPP because the jury was not asked to find, and did not find, that BNPP "unlawfully" caused harm.

### C. BNPP Cannot Be Liable Under Article 50 Where No Perpetrator Could Be Held Liable Under Swiss Tort Law.

Even if Plaintiffs were not required to prove BNPP's liability under Article 41, reversal is required: Joint-and-several liability under Article 50 presupposes that a main perpetrator committed a tort under Article 41, and Sudan did not and could not. Swiss Br.19-20. Plaintiffs do not defend the district court's two reasons for rejecting this argument, BNPP Br.36-37, and Plaintiffs' substitute theories fare no better.

1. Plaintiffs contend they "had no burden" to *sue* Sudan under Article 41. Resp.29. That is irrelevant. Swiss law requires a main perpetrator whose "unlawful principal act" *could* support liability under Swiss private tort law, whether or not named as a defendant—that is what makes secondary-liability claims "secondary." *Swisscom*, JA-__[Dkt.708-13¶2.2.1]; *see* BNPP Br.32-33; Swiss Br.19-20. Indeed, the alleged perpetrators in *Swisscom* (users watching pirated content) "were not sued," Resp.29, but the court still asked whether they *could have been* liable—and since they could not, "the defendant's liability as an accomplice [was] also out of the question," JA-__[Dkt.708-13¶2.2.2]; *see* BNPP Br.32-33. The *reasons* Sudan cannot be liable under Swiss private tort law differ from the reasons *Swisscom* users could not be liable under copyright law. But the result is the same: No joint-and-several liability without a perpetrator's predicate Article 41 violation. This principle is familiar. Where no right of recovery exists for the primary violation (including

torture), "there is necessarily no liability for aiding and abetting such violations." *Cisco Sys., Inc. v. Doe I*, 146 S. Ct. 1882, 1892 (2026).

Plaintiffs' counterexamples confirm BNPP's point—each featured a main perpetrator answerable under Swiss private tort law. In *Hockey*, the players were liable for negligence under "Art. 41 ff." JA-__[Dkt.460-17p.1,¶¶2-4]. Likewise, the *Rediffusion* and *Locksmith* infringers were liable under Article 41. *Rediffusion*, JA-__[Dkt.533-10¶9(a)] (affirming injunction against Rediffusion); *Locksmith*, JA-__[Dkt.460-13¶6.1] (appellants "admitted that [the perpetrator's] liability (article 41 CO) was engaged for the damages").

Plaintiffs' other authorities (Resp.29-30) address a different problem—proof of identification. In the "[s]pecial case" where rioters injure a victim, each is liable without proof of who struck the blow because every participant could be liable. Brehm, *Bernese Commentary*, JA-__[Dkt.171-41¶¶25, 35a]; *accord Firecrackers*, JA-__[Dkt.444-109¶3]. But where the perpetrator himself is "incapable" of committing a tort, the situation falls "outside" the scope of Article 50. Brehm, *Bernese Commentary*, JA-__[Dkt.171-41¶25].

2. Plaintiffs do not dispute that Sudan cannot be liable as a main perpetrator under Swiss private tort law. BNPP Br.34-37; Jametti Br.5, 18; Bianku Br.16; U.S. Br.6, 13. Sudan is not a "person" to whom Articles 41 and 50 apply. SCO arts. 41(1), 50(1). Assessing even a *Swiss municipality*'s liability "in accordance with

Art. 41 CO" is reversible error because it "violate[s] Swiss federal law." *Hockey*, JA-__[Dkt.460-17¶¶5,8]; *see* BNPP Br.34; Swiss Br.19-20; JA-__[Dkt.897¶41] (Romy). It does not matter whether inapplicable Swiss *public* laws may also protect individuals' "absolute rights," Resp.31, as with the border-search victim who brought a "public law" claim against the Swiss customs office, *Strip Search*, 2C_19/2022, JA-__[Dkt.708-2]. Plaintiffs acknowledge that Switzerland distinguishes between "public and private law," Resp.31, and this case is based on *private tort law*, which does not apply to Sudan, *see Hockey*, JA-__[Dkt.460-17¶¶5,8]. Plaintiffs cite no decision holding a state actor liable under private tort law, such as Article 41.

Further, Swiss courts would not apply Article 41 to extraterritorial harms committed by a foreign sovereign and its agents against its people in its own territory. BNPP Br.35-37; *Naït-Liman*, No. 51357/07 Eur.Ct.H.R. (Mar. 15, 2018), JA-__[Dkt.898-1¶¶129, 152, 198]. Allegations of *jus cogens* violations do not change the result. Bianku Br.9 (*Naït-Liman* panel member). This Court did not hold otherwise (or even address Swiss law) when it rejected application of the U.S. act-of-state doctrine at the pleading stage. *Kashef v. BNP Paribas SA*, 925 F.3d 53, 58 (2d Cir. 2019); BNPP Br.37 n.3.

These established principles of Swiss private tort law do not foreclose accomplice liability any time the perpetrator *could have* been held liable but is now "'dead,

defunct, [or] incapacitated.'" Resp.31. Nor does this case require the Court to speculate about "'personal jurisdiction'" or other issues. *Id.* It need only confirm that joint-and-several liability requires a main perpetrator who could be liable under Swiss private tort law, and that Sudan is not.

### D. The Jury Instructions Misstated Swiss Law.

The jury was instructed to decide this case using a low standard of proof unrecognized in Swiss law. And it was told that a company may be liable for providing routine services whenever it is foreseeable that its customer is committing unlawful acts—even if the company did not consciously assist those bad acts, its services had no connection to the people harmed, and the acts would have happened anyway. The instructions did not correctly state Swiss law. Swiss Br.20-29; BNPP Br.38-48.

#### 1. Burden Of Proof

"[F]ull conviction" is the default standard of proof. *Insurance Contract*, 130 III 321, JA-__[Dkt.813-3§3.2]; JA-__[Dkt.813-1¶¶15, 28] (Müller); JA-__[Dkt.935at14-24]. Here, it applies to every element but natural causation. BNPP Br.38; Swiss Br.25-27; Jametti Br.9-10. "Preponderant likelihood" is a narrow exception for cases of evidentiary hardship (*Beweisnot*) where "the nature of the damage makes strict proof objectively impossible" or proof "cannot reasonably be de-

manded," JA-__, __ [Dkt.813-1¶¶30,48]—such as product-defect cases where certain facts "can only be established indirectly," *Coffeemaker*, 133 III [2006] 81 (exploded coffee pot thrown away), JA-__[Dkt.708-20at5].

The district court's across-the-board reduction in the burden of proof is unprecedented. Plaintiffs claim that "Sudan's atrocities" required circumstantial proof, Resp.38, but they provided eyewitness testimony about their injuries and attackers, *e.g.*, JA-__[2025.10.25_Tr.923:25-924:3]; JA-__[2025.10.26_Tr.967:9-10]; JA-__[2025.10.18_Tr.962:4-13], as well as media reporting and expert testimony, JA-__[Trial_Tr.395, 637-95, 776, 840]. To prove "conscious assistance," Resp.38, Plaintiffs likewise had direct evidence relating to BNPP's interactions with Sudan, including BNPP documents and the statement of facts accompanying its plea. *E.g.*, JA-__[Trial_Tr.303:1-3, 1049:9-1050:20, 1099:17-22, 1545:6-8]. If "a corporation's state of mind," Resp.39, alone established evidentiary hardship, the exception would swallow the rule and permit parties to "circumvent the difficulties of proof." *Gravel Pit*, 107 II 269, 275, JA-__[Dkt.813-7]; *accord Insurance Contract*, JA-__[Dkt.813-3§3.2]; Swiss Br.26-28.

The preponderant-likelihood definition was also wrong. The Swiss Supreme Court recently reiterated that preponderant likelihood demands a threshold "*significantly higher than* 51%"—with precedent placing it near 75%. *Delayed MRI*, 4A_554/2025 §§ 4.1, 4.4.1 (June 9, 2026) (Addendum) (emphasis added); *see* BNPP

Br.40 (collecting cases). The district court contradicted that precedent by instructing the jury that "a preponderant likelihood means that it is *more likely than not* that the event occurred, and that other explanations do not reasonably explain the event"—a definition that tracks U.S. law's >50% preponderance-of-the-evidence standard. JA-__[2025.10.16_Tr.1624:23-25] (emphasis added). This language was not "taken from the *Coffeemaker* case," Resp.39, which required "significant reasons to believe that a claim is accurate, without other possibilities being of significant importance or reasonably coming into consideration." JA-__[Dkt.708-20at5-6]. The point is not that the instructions needed "'percentages of probability,'" Resp.40, but that the district court replaced Switzerland's demanding standard with a "very different" U.S. rule. Swiss Br.26, 28.

**2. Conscious Assistance**

Consciously assisting a perpetrator's specific acts of misconduct demands far more than merely being on notice that providing services to the perpetrator would "contribut[e] to" its ability to commit misconduct. JA-__[2025.10.16_Tr.1624:17]. Swiss law requires conscious assistance, BNPP Br.41-43; the jury was instructed that mere awareness was sufficient, JA-__[2025.10.16_Tr.1624:15-1625:22].

Swiss Supreme Court precedent forecloses Plaintiffs' position that BNPP's "conscious[] aware[ness]" of what "was happening" in Sudan established this ele-

ment. Resp.42. Conscious *awareness* is not conscious *assistance*; Swiss law requires the latter. In *Father-Son Robbery*, the son "knew, or could have known," about his father's thefts—they had jointly committed similar thefts—yet the Swiss Supreme Court held "that was not enough" to impose secondary liability for thefts the son "was not personally involved in." 4A_573/2010, JA-__[Dkt.530-19§5]. While Swiss law may not require "a specific agreement or mutual intent to cause a particular harm," Resp.42, it does require showing that BNPP "cooperated consciously," "act[ing] in concert with respect to the harmful act" that injured Plaintiffs. *Locksmith*, JA-__[Dkt.460-13¶6.2.1]; *see* Swiss Br.20-21. This difference mattered. A properly instructed jury could have found that BNPP—which provided banking services and letters of credit facilitating oil payments, not military transactions—did not act in concert with Sudan to commit the human-rights violations that injured Plaintiffs.

### 3. Causation

**Natural causation.** The jury was instructed that BNPP's financial services were a natural cause of Plaintiffs' individual injuries if those injuries "more likely occurred because [BNPP] financed [Sudan]." JA-__[2025.10.16_Tr.1627:4-9]. Even if the injuries would have occurred anyway and BNPP's services raised the possibility by just 0.1%, the jury could find this "more likely" standard satisfied.

That instruction was erroneous, and it did not "com[e] from" *Boat Collision*. Resp.45. A natural cause under *Boat Collision* is an "indispensable," "necessary condition (*conditio sine qua non*) for the damage." 4A_444/2010, JA-__[Dkt.533-61¶¶2.1, 4.4]; *see* Swiss Br.22-23; Jametti Br.13. Plaintiffs' cited case agrees. *Whiplash*, 147 V 161 § 3.2, JA-__[Dkt.708-14] ("all circumstances without . . . which the event" would not have occurred). In cases where blame is shared equally among participants, Swiss courts deem each an indispensable cause. *E.g.*, *Hockey*, JA-__[Dkt.460-17¶¶2-4,8]; *Firecrackers*, JA-__[Dkt.444-109¶3]. But Swiss courts have never relaxed natural causation to reach acts that merely made harm "more likely." JA-__[2025.10.16_Tr.1627:4-9]. Under the proper standard, BNPP had a strong causation defense. BNPP Br.45-46. Under the district court's instruction, this defense was foreclosed.

**Adequate causation.** Rather than asking whether Plaintiffs' injuries "can reasonably be attributed to" BNPP, *Swisscom*, JA-__[Dkt.708-13¶2.3.1]; *see* Jametti Br.13, the district court's instruction required only that it be "reasonably foreseeable" that BNPP's services would increase the "likelihood" or "intensity of human rights violations *and thereby* plaintiffs' damages." JA-__[2025.10.16_Tr.1627:11-17] (emphasis added). The Swiss Supreme Court has rejected concepts of adequate causation that "do[] not lead to a reasonable limitation of liability," *Barbecue*, 4A_7/2007, JA-__[Dkt.169-18¶5.4], and would create "system liability," *Swisscom*,

JA-__[Dkt.708-13¶2.3.2]. Plaintiffs note that the district court also said causation was not adequate if the causal link with Plaintiffs' injuries was "too attenuated or remote." Resp.48. But jury instructions are evaluated as a whole, and the sentence Plaintiffs identify did not correct the faulty and confusing instruction that preceded it. JA-__[2025.10.16_Tr.1627:11-17].

Plaintiffs need not "trac[k] particular dollars to particular bullets." Resp.50. But neither can they generically invoke "the fungibility of money and the collective nature of genocide" (*id.*) to avoid Swiss law requiring a "concrete" and foreseeable connection between Swiss banking conduct and the individual Plaintiffs' injuries in Sudan. *Swisscom*, JA-__[Dkt.708-13¶2.3.2]; *see Locksmith*, JA-__[Dkt.460-13¶6.2.3]. Nor can U.S. sanctions "implicitly" bridge that gap. Resp.50. BNPP's U.S. prosecutors made clear that those "who suffered grievous harm at the direction of the regim[e] in Sudan" "are not victims of this crime and cannot show that they were directly harmed by BNPP's conduct." JA-__[Dkt.637-1at9:9-21]; *see* Swiss Br.4-5.

#### 4. Prejudice

The district court's instructional errors, independently and collectively, require a new trial. Unlike an accurate but confusing instruction, *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 758 (2d Cir. 2004) (cited at Resp.51), each instruction here misstated the law on an essential element of Plaintiffs' claims. Where

the error "create[d] an erroneous impression regarding the standard of liability, *it is not harmless error* because it goes directly to the plaintiff's claim." *LNC Invs., Inc. v. First Fid. Bank, N.A. N.J.*, 173 F.3d 454, 463 (2d Cir. 1999) (emphasis added); *accord Murray v. UBS Sec., LLC*, 128 F.4th 363, 370 (2d Cir. 2025). Plaintiffs' view that BNPP's liability is "not a close call," Resp.51, is thus irrelevant—and wrong. A properly instructed jury likely would have found, for example, that Plaintiffs' evidence regarding BNPP's general knowledge of Sudanese human-rights abuses, Resp.52, failed to establish "full conviction" (~90%) that it consciously assisted the harmful acts that injured Plaintiffs, or a preponderant likelihood (~75%) that BNPP's conduct was an indispensable cause of their injuries. At minimum, the evidence does not, "as a matter of law, compel[]" judgment for Plaintiffs. *Linde v. Arab Bank, PLC*, 882 F.3d 314, 330 (2d Cir. 2018).

## II. The District Court's Inconsistent Rulings On Sanctions-Related Evidence Warrant A New Trial.

Plaintiffs' defense of the district court's evidentiary rulings highlights their internal inconsistency. To justify admitting the fact of BNPP's guilty plea, Plaintiffs say BNPP's violation of U.S. sanctions is "highly probative" of its state of mind—the "central issue" at trial. Resp.53. But to justify excluding BNPP's evidence of compliance with Swiss, EU, and UN sanctions, Plaintiffs declare BNPP's state of mind "admitted" and thus beyond dispute. Resp.56. The court's inconsistent rulings require a new trial.

### A. The District Court Erroneously Admitted Evidence Of BNPP's Guilty Plea.

The district court admitted the fact that BNPP pled guilty to U.S. sanctions violations. Plaintiffs do not dispute that the district court never expressly weighed the plea's risk of unfair prejudice, as Rule 403 requires. The court called the plea "relevant" and "probative" but never mentioned prejudice, even though BNPP objected to its admission under Rule 403. JA-__[2025.05.20_Hrg_Tr.20-21, 29:3; Dkt.796at2]; *see also* JA-__, __[Dkt.701;Dkt.738]. The court is not "presume[d]" to have considered the Rule 403 factors. *Contra* Resp.54. A court need not "mechanically recite [its Rule 403] analysis," *United States v. Brady*, 26 F.3d 282, 287 (2d Cir. 1994), but where it "gave no explanation for its conclusion," this Court is "in no position to assume that the [district] court appreciated the seriousness of the risk" of prejudice, *United States v. McCallum*, 584 F.3d 471, 477 (2d Cir. 2009). This Court thus reverses where, as here, there is "no mention of prejudice on the record." *Palin v. N.Y. Times Co.*, 113 F.4th 245, 275 (2d Cir. 2024).

The prejudice was severe. Because the jury already had BNPP's stipulated factual statements accompanying the guilty plea, BNPP Br.49, the fact of the plea added nothing but the "aura of guilt." *Monticello Tobacco Co. v. Am. Tobacco Co.*, 197 F.2d 629, 632 (2d Cir. 1952). The district court refused limiting instructions, which Plaintiffs circularly defend on the ground that the plea "was used for its proper purpose." Resp.55.

This prejudice materialized throughout trial. Plaintiffs emphasized the plea in their opening, asked witnesses about it, hammered it in their closing, and asked the jury to keep it in mind—invoking the plea *over 15 times* total. *E.g.*, JA-__[Trial_Tr.25:3-20, 284:14-23, 360:15-361:9, 379-380, 598:4-20, 1180:12-16, 1256:14-18, 1365:6-9, 1518:2-5,11-23, 1534:19-20, 1537:1-1539:4, 1614:22-24]; *see Cameron v. City of New York*, 598 F.3d 50, 61 (2d Cir. 2010). Unsurprisingly, the jury asked to read the statement including the plea shortly before issuing its verdict. JA-__[Trial_Tr.1654:25-1657:15]. Plaintiffs contend the criminal plea was admissible because BNPP's same "conduct" and "mental state" were at issue in this case. Resp.53-54. But unfair prejudice is only heightened when a prior conviction "stems from the same incident at issue." *Sharif v. Picone*, 740 F.3d 263, 274 (3d Cir. 2014). A new trial is required to eliminate the risk that the jury "conform[ed]" its verdict to the plea. *Arlio v. Lively*, 474 F.3d 46, 53 (2d Cir. 2007); *accord Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1347 (5th Cir. 1978) (reversing admission of guilty plea in civil case).

### B. The District Court Excluded Relevant Evidence Of Compliance With Swiss, EU, And UN Sanctions.

Evidence that BNPP complied with Swiss, EU, and UN sanctions tends to show that BNPP did not "consciously assis[t] the perpetrator" or "know[]" it was contributing to "an illicit act," and that harm to Plaintiffs was not "foreseeable." JA-__, __[Dkt.193at6,15]. It therefore meets the "very low standard" for relevance.

*United States v. Al-Moayad*, 545 F.3d 139, 176 (2d Cir. 2008); *see Palin*, 113 F.4th at 274.

Plaintiffs insist that "compliance with a narrower arms embargo says nothing about whether BNPP knew it funded" genocide. Resp.56. But three pages earlier, they call BNPP's plea "highly probative" of its state of mind. Resp.53. If violating one sanctions regime allegedly proves BNPP's knowledge, then complying with three others (including the country whose laws govern) has at least some "tendency" to negate it. Fed. R. Evid. 401(a). "Compliance" may "not [be] dispositive" of liability, Resp.56, but it is certainly "probative," *Gill v. Arab Bank, PLC*, 893 F.Supp.2d 523, 537-38 (E.D.N.Y. 2012) (admitting evidence of "the regulations under which the Bank operated").

Plaintiffs' other arguments are unresponsive. The principle that ignorance of the law is no excuse, Resp.56, says nothing about whether compliance with the law is relevant to BNPP's state of mind. Nor did BNPP's plea or stipulated statements "admit[]" the "knowledge" Plaintiffs needed to prove, *id.*—BNPP's U.S. guilty plea did not and could not resolve its knowledge and conscious assistance of illicit acts that injured Plaintiffs *under Swiss tort law*. *See* Swiss Br.8-9 & n.4 (the plea improperly "encouraged . . . the jury to decide the case based [on] U.S.-law considerations").

BNPP's isolated references to Swiss, EU, and UN sanctions regimes at trial or in the summation (which is not evidence) did not make the error harmless. *Contra* Resp.55. "[S]tray bits of testimony do not substitute for [a] direct account." *United States v. Scully*, 877 F.3d 464, 475 (2d Cir. 2017). The court broadly excluded evidence of BNPP's compliance with Swiss and European sanctions, SA-__[Dkt.791at1]; excluded expert testimony that would have provided context about Switzerland's sanctions regime, JA-__[Dkt.763at12]; excluded evidence that Switzerland's financial regulator "found no indications of Swiss sanctions having been breached," JA-__[Dkt.528-132at2]; JA-__[Trial_Tr.1403:2-10]; sustained objections to such evidence, JA-__[Trial_Tr.277:7-11]; and told the jury it did not matter "what other [non-U.S.] countries have done," JA-__[Trial_Tr.277:12-14]. "Given this attack on appellants' case, it cannot be said that the exclusion" of the evidence "was harmless." *Phoenix Assocs. III v. Stone*, 60 F.3d 95, 105 (2d Cir. 1995).

## III. The District Court Was Required To Hold An Evidentiary Hearing.

Three of Plaintiffs' lawyers—including the attorney who signed the appellees' brief in this Court—submitted declarations under penalty of perjury describing their lead trial counsel's allegedly unethical conduct. These lawyers now dismiss their own statements as "uncorroborated hearsay allegations." Resp.57. That label diminishes their own accusations that Lee Boyd "pressure[d]" an expert, tried to "force words into the mouth" of another, and violated ethical rules while preparing "victim-

side witnesses." JA-__[Dkt.784at2, 8, 13-15]. At the same time, Plaintiffs' lawyers did not identify which victims or experts were involved, what misconduct Boyd planned, or what "other" unidentified "incidents" occurred. JA-__[Dkt.784at2].

The district court was obliged to discover the truth "*prior* to the trial," as the alleged misconduct threatened to "subvert the entire judicial process." *Erickson v. Newmar Corp.*, 87 F.3d 298, 303-04 (9th Cir. 1996) (emphasis added); *see* BNPP Br.55. A hearing might be unnecessary where the paper record resolves the concerns, *Rossbach v. Montefiore Med. Ctr.*, 81 F.4th 124, 138-39 (2d Cir. 2023) (cited at Resp.58), but here they were ignored.

Cross-examination at trial was not viable. *Contra* Resp.58. BNPP did not know the identities of the tainted witnesses, so cross-examination would have meant conducting discovery in front of the jury.

Having been denied a hearing to discover facts "peculiarly within the knowledge of the opposing party," *Kamen v. AT&T Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986), BNPP could not possibly meet the district court's demand that it identify specific lines of tainted testimony after trial. Resp.59; JA-__[2025.11.12_Tr.4:17-22, 31:6]. Even after trial, Plaintiffs reaffirmed that their allegations of "sanctionable misconduct" were "true and accurate," and while they claimed none of it affected the verdict they had just obtained, they still refused to identify the witnesses in-

volved. JA-__[Dkt.1028at1, 5] (letter); *see also* JA-__[Dkt.1081at6:24-7:2] (withdrawal of response). The district court erred in denying an evidentiary hearing based solely on Plaintiffs' counsel's after-the-fact assertions.

## IV. The Damages Awards Must Be Reduced Under Swiss Law.

Plaintiffs agree that Swiss law's "check on excessive damages" applied here. BNPP Br.58 (quoting *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 430 (1996)). Under that standard, moral damages are measured against "the amounts awarded in comparable cases." JA-__[Dkt.1042-9¶¶33-40] (Romy); Tercier Br.17-18; Swiss Br.29-30. Here, the moral-damages awards should have been reduced to no more than $277,500 per Plaintiff based on "established doctrine and case law." Tercier Br.17-18; BNPP Br.60.

Plaintiffs argue that BNPP should have presented "a proffer of proof at trial concerning 'comparable' Swiss cases." Resp.61. But checking excessiveness is the court's (not the jury's) province, exercised after a verdict on a Rule 59 motion. *Gasperini*, 518 U.S. at 434-35. That is when and how BNPP presented it, based on comparable Swiss awards in the record. JA-__[Dkt.1041at39-47]; JA-__[2026.01.07_Tr.70].

Plaintiffs next claim that a factfinder has "discretion" in setting moral damages. Resp.61. But as Plaintiffs acknowledge, an award cannot stand if it "deviated

from the principles" recognized in law, Resp.61, and Swiss law measures excessiveness based on "the amounts awarded in comparable cases," JA-__[Dkt.1042-9¶40] (Romy); *see* Resp.61 (conceding that the "objective baseline" is what would be awarded "in a similar case").

Plaintiffs' awards vastly exceed any comparable prior award. Kashef's award, for example, is an undisputed $7.3 million in moral damages—more than 26 times the highest such award in Swiss history ($277,500), for a shooting that left the victim unable to care for herself. BNPP Br.59-60. Plaintiffs' dismissal of Swiss precedents involving shootings, hostage-takings, sexual violations, and other harms as dissimilar "garden-variety torts" rings hollow because Plaintiffs allege Sudan inflicted similar harms on them. Resp.9-10, 62; BNPP Br.58-60.

Plaintiffs' half-hearted Seventh Amendment argument, Resp.63, is foreclosed by *Gasperini*. A court's application of a "damage-control standard," reviewed for abuse of discretion, is consistent with the Constitution. 518 U.S. at 435-39.

## V. The Case Should Be Dismissed For *Forum Non Conveniens*.

This Swiss case should have been litigated in Switzerland. JA-__[Dkt.937at2]. Litigating it in New York substantially prejudiced BNPP: The bank had to defend Swiss transactions that complied with Swiss sanctions before a New York jury applying an ersatz version of Swiss law, over the Swiss Government's

protest and with limited access to Swiss evidence, producing record-breaking judgments. Plaintiffs' arguments for keeping this case in New York do not persuade. *See Gonzalez v. Naviera Neptuno A.A.*, 832 F.2d 876, 881 (5th Cir. 1987) (reversing and ordering dismissal following trial).

***Deference.*** Plaintiffs argue for unqualified deference to their choice of forum. Resp.64. But deference is a sliding scale that recedes as the case's "bona fide connection" to the forum weakens. *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 72 (2d Cir. 2001) (en banc). Plaintiffs' California and Texas residences do not convert an "overwhelmingly Swiss" dispute, *Stevenson v. Thornburgh*, 2026 WL 276584, at *2 (2d Cir. Feb. 3, 2026), into a New York controversy.

***Adequate Alternative Forum.*** Plaintiffs do not dispute that BNPP consented to Swiss jurisdiction and conditional dismissal. BNPP Br.62; Resp.64-65. Under Article 24 of the Lugano Convention, which applies here, Swiss courts "would not have discretion to decline jurisdiction and must accept jurisdiction without reservation." JA-__[Dkt.297at2] (Romy); BNPP Br.62-63.

Plaintiffs contend that under a different legal regime—the Private International Law Act (PILA)—Swiss courts may decline jurisdiction if neither party resides in Switzerland and Swiss law is inapplicable. Resp.65. But PILA, JA-__[Dkt.279-5at2], has been "supersede[d]" by the Lugano Convention on this issue, JA-__[Dkt.297at2] (Romy); Federal Act on Private International Law, art. 5 n.7,

https://perma.cc/XRB7-WRKU. And Swiss courts would apply Swiss law, not (as Plaintiffs claim) Sudanese law. JA-__[Dkt.297at5].

Plaintiffs misquote BNPP as "conced[ing that] 'Swiss courts would decline jurisdiction.'" Resp.64 (citing BNPP Br.36). BNPP instead explained that Swiss courts would "decline jurisdiction" over *Sudan*. BNPP Br.36. That statement addressed the absence of a Swiss-law tort claim against the perpetrator, *supra*, at 14-17, not Swiss courts' jurisdiction over BNPP.

***Public-interest factors.*** The public-interest factors decisively favor dismissal because Plaintiffs challenge conduct that occurred in Switzerland, implicating Swiss sanctions and tort law. Switzerland has a strong interest "in having localized controversies decided at home" rather than in a foreign court. *Iragorri*, 274 F.3d at 74; *see* BNPP Br.64; Swiss Br.2-3, 13-14, 29-30.

Plaintiffs claim that the "public interests favor accountability" because a jury ruled in their favor, Resp.66, but that gets things backwards. The *forum non* doctrine dictates which tribunal should decide liability. And Plaintiffs never identify any other New York interest. BNPP Br.64. As Judge Nathan explained, this case has only a "minor connection" to New York; "Switzerland has the greatest interest," JA-__[Dkt.151at1,11-14].

Plaintiffs' only other response is that "Swiss courts lack mechanisms to handle mass tort litigation." Resp.66. But Swiss courts permit consolidation and joinder,

JA-__[Dkt.264at5-6] (Romy), and 6,000 plaintiffs recently brought a mass-tort action in Switzerland. JA-__[Dkt.297at6-7]. Regardless, the "unavailability of beneficial litigation procedures . . . does not render an alternative forum inadequate." *Blanco v. Banco Indus. de Venez., S.A.*, 997 F.2d 974, 982 (2d Cir. 1993).

***Private-interest factors.*** Plaintiffs claim that most evidence was in the United States. Resp.64. That argument is circular: The trial centered on U.S. evidence because Swiss witnesses and documents are difficult to access outside Switzerland. JA-__[Dkt.264at4-5].

Plaintiffs' accusation of a "six-year delay" ignores the docket. Resp.65. Measured from when BNPP knew the critical fact giving rise to its *forum non* argument—Swiss law's application—BNPP moved within six months, BNPP Br.65, which is "'a reasonable time.'" Wright & Miller, *Federal Practice & Procedure* § 3828 n.30 (4th ed. 2026).

In all events, the substantial-prejudice threshold—a rule about completed trials—says nothing about the untried claims of the remaining 99.9% of the class. Plaintiffs offer no reason why New York juries should continue to decide claims against a French bank under Swiss law for harms suffered in Sudan.

## CONCLUSION

This Court should reverse and direct entry of judgment for BNPP.

Dated: September 11, 2026

Respectfully submitted,

/s/ Thomas H. Dupree Jr.

Thomas H. Dupree Jr.
Russell B. Balikian
Aaron Smith
Gibson, Dunn & Crutcher LLP
1700 M Street, N.W.
Washington, DC 20036
(202) 955-8500
TDupree@gibsondunn.com

Barry H. Berke
Dani R. James
Michael Martinez
Matt Benjamin
David Salant
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000

Carmine D. Boccuzzi, Jr.
Abena Mainoo
Katherine R. Lynch
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
(212) 225-2000

*Counsel for BNP Paribas S.A.*

## CERTIFICATE OF COMPLIANCE

I certify that:

1. This brief complies with the type-volume limitations of Second Circuit Rule 32.1(a)(4)(B), which are authorized by Fed. R. App. P. 32(e), because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), it contains 7,000 words, as determined by the word-count function of Microsoft Word.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: September 11, 2026

/s/ Thomas H. Dupree Jr.
Thomas H. Dupree Jr.

## CERTIFICATE OF SERVICE

I certify that on September 11, 2026, I caused the foregoing brief to be electronically filed and served on all counsel of record via this Court's CM/ECF system.

Dated: September 11, 2026

/s/ Thomas H. Dupree Jr.
Thomas H. Dupree Jr.

# ADDENDUM

# TABLE OF CONTENTS

**Page**

*Delayed MRI Case*,
4A_554/2025 (Swiss Sup. Ct. June 9, 2026) (certified translation).......Add. 1

MORNINGSIDE
A Questel Company

morningtrans.com

# TRANSLATION CERTIFICATION

**Date: 2026/09/03**

To whom it may concern:

This is to certify that the attached translation is an accurate representation of the documents received by this office. The translation was completed from:

- French (France)

To:

- English (USA)

The documents are designated as:

- '4A_554_2025 09.06.2026 - Tribunal fédéral.docx'

Samuel Wu, Managing Director of this company, attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

Signature of **Samuel Wu**, Managing Director



299 South Main Street, Suite 1300
Salt Lake City, UT 84111

Bundesgericht
Tribunal fédéral
Tribunale federale
Tribunal federal

back

**4A_554/2025**

**Judgment of June 9, 2026,**

**First Civil Law Court**

Composition
Federal Justices Hurni (Presiding), Kiss,
and Denys. Clerk: Mr. Hausammann.

Parties to the proceedings
A.________,
represented by Marie-Eve Guillod, attorney,
appellant,

*against*

Hospital B.________,
represented by Philippe Leuba, attorney,
respondent.

Subject Matter
Medical liability (causal link),

appeal against the judgment of the Cantonal Court of the State of Fribourg, First Administrative Court, dated September 23, 2025 (601 2024 49).

**Facts:**

**A.**

**A.a.** A.___________, born in 1993, became pregnant in 2015 and had an uncomplicated pregnancy. On xxx 2016, because her pregnancy had gone past term, she went to B. Hospital_____________ (hereinafter: B._________) to have labor induced. She gave birth vaginally on yyy 2016, after an epidural was administered at her request. On zzz, 2016, she was discharged from B. _____________and returned home.
Shortly after giving birth, A. ____________began experiencing lower back pain. Despite conservative treatment, the pain gradually intensified and became acute as of April 21, 2016. On April 23, 2016, in the late afternoon, she visited an osteopath who noted severe pain in the lumbar region, marked weakness in both legs, and an inability to move her toes or stand, though no sensory disturbances were noted.

**A.b.** At 6:29 p.m. on April 23, 2016, A. ____________was admitted to the emergency department at B.____________. The clinical examination revealed decreased muscle strength in the legs, as well as

sphincter hypotonia with perianal hypoesthesia. A blood test and an X-ray of the lumbar spine, performed that same evening, revealed nothing unusual. A CT scan of the lumbar spine, performed at 11:07 p.m., showed a suspicious collection and led the radiologist to recommend an MRI. The evaluation suggested a diagnosis of left-sided lumbocruralgia with suspicion of partial cauda equina syndrome.
During the night of April 23–24, 2016, around 1:30 a.m., the patient was transferred to the orthopedic surgery department. On the morning of April 24, 2016, a new neurological evaluation revealed a worsening of her clinical condition. The neurologist diagnosed partial cauda equina syndrome and recommended transferring A. ___________to C. Hospital___________for an MRI. This examination was performed at 2:38 p.m. and revealed an accumulation of epidural fluid with compression of the dural tube and resulting cauda equina symptoms. Decompression surgery was performed promptly.
Following this procedure, the patient experienced bladder and anal sphincter dysfunction. She was hospitalized at C. Hospital___________until May 20, 2016, and then continued her rehabilitation at B. ___________until June 17, 2016. She continued to receive physical and occupational therapy sessions until November 2017.

**A.c.** On April 13, 2017, A. ___________filed a claim for compensation against B._________, seeking a total of 2,597,409 Swiss francs for household damages, loss of earnings and pension, pain and suffering, assistance costs, and uncovered medical expenses.
As part of the proceedings conducted by B. ___________, an expert report was issued on January 24, 2022, by FMH-certified specialists in anesthesiology, gynecology and obstetrics, as well as orthopedic surgery and musculoskeletal traumatology. In essence, the experts noted that the delay in treating the spinal surgery was excessive, that the patient's symptoms should have raised suspicion of neurological damage, and that an urgent evaluation, including an MRI, should have been performed. These failures constituted a breach of the duty of care and resulted in persistent and permanent neurological impairments (paraparesis, para-hypoesthesia, sphincter dysfunction), which were classified as severe neurological sequelae. As for the causal link between these impairments and the breach of the duty of care, the experts noted that the sooner decompression was performed after the onset of a neurological deficit, the better the chances of recovery. In this specific case, however, the medical literature did not allow for a determination of the extent to which the delay had exacerbated the condition. They specified that, even with optimal surgical decompression, approximately 30% of patients do not make a full recovery.
As part of the proceedings conducted by the Cantonal Disability Insurance Office ("Cantonal Office AI," hereinafter: OAI), which had also made claims against B. ___________, this expert opinion was submitted to Dr. D. ___________, an FMH-certified specialist in surgery and traumatology. In a report dated September 19, 2023, Dr. D. stated that a causal link existed between the health problems and the breach of standard medical practice, with a preponderance of probability.

**B.**
By decision of February 22, 2024, B. ___________rejected A.__________'s claim for compensation. In a ruling dated September 23, 2025, the First Administrative Court of the Fribourg Cantonal Court upheld this decision, on the grounds that the natural causal link had not been established to the standard of preponderant probability.

**C.**
In a civil appeal, A. ___________primarily requests that the Federal Supreme Court reverse the judgment of September 23, 2025, to the effect that B. ___________be ordered to pay her the sum of 1,623,838 Swiss francs, with interest at 5% from July 1, 2024. In the alternative, she seeks the annulment of the judgment and the remand of the case to the lower court for a new decision in accordance with the reasoning set forth herein. The appellant further requests full legal aid, with her attorney appointed as court-appointed counsel.
No response was requested.

**Legal rationale:**

**1.**
The subject matter of the contested judgment is the liability of a public hospital based on cantonal public law governing state liability (see below, para. 2.1). This is a decision rendered in application of cantonal public law provisions in a matter related to civil law within the meaning of Art. 72(2)(b) LTF (**ATF 139 III 252**, para. 1.5; **135 III 329**, para. 1.1; **133 III 462**, para. 2.1). It must therefore be challenged before the Federal Supreme Court by means of a civil appeal when the amount in dispute exceeds 30,000 Swiss francs. (**ATF 139 III 252**, para. 1.5; **135 III 329**, para. 1.1).

Filed within the time limit set by law (Art. 100(1) LTF) by the appellant, who was unsuccessful in her claims (Art. 76(1) LTF), and directed against a final decision (Art. 90 LTF) rendered on appeal by the higher court of the Canton of Fribourg (Art. 75 LTF) in a case where the amount in dispute exceeds 30,000 francs (Art. 74(1)(b) LTF), the civil appeal is, in principle, admissible.

**2.**

**2.1.** According to case law, the care provided to patients in public hospitals is not related to the operation of a business (see Art. 61(2) CO), but rather constitutes the performance of a public duty; pursuant to the optional reservation provided for in Art. 61(1) CO, the cantons are therefore free to subject to cantonal public law the liability of physicians employed in a public hospital for damage or non-pecuniary harm they cause in the performance of their duties (**ATF 139 III 252**, para. 1.3; **133 III 462**, para. 2.1; **122 III 101**, para. 2a/aa and bb; judgment 4A_621/2024 of July 9, 2025, para. 2.1).

**2.2.** The Canton of Fribourg has made use of this reservation. Article 41 of the Act of June 27, 2006, on the Fribourg Hospital (LHFR/FR; RS/ FR 822.0.1) expressly provides that the liability of that hospital for harm unlawfully caused by its employees to others in the performance of their duties is governed by the cantonal Act of September 16, 1986, on the Civil Liability of Public Entities and Their Agents (LResp/FR; RS/FR 16.1). According to Art. 6(1) LResp/FR, public entities are liable for harm that their agents unlawfully cause others in the performance of their duties. Art. 7(1) LResp/FR permits the awarding of compensatory damages for pain and suffering in cases of bodily injury or death. Freiburg public law has thus established causal liability for the acts of physicians in the canton’s public hospitals. This liability requires the fulfillment of three conditions: an unlawful act, harm (property damage or emotional distress), and a causal relationship (natural and adequate) between the unlawful act and the harm (**ATF 139 III 252**, para. 1.4; **133 III 462**, para. 4.1; the aforementioned decision 4A_621/2024, para. 2.2).
Furthermore, the provisions of the Swiss Code of Obligations apply, in particular to the determination of harm and the assessment of compensation (Art. 9 LResp/FR), which are therefore applicable as supplementary cantonal law.

**3.**

**3.1.** The Federal Supreme Court rules on the basis of the facts established by the lower court (Art. 105(1) LTF). It may deviate from these facts only if they were established in a manifestly inaccurate manner – which corresponds to the concept of arbitrariness within the meaning of Art. 9 of the Constitution (**ATF 140 III 115**, para. 2; **137 I 58**, para. 4.1.2; **137 II 353**, para. 5.1) – or in violation of the law within the meaning of Art. 95 LTF (Art. 105(2) LTF), and if correcting the defect is likely to affect the outcome of the case (Art. 97(1) LTF).
Challenges to the established facts are subject to the strict principle of allegation set forth in Art. 106(2) LTF (**ATF 140 III 264**, para. 2.3, and the references cited therein). A party seeking to challenge the facts established by the lower court must explain clearly and in detail how these conditions are met (**ATF 140 III 16**, para. 1.3.1, and the references cited). If the party seeks to have the factual record supplemented, it must also demonstrate, through specific references to the case file, that it has presented to the lower courts – in accordance with the rules of procedure – the legally relevant facts in this regard and the appropriate evidence (**ATF 140 III 86**, para. 2). If the challenge does not meet these requirements, allegations regarding a factual basis that deviates from that of the challenged decision cannot be taken into consideration (**ATF 140 III 16**, para. 1.3.1).
With regard to the assessment of evidence, arbitrariness exists when the authority fails to take into account, without any serious reason, a piece of evidence capable of altering the decision; when it is manifestly mistaken as to its meaning and scope; or when, based on the evidence gathered, it draws untenable conclusions. Arbitrariness does not arise merely because another solution would be conceivable or even preferable (**ATF 136 III 552**, para. 4.2).

**3.2.** With regard to the interpretation and application of cantonal public law, including federal law applied as supplementary cantonal law, the Federal Supreme Court examines only whether the misapplication of cantonal law constitutes a violation of federal law because it is arbitrary within the meaning of Art. 9 of the Constitution or because it is contrary to other constitutional rights (Art. 106(2) LTF; supra-cited decision 4A_621/2024, para. 3.2).

**4.**
The appellant criticizes the Cantonal Court for denying the existence of a causal link in order to hold B.___________liable. In this regard, she complains of arbitrariness in the assessment of the evidence and the determination of the facts, particularly with respect to the meaning and scope attributed to the expert reports dated March 1 (*recte* January 24), 2022, and September 19, 2023.

**4.1.** Natural causation between two events exists when, without the first, the second would not have occurred (**ATF 143 III 242**, para. 3.7; **133 III 462**, para. 4.4.2). The conduct need not necessarily be the sole or immediate cause of the result (**ATF 143 III 242**, para. 3.7; **125 IV 195**, para. 2b). Given the usual difficulties in proving causation, established case law holds that a standard of proof based on a preponderance of the evidence is sufficient to establish natural causation (**ATF 107 II 269**, para. 1b; judgments 4A_351/2025 of December 9, 2025, para. 10.1; 4A_605/2019 of May 27, 2020, para. 5.5.1; 4A_262/2016 of October 10, 2016, para. 4.4.2.1). Preponderance of probability requires that, from an objective standpoint, there be significant grounds supporting the accuracy of an allegation, without other possibilities being of significant importance or reasonably coming into consideration (**ATF 133 III 81**, para. 4.2.2; **132 III 715**, para. 3.1; decisions 4A_401/2023 of May 15, 2024, para. 6.1.1; 4A_82/2023 of August 8, 2023, para. 4.3.2). The Federal Supreme Court clarified that case law had not established specific percentages, but that according to legal doctrine, a 51% probability was insufficient, and a significantly higher degree of probability must be applied: a 75% probability was cited (decisions 4A_621/2024 of July 9, 2025, para. 6.1; 4A_401/2023 of May 15, 2024, para. 6.4; 4A_424/2020 of January 19, 2021, para. 4.1, unpublished in **ATF 147 III 73**, and the references).
When, as in the present case, the alleged breach constitutes an omission, the examination of causation amounts to determining whether the damage would also have occurred if the omitted act had been performed (hypothetical causation). Strict proof cannot be required in this regard. It is sufficient that the hypothetical course of events be established with a preponderance of probability ("*überwiegende Wahrscheinlichkeit*"; **ATF 132 III 715**, para. 3.2; judgments 4A_118/2025 of March 23, 2026, para. 4.2; 4A_351/2025, cited above, para. 10.1 with references; 4A_620/2024 of November 4, 2025, para. 8.2.1.1). As a general rule, once the hypothetical causal link between the omission and the damage has been established, there is no justification for subjecting this finding to a further examination regarding the appropriate nature of causation (**ATF 132 III 715**, para. 2.3; **115 II 440**, para. 5a). Thus, when determining whether a causal link exists between one or more omissions and a loss, one must consider the hypothetical course of events. In such a case, the Federal Supreme Court, hearing a civil appeal, is bound, pursuant to Art. 105(1) LTF, by the cantonal findings regarding natural causation, provided that they are not based exclusively on common experience but on facts arising from the assessment of the evidence (**ATF 132 III 305**, para. 3.5 and references; judgments 4A_401/2023, cited above, para. 6.1.1; 4A_133/2021 of October 26, 2021, para. 9.1.3).

**4.2.** According to case law in administrative matters, particularly in the medical field, the principle of free evaluation of evidence applies: the administrative authority or the judge freely evaluates the evidence, without being bound by formal rules of evidence, by conducting a comprehensive and rigorous assessment of the evidence. Consequently, the court must objectively examine all evidence, regardless of its source, and then determine whether the available evidence permits a valid ruling on the disputed legal issue. In particular, if medical reports are contradictory, the judge must evaluate all the evidence and state the reasons why he or she relies on one medical opinion rather than another (**ATF 143 V 124**, para. 2.2.2; **134 V 231**, para. 5.1; **125 V 351**, para. 3; judgment 4A_478/2022 of March 5, 2024, para. 5.1.3).
When the Cantonal Court accepts the findings of an expert report, the Federal Supreme Court will uphold a claim of arbitrary assessment of the evidence only if the expert failed to answer the questions, if the expert's conclusions are contradictory, or if, in some other way, the expert opinion is marred by defects so obvious and recognizable – even without specialized knowledge – that it was simply impossible to overlook them. The cantonal authority is not required to verify the scientific accuracy of the expert's opinions using specialized literature. Nor is it the role of the Federal Supreme Court to verify that all of the expert's statements are free from arbitrariness; its task is limited to examining whether the cantonal authority could, without arbitrariness, adopt the conclusions of the expert opinion (**ATF 133 II 384**, para. 4.2.3; **132 II 257**, para. 4.4.1; judgments 4A_82/2023 of August 8, 2023, para. 4.2; 4A_558/2020 of May 18, 2021, para. 4.1).

**4.3.** In the present case, the Cantonal Court found that an unlawful act had been committed by B.______. The appellant's treatment had taken an excessively long time. Despite a clinical presentation suggestive

of cauda equina syndrome and a CT scan that had revealed a suspicious collection – necessitating an immediate MRI – the MRI was delayed by more than twenty hours. A breach of the duty of care was therefore established, insofar as the physicians at B. ___________had failed to recognize a serious illness despite the typical symptoms. The cantonal judges also recognized the existence of damages, as the appellant suffers from severe neurological impairments (paraparesis, para-hypoesthesia leading to gait disturbances, and significant and disabling sphincter dysfunction) that resulted in a total degree of disability recognized by the OAI.
However, while acknowledging the full probative value of the expert report dated January 24, 2022, the Cantonal Court held that it did not establish a causal link beyond a preponderance of the evidence. In the view of the cantonal judges, the experts had limited themselves to citing statistics from the medical literature, without being able to assess or quantify the appellant's chances of recovery in this specific case. Furthermore, given that the appellant did not seek admission to the emergency room until the evening of April 23, 2016, even though she had already been suffering from acute pain since April 21, 2016, it could reasonably be inferred that her chances of recovery would have been significantly lower than the theoretical rate of 70 percent, had appropriate treatment been provided immediately (namely, an MRI followed by decompression surgery). The Cantonal Court then held that the medical assessment produced as part of the OAI proceedings was not relevant for determining causation in a medical liability dispute, particularly since the report dated September 19, 2023, was also based on general statistics.

**4.4.**

**4.4.1.** The Cantonal Court correctly held that the existence of a causal link should not be analyzed using an arithmetic calculation derived from statistics, but rather by considering all the circumstances of the specific case (see judgment 4A_401/2023 of May 15, 2024, para. 6.4). However, based on the evidence cited in the contested judgment, the cantonal judges did not act arbitrarily in denying the existence of a causal link between the breach of professional standards and the injuries sustained by the appellant. Contrary to the appellant's argument on appeal, the 70% rate cited in the expert report of January 24, 2022 (specifically, 30% of patients who do not recover as desired) corresponds to a general statistical figure and in no way to her specific situation. In this specific case, the experts were indeed unable to determine the probability that immediate treatment at B. ___________would have reduced the harm, nor to what extent the delay in treatment contributed to its worsening.
Admittedly, the expert report dated January 24, 2022, indicates that the chances of success were all the higher the sooner surgical decompression was performed after the onset of a neurological deficit. From this, it can be inferred that the 20-hour delay by B. ___________in treating the appellant increased the risk of complications. The Cantonal Court did not overlook this point, but noted that the appellant herself did not go to the emergency room immediately and did not present herself there until 48 hours after the onset of symptoms, even though prompt treatment is crucial in cases of epidural abscess. Given this reasoning – which, incidentally, is not challenged in the appeal – it was not unreasonable to conclude that the risk of complications would have been significantly higher than 30%, even if B. ___________had provided immediate care. Consequently, the cantonal judges could also conclude that the threshold of preponderant probability – that is, a rate significantly higher than 51 percent – had not been met to establish a hypothetical causal link between the tortious act committed by the respondent and the appellant's sequelae. Insofar as this assessment of the evidence convinced the Cantonal Court that a causal link had not been established in this case, the claim alleging a violation of Art. 8 of the Swiss Civil Code, according to which the burden of proof regarding causation would fall on the respondent, has in any event become moot (see **ATF 141 III 241**, para. 3.2; judgment 4A_620/2024 of November 4, 2025, para. 8.2.1.2).

**4.4.2.** The appellant then criticizes the observations made by B. ___________on July 4, 2024, in the cantonal proceedings, arguing that he should have raised an objection based on lawful substitution (see, on this concept, **ATF 122 III 229**, para. 5a/aa), according to which the outcome would have been the same even if the treatment had been in accordance with medical standards. However, the Cantonal Court's assessment contains nothing of the sort, rendering this criticism – which appears to be, in part, a copy-and-paste from a previous submission by the appellant – inadmissible from the outset.

**4.4.3.** The appellant further criticizes the Cantonal Court for departing from the conclusions of Dr. D._______'s report dated September 19, 2023, which found a predominant causal link between the wrongful act and the damage suffered.

The lower court explained the reasons why it departed from Dr. D.________'s analysis. Relying on the same medical literature as the experts, Dr. D. ___________concluded, without further elaboration, that a causal link existed based solely on general statistics. The cantonal judges could reasonably conclude that the physician commissioned by the OAI had not conducted his analysis in light of the specific circumstances of the case and that, in particular, he had not taken into account the time that had already elapsed between the onset of symptoms and the appellant's arrival at the emergency room. This assessment of the evidence withstands criticism of arbitrariness. The fact that Dr. D. ___________is a specialist in orthopedic surgery and musculoskeletal traumatology does not alter this; only the content of the report is decisive in assessing its probative value (see **ATF 134 V 231**, para. 5.1; **125 V 351**, para. 3a; judgment 4A_163/2024 of March 21, 2025, para. 4.3.2).
Furthermore, the Cantonal Court could take into account the fact that the issue of causation does not, in principle, arise in the context of disability insurance, which – unlike accident insurance – is not a causation-based insurance. In this case, Dr. D. ___________ruled on this issue, insofar as the OAI had asserted recourse claims against B. ___________. The appellant does not, however, claim that the OAI appealed the decision by B. ___________rejecting the claim for compensation. Moreover, the report dated September 19, 2023, does not criticize the experts' conclusions, including those regarding the issue of natural causation. Thus, the lower court was entitled to depart from the laconic, theoretical response – lacking any detailed assessment – provided by Dr. D.___________on the issue of causation.

**5.**
In light of the foregoing, the appeal is unfounded and must be dismissed to the extent that it is admissible. Since the appeal had no prospect of success from the outset, the appellant's request for legal aid must be denied (Art. 64(1) LTF). Given the circumstances, the Federal Supreme Court will, on an exceptional basis, waive the collection of court fees (Art. 66(1) *in fine* LTF). No costs are awarded, as the respondent was not invited to submit a response.

**For these reasons, the Federal Supreme Court rules as follows:**

**1.**
The appeal is dismissed to the extent that it is admissible.

**2.**
The request for legal aid is rejected.

**3.**
No court fees are imposed.

**4.**
This judgment is communicated to the parties' representatives and to the Cantonal Court of the State of Fribourg, First Administrative Court.

Lausanne, June 9, 2026

On behalf of the First Civil Law Court of the Swiss Federal Supreme Court

The President: Hurni

The Clerk: Hausammann

Bundesgericht
Tribunal fédéral
Tribunale federale
Tribunal federal

retour

Bundesgericht
Tribunal fédéral
Tribunale federale
Tribunal federal

**4A_554/2025**

**Arrêt du 9 juin 2026**

**Ire Cour de droit civil**

Composition
MM. et Mme les Juges fédéraux
Hurni, Président, Kiss et Denys.
Greffier : M. Hausammann.

Participants à la procédure
A.________,
représentée par Me Marie-Eve Guillod, avocate,
recourante,

*contre*

Hôpital B.________,
représenté par Me Philippe Leuba, avocat,
intimé.

Objet
Responsabilité médicale (lien de causalité),

recours contre l'arrêt du Tribunal cantonal de l'État de Fribourg, Ie Cour administrative, du 23 septembre 2025 (601 2024 49).

**Faits :**

**A.**

**A.a.** A.________, née en 1993, est tombée enceinte en 2015 et a mené une grossesse sans problème. Le xxx 2016, en raison du dépassement du terme de celle-ci, elle s'est rendue à l'Hôpital B.________ (ci-après:

B.________) pour provoquer l'accouchement. Elle a accouché par voie basse le yyy 2016, après qu'une péridurale lui ait été administrée à sa demande. Le zzz 2016, elle a quitté le B.________ et regagné son domicile.
Peu après l'accouchement, A.________ a présenté des lombalgies. Malgré un traitement conservateur, les douleurs se sont progressivement intensifiées et sont devenues aiguës dès le 21 avril 2016. Le 23 avril 2016, en fin d'après-midi, elle s'est rendue chez un ostéopathe qui a constaté de fortes douleurs dans la région lombaire, une faiblesse marquée des deux jambes et une impossibilité de bouger les orteils et se tenir debout, sans toutefois relever de troubles sensitifs.

**A.b.** À 18h29, le 23 avril 2016, A.________ a été admise au service des urgences du B.________.
L'examen clinique a mis en évidence une baisse de la force motrice dans les jambes, ainsi qu'une hypotonie sphinctérienne avec une hypoesthésie péri-anale. Une prise de sang et une radiographie de la colonne lombaire, effectuées le soir-même, n'ont rien révélé de particulier. Un scanner de la colonne lombaire, réalisé à 23h07, a montré une collection suspecte et amené le radiologue à préconiser la réalisation d'une IRM. L'évaluation laissait évoquer un diagnostic de lombocruralgies à prédominance gauche avec suspicion du syndrome de la queue de cheval partiel.
Dans la nuit du 23 au 24 avril 2016, vers 1h30, la patiente a été transférée au service de chirurgie orthopédique. Au matin du 24 avril 2016, une nouvelle évaluation neurologique a mis en évidence une aggravation de l'état clinique. Le neurologue a fait état d'un syndrome de la queue de cheval partiel et a proposé le transfert de A.________ à l'Hôpital C.________ pour une IRM. Cet examen a été effectué à 14h38 et a montré une accumulation de liquide épidural avec compression du tube dural et symptômes consécutifs de la queue de cheval. Une chirurgie de décompression a rapidement été réalisée.
Après cette intervention, la patiente a souffert de dysfonctionnements de la vessie et du sphincter anal. Elle a été hospitalisée à l'Hôpital C.________ jusqu'au 20 mai 2016, puis a poursuivi sa rééducation au B.________ jusqu'au 17 juin 2016. Jusqu'en novembre 2017, elle a encore suivi des séances de physiothérapie et d'ergothérapie.

**A.c.** Le 13 avril 2017, A.________ a déposé une demande d'indemnités à l'encontre du B.________, réclamant un montant total de 2'597'409 fr. à titre de dommage domestique, perte de gain et de rente, tort moral, dommage d'assistance et frais médicaux non couverts.
Dans le cadre de la procédure menée par le B.________, un rapport d'expertise a été rendu le 24 janvier 2022 par des spécialistes FMH en anesthésiologie, en gynécologie et obstétrique, ainsi qu'en chirurgie orthopédique et traumatologie de l'appareil locomoteur. En substance, les experts ont relevé que la prise en charge de la chirurgie spinale avait été trop longue, que les symptômes présentés par la patiente auraient dû faire suspecter une atteinte neurologique et qu'une évaluation urgente, incluant une IRM, aurait dû être réalisée. Ces manquements avaient constitué une violation du devoir de diligence et provoqué des atteintes neurologiques persistantes et définitives (paraparésie, para-hypoesthésie, atteinte sphinctérienne) qui ont été qualifiées de séquelles neurologiques sévères. Quant au lien de causalité entre ces atteintes et la violation du devoir de diligence, les experts ont relevé que plus la décompression était rapide après l'apparition d'un déficit neurologique, meilleures étaient les chances de récupération. Dans le cas concret, la littérature médicale ne permettait toutefois pas de déterminer dans quelle mesure le retard l'avait aggravé. Ils ont précisé que, même en cas de décompression chirurgicale optimale, environ 30 % des patients ne récupéraient pas totalement.
Dans le cadre de la procédure instruite par l'Office cantonal AI (ci-après: OAI), qui avait aussi émis des prétentions à l'égard du B.________, cette expertise a été soumise au Dr D.________, spécialiste FMH en chirurgie et traumatologie. Dans un rapport du 19 septembre 2023, ce dernier a indiqué qu'un lien de causalité existait entre les problèmes de santé et la violation des règles de l'art médical, avec une probabilité prépondérante.

**B.**
Par décision du 22 février 2024, le B.________ a rejeté la demande d'indemnisation de A.________.
Statuant par arrêt du 23 septembre 2025, la Ie Cour administrative du Tribunal cantonal fribourgeois a confirmé cette décision, au motif que le lien de causalité naturelle n'avait pas été établi au degré de la vraisemblance prépondérante.

**C.**
Agissant par la voie du recours en matière civile, A.________ demande principalement au Tribunal fédéral de réformer l'arrêt du 23 septembre 2025 en ce sens que le B.________ soit condamné à lui verser la somme de 1'623'838 fr., avec intérêts à 5 % dès le 1er juillet 2024. Subsidiairement, elle conclut à son annulation et au renvoi de la cause à l'instance précédente pour nouvelle décision dans le sens des considérants. La recourante sollicite encore l'assistance judiciaire totale, avec désignation de son avocate comme conseil d'office.
Il n'a pas été demandé de réponse.

**Considérant en droit :**

**1.**
L'arrêt attaqué a pour objet la responsabilité d'un hôpital public fondée sur le droit public cantonal en matière de responsabilité de l'État (cf. *infra* consid. 2.1). Il s'agit d'une décision prise en application de normes de droit public cantonal dans une matière connexe au droit civil au sens de l'art. 72 al. 2 let. b LTF (**ATF 139 III 252** consid. 1.5; **135 III 329** consid. 1.1; **133 III 462** consid. 2.1). Elle doit donc être attaquée devant le Tribunal fédéral par la voie du recours en matière civile lorsque la valeur litigieuse dépasse 30'000 fr. (**ATF 139 III 252** consid. 1.5; **135 III 329** consid. 1.1).
Interjeté dans le délai fixé par la loi (art. 100 al. 1 LTF) par la recourante, qui a succombé dans ses conclusions (art. 76 al. 1 LTF), et dirigé contre une décision finale (art. 90 LTF) rendue sur recours par le tribunal supérieur du canton de Fribourg (art. 75 LTF) dans une affaire dont la valeur litigieuse excède 30'000 fr. (art. 74 al. 1 let. b LTF), le recours en matière civile est en principe recevable.

**2.**

**2.1.** Selon la jurisprudence, les soins dispensés aux malades dans les hôpitaux publics ne se rattachent pas à l'exercice d'une industrie (cf. art. 61 al. 2 CO), mais relèvent de l'exécution d'une tâche publique; en vertu de la réserve facultative prévue à l'art. 61 al. 1 CO, les cantons sont donc libres de soumettre au droit public cantonal la responsabilité des médecins engagés dans un hôpital public pour le dommage ou le tort moral qu'ils causent dans l'exercice de leur charge (**ATF 139 III 252** consid. 1.3; **133 III 462** consid. 2.1; **122 III 101** consid. 2a/aa et bb; arrêt 4A_621/2024 du 9 juillet 2025 consid. 2.1).

**2.2.** Le canton de Fribourg a fait usage de cette réserve. L'art. 41 de la loi du 27 juin 2006 sur l'hôpital fribourgeois (LHFR/FR; RS/FR 822.0.1) prévoit expressément que la responsabilité de cet hôpital pour le préjudice que ses employés causent d'une manière illicite à autrui dans l'exercice de leurs fonctions est régie par la loi cantonale du 16 septembre 1986 sur la responsabilité civile des collectivités publiques et de leurs agents (LResp/FR; RS/FR 16.1). Selon l'art. 6 al. 1 LResp/FR, les collectivités publiques répondent du préjudice que leurs agents causent d'une manière illicite à autrui dans l'exercice de leurs fonctions. L'art. 7 al. 1 LResp/FR permet l'octroi d'une réparation morale en cas de lésions corporelles ou de mort d'homme. Le droit public fribourgeois a ainsi institué une responsabilité causale pour les actes des médecins dans les hôpitaux publics du canton. Cette responsabilité suppose la réunion de trois conditions: un acte illicite, un préjudice (dommage ou tort moral) et un rapport de causalité (naturelle et adéquate) entre l'acte illicite et le préjudice (**ATF 139 III 252** consid. 1.4; **133 III 462** consid. 4.1; arrêt 4A_621/2024 précité consid. 2.2).
Pour le surplus, les dispositions du Code des obligations s'appliquent, en particulier à la détermination du préjudice et à la fixation de l'indemnité (art. 9 LResp/FR), lesquelles sont donc applicables à titre de droit cantonal supplétif.

**3.**

**3.1.** Le Tribunal fédéral statue sur la base des faits établis par l'autorité précédente (art. 105 al. 1 LTF). Il ne peut s'en écarter que si ces faits ont été établis de façon manifestement inexacte - ce qui correspond à la notion d'arbitraire au sens de l'art. 9 Cst. (**ATF 140 III 115** consid. 2; **137 I 58** consid. 4.1.2; **137 II 353** consid. 5.1) - ou en violation du droit au sens de l'art. 95 LTF (art. 105 al. 2 LTF), et si la correction du vice est susceptible d'influer sur le sort de la cause (art. 97 al. 1 LTF).
La critique de l'état de fait retenu est soumise au principe strict de l'allégation énoncé par l'art. 106 al. 2 LTF (**ATF 140 III 264** consid. 2.3 et les références citées). La partie qui entend attaquer les faits constatés par l'autorité précédente doit expliquer clairement et de manière circonstanciée en quoi ces conditions seraient réalisées (**ATF 140 III 16** consid. 1.3.1 et les références citées). Si elle souhaite obtenir un complètement de l'état de fait, elle doit aussi démontrer, par des renvois précis aux pièces du dossier, qu'elle a présenté aux autorités précédentes, en conformité avec les règles de la procédure, les faits juridiquement pertinents à cet égard et les moyens de preuve adéquats (**ATF 140 III 86** consid. 2). Si la critique ne satisfait pas à ces exigences, les allégations relatives à un état de fait qui s'écarterait de celui de la décision attaquée ne pourront pas être prises en considération (**ATF 140 III 16** consid. 1.3.1).
En matière d'appréciation des preuves, il y a arbitraire lorsque l'autorité ne prend pas en compte, sans aucune raison sérieuse, un élément de preuve propre à modifier la décision, lorsqu'elle se trompe manifestement sur son sens et sa portée, ou encore lorsque, en se fondant sur les éléments recueillis, elle en tire des constatations insoutenables. L'arbitraire ne résulte pas du seul fait qu'une autre solution serait envisageable, voire préférable (**ATF 136 III 552** consid. 4.2).

**3.2.** En matière d'interprétation et d'application du droit public cantonal, y compris du droit fédéral appliqué à titre de droit cantonal supplétif, le Tribunal fédéral n'examine que si la mauvaise application du droit cantonal constitue une violation du droit fédéral, parce qu'elle est arbitraire au sens de l'art. 9 Cst. ou parce qu'elle est contraire à d'autres droits constitutionnels (art. 106 al. 2 LTF; arrêt 4A_621/2024 précité consid. 3.2).

**4.**

La recourante reproche à la cour cantonale d'avoir nié l'existence d'un lien de causalité pour retenir la responsabilité du B.________. Elle se plaint à cet égard d'arbitraire dans l'appréciation des preuves et l'établissement des faits, en particulier quant au sens et à la portée donnés aux rapports d'expertises des 1er mars ( *recte* 24 janvier) 2022 et 19 septembre 2023.

**4.1.** La causalité naturelle entre deux événements est réalisée lorsque, sans le premier, le second ne se serait pas produit (**ATF 143 III 242** consid. 3.7; **133 III 462** consid. 4.4.2). Le comportement ne doit pas nécessairement être la cause unique ou immédiate du résultat (**ATF 143 III 242** consid. 3.7; **125 IV 195** consid. 2b). Compte tenu des difficultés de preuve habituelles, la pratique constante considère que le degré de preuve de la vraisemblance prépondérante suffit pour établir la causalité naturelle (**ATF 107 II 269** consid. 1b; arrêts 4A_351/2025 du 9 décembre 2025 consid. 10.1; 4A_605/2019 du 27 mai 2020, consid. 5.5.1; 4A_262/2016 du 10 octobre 2016, consid. 4.4.2.1). La vraisemblance prépondérante suppose que, d'un point de vue objectif, des motifs importants plaident pour l'exactitude d'une allégation, sans que d'autres possibilités ne revêtent une importance significative ou n'entrent raisonnablement en considération (**ATF 133 III 81** consid. 4.2.2; **132 III 715** consid. 3.1; arrêts 4A_401/2023 du 15 mai 2024 consid. 6.1.1; 4A_82/2023 du 8 août 2023 consid. 4.3.2). Le Tribunal fédéral a précisé que la jurisprudence n'avait pas établi de pourcentages, mais que selon la doctrine, une vraisemblance de 51 % ne suffisait pas, un degré de vraisemblance nettement plus élevé devant être appliqué: un degré de 75 % était cité (arrêts 4A_621/2024 du 9 juillet 2025 consid. 6.1; 4A_401/2023 du 15 mai 2024 consid. 6.4; 4A_424/2020 du 19 janvier 2021 consid. 4.1 non publié in **ATF 147 III 73** et les références).
Lorsque, comme en l'espèce, le manquement reproché s'analyse comme une omission, l'examen du lien de causalité revient à se demander si le dommage serait également survenu si l'acte omis avait été accompli (causalité hypothétique). Une preuve stricte ne peut être exigée en la matière. Il suffit que le cours hypothétique des événements soit établi avec une vraisemblance prépondérante *(überwiegende Wahrscheinlichkeit* "; **ATF 132 III 715** consid. 3.2; arrêts 4A_118/2025 du 23 mars 2026 consid. 4.2; 4A_351/2025 précité consid. 10.1 avec les références; 4A_620/2024 du 4 novembre 2025 consid. 8.2.1.1). En règle générale, lorsque le lien de causalité hypothétique entre l'omission et le dommage est établi, il ne se justifie pas de soumettre cette constatation à un nouvel examen sur la nature adéquate de la causalité (**ATF 132 III 715** consid. 2.3; **115 II 440** consid. 5a). Ainsi, lorsqu'il s'agit de rechercher l'existence d'un lien de causalité entre une ou des omissions et un dommage, il convient de s'interroger sur le cours hypothétique des événements. Dans ce cas de figure, le Tribunal fédéral, saisi d'un recours en matière civile, est lié, selon l'art. 105 al. 1 LTF, par les constatations cantonales concernant la causalité naturelle, dès lors qu'elles ne reposent pas exclusivement sur l'expérience de la vie, mais sur des faits ressortant de l'appréciation des preuves (**ATF 132 III 305** consid. 3.5 et les références; arrêts 4A_401/2023 précité consid. 6.1.1; 4A_133/2021 du 26 octobre 2021 consid. 9.1.3).

**4.2.** Selon la jurisprudence rendue en matière administrative, notamment dans le domaine médical, le principe de la libre appréciation des preuves est applicable: l'administration ou le juge apprécie librement les moyens de preuve, sans être lié par des règles de preuve formelles, en procédant à une appréciation complète et rigoureuse des preuves. Dès lors, le juge doit examiner de manière objective tous les moyens de preuve, qu'elle qu'en soit la provenance, puis décider si les titres à disposition permettent de porter un jugement valable sur le droit litigieux. Notamment si les rapports médicaux sont contradictoires, il doit apprécier l'ensemble des preuves et indiquer les raisons pour lesquelles il se fonde sur une opinion médicale et non pas sur une autre (**ATF 143 V 124** consid. 2.2.2; **134 V 231** consid. 5.1; **125 V 351** consid. 3; arrêt 4A_478/2022 du 5 mars 2024 consid. 5.1.3).
Lorsque la juridiction cantonale se rallie au résultat d'une expertise, le Tribunal fédéral n'admet le grief d'appréciation arbitraire des preuves que si l'expert n'a pas répondu aux questions, si ses conclusions sont contradictoires ou si, de quelque autre manière, l'expertise est entachée de défauts à ce point évidents et reconnaissables, même en l'absence de connaissances ad hoc, qu'il n'était tout simplement pas possible de les ignorer. L'autorité cantonale n'est pas tenue de contrôler à l'aide d'ouvrages spécialisés l'exactitude scientifique des avis de l'expert. Il n'appartient pas non plus au Tribunal fédéral de vérifier que toutes les affirmations de l'expert sont exemptes d'arbitraire; sa tâche se limite à examiner si l'autorité cantonale pouvait, sans arbitraire, faire siennes les conclusions de l'expertise (**ATF 133 II 384** consid. 4.2.3; **132 II 257** consid. 4.4.1; arrêts 4A_82/2023 du 8 août 2023 consid. 4.2; 4A_558/2020 du 18 mai 2021 consid. 4.1).

**4.3.** En l'espèce, la cour cantonale a admis qu'un acte illicite avait été commis par le B.________. La prise en charge de la recourante avait été excessivement longue. Malgré un tableau clinique qui était évocateur

d'un syndrome de la queue de cheval et un scanner qui avait révélé une collection suspecte, imposant une IRM immédiate, celle-ci avait été différée de plus de vingt heures. Une violation du devoir de diligence était dès lors établie, dans la mesure où les médecins du B.________ n'avaient pas discerné une maladie grave malgré les symptômes typiques. Les juges cantonaux ont également admis l'existence d'un dommage, la recourante souffrant d'atteintes neurologiques sévères (paraparésie, para-hypoesthésie entraînant des troubles de la marche, atteinte sphinctérienne importante et invalidante) ayant conduit à un degré d'invalidité total reconnu par l'OAI.
En revanche, reconnaissant une pleine valeur probante au rapport d'expertise du 24 janvier 2022, la cour cantonale a considéré qu'il ne permettait pas d'établir un lien de causalité, au degré de la vraisemblance prépondérante. Pour les juges cantonaux, les experts s'étaient limités à renvoyer aux statistiques issues de la littérature médicale, sans pouvoir se prononcer ou chiffrer les chances de récupération de la recourante dans le cas concret. En outre, dans la mesure où la recourante n'avait demandé à être admise aux urgences que dans la soirée du 23 avril 2016, alors qu'elle souffrait déjà de douleurs aiguës depuis le 21 avril 2016, il pouvait raisonnablement en être déduit que ses chances de récupération auraient été significativement inférieures au taux théorique de 70 %, si la prise en charge idoine avait été immédiate (à savoir une IRM suivie d'une chirurgie de décompression). La cour cantonale a ensuite estimé que l'appréciation médicale produite dans le cadre de la procédure de l'OAI n'était pas pertinente pour trancher la causalité dans un litige de responsabilité médicale, ce d'autant plus que le rapport du 19 septembre 2023 se fondait également sur des statistiques générales.

**4.4.**

**4.4.1.** La cour cantonale a justement considéré que l'existence du lien de causalité ne devait pas être analysée selon un calcul arithmétique découlant de statistiques, mais au regard de l'ensemble des circonstances du cas particulier (cf. arrêt 4A_401/2023 du 15 mai 2024 consid. 6.4). Or sur la base des éléments cités dans l'arrêt querellé, les juges cantonaux n'ont pas versé dans l'arbitraire en niant l'existence d'un lien de causalité entre la violation des règles de l'art et les lésions subies par la recourante.
Contrairement à ce que soutient de manière appellatoire la recourante, le taux de 70 % cité dans l'expertise du 24 janvier 2022 (respectivement de 30 % des patients qui ne récupèrent pas tel que souhaité) correspond bien à une statistique générale et aucunement à sa situation concrète. Dans le cas concret, les experts n'ont effectivement pas été en mesure déterminer avec quelle probabilité une prise en charge immédiate au B.________ aurait permis de réduire le dommage, ni dans quelle mesure le retard de prise en charge a contribué à son aggravation.
Certes l'expertise du 24 janvier 2022 indique que les chances de succès étaient d'autant plus élevées que la décompression chirurgicale intervenait rapidement après l'apparition d'un déficit neurologique. Cela permet d'en déduire que le retard de 20 heures pris par le B.________ dans la prise en charge de la recourante a augmenté le risque de complications. La cour cantonale n'a pas ignoré ce point, mais a toutefois constaté que la recourante ne s'était elle-même pas rendue immédiatement aux urgences et qu'elle ne s'y était annoncée que 48 heures après l'apparition des symptômes, alors qu'une prise en charge rapide était décisive en cas d'abcès épidural. Compte tenu de ce raisonnement, qui n'est du reste pas remis en cause dans le recours, il n'était pas insoutenable de considérer que les risques de complications auraient été significativement supérieurs à 30 %, même si la prise en charge par le B.________ avait été immédiate. Par conséquent, les juges cantonaux pouvaient aussi considérer que le degré de vraisemblance prépondérante, soit un taux nettement plus élevé que 51 %, n'était pas non plus atteint pour retenir un lien de causalité hypothétique entre l'acte illicite commis par l'intimé et les séquelles de la recourante. Dans la mesure où cette appréciation des preuves a convaincu la cour cantonale qu'un lien de causalité n'était en l'espèce pas établi, le grief tiré de la violation de l'art. 8 CC, selon lequel la charge de la preuve de la causalité reviendrait à l'intimé, est au demeurant devenu sans objet (cf. **ATF 141 III 241** consid. 3.2; arrêt 4A_620/2024 du 4 novembre 2025 consid. 8.2.1.2).

**4.4.2.** La recourante critique ensuite les observations du 4 juillet 2024 du B.________ effectuées dans la procédure cantonale, estimant qu'il aurait fait valoir une objection fondée sur un comportement de substitution licite (cf. sur cette notion, cf. **ATF 122 III 229** consid. 5a/aa), selon laquelle le résultat aurait été identique même si la prise en charge avait été conforme aux règles de l'art médical. L'appréciation de la cour cantonale ne comprend toutefois rien de tel, rendant cette critique, qui semble être partiellement un copié-collé d'une précédente écriture de la recourante, d'emblée irrecevable.

**4.4.3.** La recourante reproche encore à la cour cantonale de s'être écartée des conclusions du rapport du 19 septembre 2023 du Dr D.________ qui retenait l'existence d'un lien de causalité prépondérant entre l'acte illicite et le dommage subi.
L'instance précédente a expliqué les raisons pour lesquelles elle s'est écartée de l'analyse effectuée par le Dr D.________. Se fondant sur la même littérature médicale que les experts, ce dernier a en effet conclu, sans autres développements, à l'existence d'un lien de causalité sur la seule base des statistiques

générales. Les juges cantonaux pouvaient en déduire, de manière soutenable, que le médecin mandaté par l'OAI n'avait pas livré son analyse à l'aune des circonstances du cas d'espèce et qu'il n'avait en particulier pas tenu compte du temps qui s'était déjà écoulé entre l'apparition des symptômes et l'entrée aux urgences de la recourante. Cette appréciation des preuves résiste à la critique de l'arbitraire. Le fait que le Dr D.________ soit un spécialiste en chirurgie orthopédique et en traumatologie de l'appareil locomoteur n'y change rien, seul le contenu du rapport étant décisif pour apprécier sa valeur probante (cf. **ATF 134 V 231** consid. 5.1; **125 V 351** consid. 3a; arrêt 4A_163/2024 du 21 mars 2025 consid. 4.3.2).
La cour cantonale pouvait par ailleurs tenir compte du fait que la question de la causalité ne se posait en principe pas dans le cadre de l'assurance-invalidité qui n'est pas une assurance causale à l'instar de l'assurance-accidents. En l'occurrence, le Dr D.________ s'est prononcé sur cette question, dans la mesure où l'OAI avait émis des prétentions récursoires à l'égard du B.________. La recourante ne prétend toutefois pas que l'OAI aurait recouru contre la décision du B.________ rejetant la demande d'indemnisation. Le rapport du 19 septembre 2023 ne critique du reste pas les conclusions des experts, y compris sur la question de la causalité naturelle. Ainsi, l'instance précédente pouvait s'écarter de la réponse laconique, théorique et dépourvue de toute appréciation circonstanciée, qui a été apportée par le Dr D.________ sur la question de la causalité.

**5.**
Au vu de ce qui précède, le recours se révèle mal fondé et doit être rejeté dans la mesure de sa recevabilité.
Comme le recours était d'emblée dénué de chances de succès, la demande d'assistance judiciaire de la recourante doit être écartée (art. 64 al. 1 LTF). Étant donné les circonstances, le Tribunal fédéral renoncera, à titre exceptionnel, à la perception de frais judiciaires (art. 66 al. 1 *in fine* LTF). Il n'est pas alloué de dépens, l'intimé n'ayant pas été invité à se déterminer.

**Par ces motifs, le Tribunal fédéral prononce :**

**1.**
Le recours est rejeté dans la mesure où il est recevable.

**2.**
La demande d'assistance judiciaire est rejetée.

**3.**
Il est statué sans frais judiciaires.

**4.**
Le présent arrêt est communiqué aux mandataires des parties et au Tribunal cantonal de l'État de Fribourg, le Cour administrative.

Lausanne, le 9 juin 2026

Au nom de la Ire Cour de droit civil
du Tribunal fédéral suisse

Le Président : Hurni

Le Greffier : Hausammann